IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **STANLEY TYRONE JARRETT**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:07-CV-911-MHT-TFM** |
| | ) | |
| **CITY OF MONTGOMERY**, **WILLIE** | ) | |
| **COLLINS**, **MARY BRANTLEY**, **MARIE** | ) | |
| **JENKINS**, and **HELEN TURNER**, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ANSWER AND SPECIAL REPORT

COME NOW Defendants City of Montgomery, Willie Collins, Mary Brantley,

Marie Jenkins, and Helen Turner, and respectfully submit the following Answer and

Special Report:

### I. PLAINTIFF'S CLAIMS

1.    In his Complaint (Doc. 1), Plaintiff states his claims as follows:

**GROUND ONE**: Cruel and Unusual Punishment.
I've wrote Warden Collins also Asst. Warden Brantley
about this. I'm assigned to Cellblock 3-B which is very
unsanitary. Sheets and blankets hasn't been changed or
washed in months. Virus and infection is spreading around
from inmate to inmate. Inmates are not able to shower daily
because towels are not passed out daily. Jailers are holding
Kangaroo Court, on inforcing the rules. I wasn't given a
handbook, rule book or orientation. Jail don't even follow
the rules of the handbook.

**GROUND TWO**: Negligence.
Warden Collins also Asst. Warden Brantley about these
grounds. After an inmate jumped off his top bunk bed onto
my back when I was laying on the floor of a over crowded
cell my request to see the nurse and/or doctor was ignored.
Knowing about the unsanitary condition such as [illegible]

the shower is normally out of order. Inmates aren't given shower towels but approximately 2 days a week. Sheets and Blanket haven't been changed or washed for the stay of [illegible] in 3-B cell [illegible].

**GROUND THREE**: Discrimination.
After getting shots to work in the kitchen and getting the O.K. from the nurse Kitchen Supervisor Turner dismissed my attempt because I'm Stanley Jarrett. Montgomery City Jail also house Federal Inmates. Only federal inmates have access to legal publications regarding his or her cases, or crimes. After request for any legal publications or access to publications regarding Municipal Inmates, or any information on Inmate rights, Municipal Court Cases, or on Appeals. The only thing I received was Federal Sentencing Guidelines Manual 2006. I have been denied access to rule books for municipal inmates, but I get threaten daily if I break one. Because of my knowledge of the law I've not been able to work or do anything outside the cell. Today 10-2-07 Officer Jenkins told me the reason I can't go to work in the kitchen is because I've come back with that shit. Officer Jenkins hand picked people and volunteers but because of this action of complaint, and myself helping others with their complaints I've been blackballed from jobs through-out the Montgomery City Jail.

**GROUND FOUR**: Promoting Hazardous Conditions.
In Cell Block 3-B inmate Sam, getting off his bunk jumped off his top bunk, jumped off his top bunk bed intending to land on the floor but came down on inmate's Stanley Jarrett's back who was assigned to the floor. Inmate Jarrett asked to see the Nurse or Doctor immediately. It took approximately 2 weeks for a response to my request. The only help Jarrett has receive from the doctor is Tylenol. Jarrett often loses the sense feel in his hand and feet, also stays in contentious pain. Now Jarrett has gained a bed but on each side of his bed an inmate sleeps on the floor. There is no way to get off his bed without stepping on a inmate or his mattress. This Jail is over crowded with mostly Traffic Violations, which does not hold a threat of danger to the community. Sheets or blankets are not being washed or changed out at all. Towels are, and have been past out then taken up 1 sometime 2 days a week. Therefore inmates hygiene is poorly kept. Virus, Diseases, and other illnesses are, and have been spread around the cell from inmate to inmate.

2

**GROUND FIVE**: Malicious Persecution.

Because of me being out spoken about my rights concerning Inmate rights, Inmate handbooks, cleanliness of myself and others in this Montgomery City Jail, I've been Black Balled from jobs around City Jail. I also have a Trail date for 16th day of Nov. 07, but have been unable to view or get a response to any request or any motions to the Municipal Court. I asked for publication concerning Municipal Cases pertaining to my cases, or Inmates Rights, but was given Federal Sentencing Guidelines Manual Vol. 1 Which does not pertaining to nothing I'm going through.

**REQUESTED RELIEF**:

I want sheets and blankets washed weekly. Rule Books be available to ever inmate and for officer to abide by it also. I would like to be compensated for mental stress, pain & suffering. Also put legal publications reguarding Inmate right for Municipal Inmates, information on Municipal Court Cases, and Appeals. Want access to knowage about Municipal Court, and cases. Please investigate Medical Treatment.

## II. ANSWER

2.    <u>GROUND ONE: Cruel and Unusual Punishment</u>. Defendants admit that Stanley Jarrett is assigned to Cellblock 3-B and that Jarrett was not given his own copy of the Montgomery Municipal Jail's Standard Operating Procedures Manual. Defendants deny the remaining allegations stated in Ground One and demand strict proof thereof.

3.    <u>GROUND TWO: Negligence</u>. Defendants deny the allegations stated in Ground Two and demand strict proof thereof.

4.    <u>GROUND THREE: Discrimination</u>. Defendants admit that Jarrett was not allowed to work in the kitchen. Defendants also admit that the Montgomery Municipal Jail also houses Federal inmates and that federal inmates have access to certain legal publications. Defendants deny the remaining allegations stated in Ground Three and demand strict proof thereof.

5.      GROUND FOUR: Promoting Hazardous Conditions. Defendants deny the allegations stated in Ground Four and demand strict proof thereof.

6.      GROUND FIVE: Malicious Prosecution. Defendants admit that Jarrett had a trial date on November 16, 2007. Defendants deny the remaining allegations stated in Ground Four and demand strict proof thereof.

### III. AFFIRMATIVE DEFENSES

7.      Defendants assert the following affirmative defenses:

8.      Defendants plead insufficiency of service of process.

9.      Defendants generally deny all material allegations of the Complaint and deny that Plaintiff is entitled to any relief.

10.      Defendants aver that Plaintiff's Complaint fails to state a cause of action against Defendants upon which relief can be granted.

11.      Defendants plead the general issue and deny any allegations not specifically denied.

12.      Defendants plead qualified and discretionary function immunity.

13.      Defendants assert tort immunity pursuant to Ala. Code § 6-5-338 (1975).

14.      Defendants assert state actor immunity pursuant to Article 1 § 14, Constitution of Alabama (1901).

15.      To the extent applicable, Defendants plead estoppel, waiver and laches.

16.      Defendants plead that the claims made by Plaintiff are completely without merit and should be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

17.      Defendants reserve the right to plead additional defenses as they become known, as permitted by the Court.

**IV. FACTS**

18.    <u>Procedural Background</u>. Plaintiff Stanley Jarrett has an extensive criminal history and has been in and out of the Montgomery Municipal Jail since the early 1990s. See Affidavit of Willie Collins attached hereto as Exhibit R.

19.    On September 13, 2007, Plaintiff Stanley Jarrett was arraigned on charges of Harassment (2007CRA007180A) and Receiving Stolen Property (2007CRA007180B), for stealing meat from a grocery store and then fighting with store security personnel in an attempt to flee the scene. See Case Action Summaries attached hereto as Exhibit A. Represented by Public Defender Terry Luck, Jarrett pleaded not guilty to both charges and the matters were set for Trial on November 16, 2007.

20.    On November 16, 2007, the Court also had before it Plaintiff's unpaid fines from prior adjudications, totaling $3,790, not including an additional $825 in fines due by January 1, 2008. The Court commuted the fines to jail time, crediting Jarrett the standard $25 per day served. See Court Disposition Sheet (9/13/07) attached hereto as Exhibit B.

21.    On November 16, 2007, the Public Defender worked out a deal and Plaintiff changed his plea to guilty on the Receiving Stolen Property charge and the Harassment charge was nol-prossed. Exhibit A, see also Court Disposition Sheet (11/16/07) attached hereto as Exhibit C. Plaintiff is still serving time to satisfy his prior sentences, and is expected to be released on February 7, 2008. Exhibits B and C.

22.    <u>Medical Care</u>. On September 25, 2007, Jarrett was seen by Dr. Marcial J. Mendez, M.D., the Municipal Jail Doctor. See Nurses Notes attached hereto as Exhibit D. Dr. Mendez notes that Jarrett had multiple complaints: (a) that he has an ulcer and wants

a bland diet; (b) that he has asthma and wants an inhaler; (c) that "somebody fell on his back the other day;" and (d) that he has a cold. See Notes by Dr. Mendez (9/25/07) attached hereto as Exhibit E. Dr. Mendez goes on to report that Jarrett's back "has not palpable tenderness" and that there is no bruising. Exhibit D. Dr. Mendez prescribed a bland diet, Nexium for the ulcer, albuterol for the asthma, Tylenol for the back pain and Medent DM for the cold. Exhibit E. Dr. Mendez wrote out prescription orders for these medications the same day as Jarrett's appointment. See Physicians' Order attached hereto as Exhibit F.

23.     On October 7, 2007, Jarrett submitted a Medical Request Form, asking for medical treatment for his back and hernia pain, as well as A&D ointment for his face. See Medical Request Form (10/7/07) attached hereto as Exhibit G. Jail nurses triaged Jarrett's request and scheduled him to see Dr. Mendez on October 15, 2007. Exhibit G. Two days later, on October 9, 2007, Jarrett submitted an Inmate Request Form, requesting medication for his back pain and cold, and to see a back doctor. See Inmate Request Form (10/9/07) attached hereto as Exhibit H. Jail nurses noted that Jarrett was already scheduled to see a doctor for the back pain and had just completed a prescription for his cold. Exhibit H.

24.     On October 16, 2007, Jarrett was seen by Dr. Mendez. See Note by Dr. Mendez (10/16/07) attached hereto as Exhibit I. Dr. Mendez notes that Jarrett was complaining of pain to his lower back and requested a clipper shaver because he cannot use shaving cream. Exhibit I. Dr. Mendez conducted an examination of Jarrett's back and found Jarrett was experiencing some tenderness. Exhibit I. Dr. Mendez prescribed stronger pain medications and ordered spine x-rays. Exhibit I. Dr. Mendez also approved

Jarrett's request for a clipper shaver. Exhibit I; see also Convalescent and Change in Work Classification Status (10/16/07) attached hereto as Exhibit J. On October 16, 2007, Dr. Mendez wrote out prescription orders for Jarrett to have Flexeril, a muscle relaxant, and Ultram, narcotic-like pain reliever. Exhibit F.

25.     On October 17, 2007, Jarrett's spine was x-rayed at Southern Radiology Services, LLC. See Southern Radiology Services, LLC, Service Request Form attached hereto as Exhibit K. On October 25, 2007, Jarrett was seen by Dr. Mendez for a follow up on his x-ray results. Exhibit D. See also Southern Radiology Services, LLC, X-Ray Report (10/17/07) attached hereto as Exhibit L, and Note by Dr. Mendez (10/25/07) attached hereto as Exhibit M. Dr. Mendez explained the x-ray results, including that there was no evidence of acute fracture. Exhibit M. Because Jarrett was still complaining of back pain, Dr. Mendez ordered an MRI of Jarrett's spine and refilled his pain medication. Exhibit M. On October 26, 2007, Jail nurses scheduled Jarrett for an MRI of his spine at Jackson Hospital on October 30, 2007.

26.     On November 7, 2007, Jarrett was seen by Dr. Mendez for a follow up on his back issues. Exhibit D. On November 7, 2007, Dr. Mendez wrote out prescription orders for Jarrett to have Darvocet, a pain medication, and to continue on Flexeril, a muscle relaxant. Exhibit F. On November 7, 2007, Jarrett was also given an extra mattress due to his back injury. See Convalescent and Change in Work Classification Status (11/7/07) attached hereto as Exhibit N. On November 8, 2007, Jail nurses rescheduled Jarrett's MRI to November 13, 2007. Exhibit D. On November 13, 2007, Jarrett was transported to Jackson Hospital for an MRI of his spine. Exhibit D.

27.     On November 17, 2007, Jarrett submitted a Medical Request Form, asking

to see the doctor about his MRI results. See Medical Request Form (11/17/07) attached hereto as Exhibit O. On November 20, 2007, Dr. Mendez met with Jarrett to discuss his MRI results. Exhibit D, see also MRI Report (11/13/07) attached hereto as Exhibit P. On November 20, 2007, Dr. Mendez wrote out prescription orders for Jarrett to have Motrin, a pain medication, and Benadryl, an antihistamine, and to continue on Flexeril, a muscle relaxant. Exhibit F.

     28.    <u>Jail Operating Procedures and Living Conditions</u>. All employees of the Montgomery Municipal Jail must follow the Standard Operating Procedures Manual, in addition to the Rules and Regulations of the Montgomery Police Department. See Affidavit of Mary Brantley attached hereto as Exhibit S, and Montgomery Municipal Jail Standard Operating Procedures Manual[1] attached hereto as Exhibit Q. The Standard Operating Procedures Manual is over 100 pages long. Exhibits Q and S. The Montgomery Municipal Jail houses thousands of municipal inmates each year, and does not have adequate resources to give each inmate his own copy of the Standard Operating Procedures Manual, however, a copy is provided in the cell blocks. Exhibit S; and see Affidavit of Willie Collins attached hereto as Exhibit R.

     29.    The Jail will, however, make a copy of the manual for any inmate who requests one. Exhibit R. The Jail adheres to its own rules about due process, to include disciplinary hearings for inmate misconduct. Exhibits Q and R. The Jail is required to provide legal reference materials to the federal inmates, but does not maintain a legal library for municipal inmates, none of whom are charged with felonies and most of whom are incarcerated for a very brief time. Exhibits R and S.

---

[1] For safety reasons, Section IX of the Standard Operating Procedures Manual is restricted. Because it is not relevant to Plaintiff's claims, this section on Emergency Plans is not included in Exhibit Q.

30.     The sheets and blankets are changed weekly, and inmates are given fresh towels at least three times per week, as required by Jail policy and procedures. Exhibits R and S. Although inmates do not receive a new towel every day, inmates keep their towels until they are issued fresh ones so they always have a towel. Exhibit S. Hygiene packets with soap and tissue are issued every other night. Exhibit S. Further, there are showers in Jarrett's cellblock, 3-B, and nothing prevents him from showering at any time inmates are allowed to be out of their beds. Exhibits R and S. The shower in 3-B has not been out of order, as Jarrett claims. Exhibit S.

31.     Inmates are required to take at least two showers per week, and encouraged to shower daily. Exhibit S. Inmates are also required to stay reasonably close shaven at all times. Exhibit S. Clothing is exchanged for clean clothing at least once per week, and more often if necessary. Exhibit S.

32.     Inmate living quarters are cleaned regularly. Exhibit S. Toilets and shower stalls are cleaned daily with hot, soapy water and scouring powder. Exhibit S. The top of every mattress is cleared off daily and wiped with a clean dust cloth. Exhibit S. All beds are washed weekly with hot soapy water, by removing and setting the mattresses aside. Exhibit S. Every inmate is issued a mattress, and additional mattresses may be authorized for medical reasons. Exhibit S. Blankets and sheets are changed out at least once a week. Exhibit S.

33.     The common areas in the jail are also cleaned regularly, usually by inmate details. Exhibit S. All floors are swept and mopped with hot, soapy water at least once daily, and more often if necessary. Exhibit S. Trash containers are emptied as often as necessary, and are cleaned with hot, soapy water at least once daily and more often if

necessary. Exhibit S. All bars are wiped down and cleaned with hot, soapy water at least once a week. Exhibit S. Walls are washed monthly, and wooden surfaces like doors are cleaned weekly. Exhibit S. Mops, scrub brushes, and mop buckets are thoroughly washed and rinsed after each use. Exhibit S.

34.     There is no indication that diseases are spreading among the inmates any more than in any environment where a group of people live in close proximity to one another, and there are no signs of any epidemic. Exhibits R and S. Many of the inmates are sick when they come in. Exhibit R. Many are referred to local hospitals, others are treated by Jail nurses or treated by the Jail doctor, who works at the Jail at least 2 days each week and is on call at all times. Exhibit R. Any inmate who wants to see a doctor submits a written request. Exhibit R. Jail nurses triage the requests and prioritize them by severity. Exhibits R and S. Then the doctor sees inmates in the order prioritized. Exhibit R. The Jail does not ignore inmate requests for medical care. Exhibit S. Jarrett was seen by Dr. Mendez and treated for back pain on September 25, 2007, which was only 12 days after he was placed in the Jail. Exhibit S.

35.     There are a limited number of jobs for inmates to work – in the kitchen and on various details, such as cleaning the jail hallway floors or cutting grass. Exhibits R and S; see also Affidavit of Marie Jenkins attached hereto as Exhibit T. These jobs are unpaid, but provide the inmate an opportunity to get out of the cell for a time. Exhibit R. No inmate is entitled to work in these jobs and the Warden, along with his staff, have discretionary authority to decide which inmates may work these jobs. Exhibits R, S and T. There are more volunteers than positions, so not every volunteer gets to work outside his or her cell. Exhibit S.

36.     Kitchen Supervisor Helen Turner is the final decision maker regarding which inmates will work for her in the kitchen, subject to the Montgomery Municipal Jail Standard Operating Procedures. Exhibit S; and Affidavit of Helen M. Turner attached hereto as Exhibit U. Our Standard Operating Procedures prohibit any sick inmate from working in the kitchen. Exhibits Q and S. Ms. Turner did receive a note from Stanley Jarrett, saying that he wanted to work in the kitchen, but Jarrett was listed on the medical list as someone who needs a bland diet. Exhibit U. Jarrett was not given a job in the kitchen. Exhibit T and U. Ms. Turner does not allow people on the sick list to work in the kitchen because their medical problems could cause them to be a danger to themselves or others. Exhibit U. For instance, a sick person could pass along infections through the food or be taking medications that make it dangerous for them to work in the kitchen, or they might have access to, and eat, food they are not supposed to have. Exhibit U.

37.     Even aside from the sick list, there are only a limited number of positions for inmates to work in the kitchen, so not everyone who applies can be given a kitchen job. Exhibit U. Ms. Turner is the only person with authority to decide who works in her kitchen, and she makes every effort to be fair when she exercises her discretionary authority in matching inmates with jobs. Exhibit U. The medical staff cannot authorize an inmate to work in the kitchen. Exhibit U. Jarrett claims Officer Jenkins told him the reason he was not given the kitchen job is because he had "come back with that shit." Complaint, Exhibit T. Officer Jenkins did not say that. Exhibit T.

38.     For safety reasons, the Jail screens all candidates for detail jobs and do not allow, for instance, an inmate with domestic violence or weapons charges work on outside details. Exhibit R. Jarrett's pending harassment charge and medical history would

have made him a risk and may have precluded him from being assigned to a work detail. Exhibit R. Jarrett's requests to work details were not denied because he was assisting other inmates with their legal pleadings, as he claims. Exhibit R. A number of factors are considered in assigning inmates to work details, to include personality, medical issues, safety and whether the crew is likely to come in contact with the public. Exhibit T. It is in the officer's discretion to choose the people he or she thinks will work well together and do a good job on the task at hand. Exhibit T. Stanley Jarrett has not been "blackballed" from working details. Exhibit T.

39.     Regular capacity is 272 inmates, and the Jail has been housing approximately 370 at any given time for several months now, due to recent the crack down on crime. Exhibit R. There are only 272 beds in the Jail, so a number of inmates must sleep on mattresses set on the floor, but every inmate has a mattress with sheets and blankets. Exhibits R and S. This is the best that can be done with the resources and space the Jail has for the number of inmates it houses. Exhibits R and S. It is true that many municipal inmates are incarcerated for not paying their traffic fines, but the Jail must comply with the orders of Municipal Court and the laws that govern municipal inmates. Exhibit S. The Jail does not decide who is incarcerated and who can be released and when. Exhibit S.

### V. MEMORANDUM OF POINTS AND AUTHORITIES

40.     Defendants submit the following memorandum of points and authorities to further support their position:

### A. CRUEL AND UNUSUAL PUNISHMENT

41.     Plaintiff's Count One alleges cruel and unusual punishment under the

Eighth Amendment for denial of medical treatment and being placed in an unsanitary cell, and states his cellblock is unsanitary, that the bed linens have not been laundered in months, that disease is spreading among the inmates and inmates cannot shower daily because they are not given fresh towels every day. Plaintiff also complains that he was not given a handbook or orientation and that "Jailers are holding Kangaroo Court" on enforcing the rules. Plaintiff cannot maintain his Eighth Amendment claim of cruel and unusual punishment on the grounds stated here, for the reasons stated in full below.

42.     Plaintiff's claims are not supported by the facts. As stated above, the Jail is cleaned on a regular basis, the sheets and blankets are changed weekly, and inmates are given fresh towels at least three times per week, as required by Jail policy and procedures. Exhibits Q, R and S. Although inmates do not receive a new towel every day, inmates keep their towels until they are issued fresh ones so they always have a towel. Exhibits S. Hygiene packets with soap and tissue are issued every other night. Exhibits Q and S. Further, there are showers in Jarrett's cellblock, 3-B, and nothing prevents inmates from showering at any time inmates are allowed to be out of their beds. Exhibits R and S. The shower in 3-B has not been out of order, as Jarrett claims. Exhibit S. There is no evidence that disease is spreading any more than can be expected in a situation where many people live in close quarters. Exhibits R and S. Sanitation is important, and the common areas and inmate quarters of the Jail are cleaned regularly.

43.     Jail officers are not holding Kangaroo Court. To the contrary, the Jail adheres to its own rules about due process, to include disciplinary hearings for inmate misconduct. Exhibits Q and R. All employees of the Montgomery Municipal Jail must follow the Standard Operating Procedures Manual, in addition to the Rules and

Regulations of the Montgomery Police Department. Exhibits Q and S. The Montgomery Municipal Jail houses thousands of municipal inmates each year, and does not have adequate resources to give each inmate his own copy of the 100-plus page Standard Operating Procedures Manual, however, a copy is provided in the cell blocks for inmate use. Exhibits R and S.

### 1. Denial of Medical Treatment

44.    Plaintiff titles Ground Four of his Complaint "Promoting Hazardous Conditions" and as supporting facts claims that when another inmate accidentally stepped on Plaintiff while trying to get out of bed, Plaintiff asked to see a doctor but was not seen for "approximately 2 weeks." Plaintiff also complains that he has only received Tylenol for his pains, and complains of lost sensation in his extremities.

45.    Plaintiff might be exaggerating about how long it took to be seen because was seen by Dr. Mendez on September 25, 2007, which was only 12 days after Plaintiff was incarcerated. Exhibits D and E. Further, Plaintiff's medical records show that he makes a lot of various complaints every time he sees the doctor, so it is highly unlikely that he neglected to tell Dr. Mendez about numbness in his extremities. Also, the records reflect that Plaintiff was prescribed a variety of medications for pain and muscle spasms while under Dr. Mendez's treatment for his back pain. Exhibit F.

46.    In Estelle v. Gamble, 429 U.S. 97, 101, 97 S. Ct. 285, 289 (1976), the Supreme Court held that a prison official's "deliberate indifference to [the] serious medical needs of [a] prisoner constitutes the unnecessary and wanton infliction of pain … proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104, 97 S.Ct. 285 (quotation marks and citation omitted); see also Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir.

14

1999). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted); see also Estelle, 429 U.S. at 106, 97 S.Ct. 285 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" Estelle, 429 U.S. at 105-06, 97 S.Ct. 285.

47.    For an inmate to maintain a §1983 action for a violation of the prohibition against cruel and unusual punishment and to show that a prison official acted with deliberate indifference to serious medical needs, the inmate must satisfy both an objective and a subjective inquiry. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000); Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995). First, a plaintiff must set forth evidence of an objectively serious medical need. Taylor, 221 F.3d at 1258; Adams, 61 F.3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. Farmer, 511 U.S. at 834, 114 S.Ct. 1970; McElligott, 182 F.3d at 1254; Campbell, 169 F.3d at 1363.

**(a) Serious Medical Need**

48.    A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). Such a medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'" Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir.

2000), quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994).

49.     Jarrett was also treated on multiple occasions for his back complaints alone, but was also treated for a variety of other ailments including stomach ulcers, common cold symptoms, and mild asthma. These latter complaints probably do not meet the serious medical need standard, and even the back injury was arguably not a serious medical need at the beginning, based on the symptoms Jarrett presented.

### (b) Deliberate Indifference

50.     "A prison official cannot be found deliberately indifferent under the Eighth Amendment 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Farrow, 320 F.3d at 1245 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)) (emphasis removed).   "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  ("Medical treatment that is 'so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness' constitutes deliberate indifference.") Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).

51.     Jarrett has failed to state any claim adequate to show to medical treatment so egregious or inadequate to "shock the conscious or to be intolerable to fundamental fairness." Adams v. Poag, 61 F. 3d 1537, 1544 (11th Cir. 1995).  Jarrett alleges that he was denied proper medical treatment for his back problems, but every request Jarrett

made to receive medical treatment was granted, and there is no indication that Jarrett was ever denied medical treatment. To the contrary, Jarrett was: (a) seen by the doctor numerous times, (b) written numerous prescriptions, (c) sent for x-rays then an MRI of his back, and (d) given a bland diet, an extra mattress and a special shaver.

52.    Jarrett's allegations do not amount to a constitutional violation for cruel and unusual punishment. The medical care provided to Jarrett was responsive and adequate in all respects. None of the jail officers or nurses intentionally or recklessly disregarded any serious medical need Jarrett may have had, nor does his sore back pose a risk of serious harm such that a finding of deliberate indifference would be justified.

## 2. Unsanitary Living Conditions

53.    Jarrett alleges that he was placed in an unsanitary cell with a broken shower, dirty linens and is not given fresh towels daily. Where an inmate challenges the conditions of his confinement, the court must decide whether prison officials were "deliberately indifferent" to his health or safety.  Fountain v. Talley, 104 F.Supp.2d 1345, 1350 (M.D. Ala. 2000). In Ground Four, Plaintiff also complains of overcrowding and argues that traffic violation offenders do not pose a threat to the community and implies they should not be incarcerated. The Jail employees cannot change the fact of overcrowding and admit that there are more inmates than beds. Exhibits R and S. The Jail does not determine who will be incarcerated, or for how long. Exhibits Q and S.

54.    "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"  Farmer, 114 S.Ct. at 1979. The Eighth Amendment prohibits cruel and unusual punishment and prison officials violate that amendment when they are deliberately indifferent to a substantial risk of serious harm to

inmates. <u>Marsh v. Butler County, Ala.</u>, 268 F.3d 1014, 1027 (11th Cir. 2001).

55.    To prove an Eighth Amendment constitutional violation, the evidence, viewed in the light most favorable to Plaintiff, must show (i) facts presenting an objectively substantial risk to inmates and awareness of these facts on the part of the officials charged with deliberate indifference; (ii) that the officials drew the subjective inference from known facts that a substantial risk of serious harm existed; and (iii) that the officials responded in an objectively unreasonable manner. <u>Doe v. Georgia Dept. of Corrections,</u> 2007 WL 2688661, 2 (11th Cir. 2007), <u>citing</u> <u>Farmer</u>, 114 S.Ct. at 1979.

56.    The plaintiff here cannot show any of these three factors. His complaints do not present an objectively substantial risk to inmates. The evidence shows that inmates in Cellblock 3-B have a shower available to them anytime they are allowed to be up out of their beds, that linens are exchanged weekly, and towels are exchanged three times per week. Even assuming *aguendo* that Jail officials should have drawn an inference that these conditions created a substantial risk of serious harm, there is no evidence that Jail officials responded in an objectively unreasonable manner. Plaintiff's complaints about unsanitary conditions are unfounded and cannot support an Eighth Amendment claim of cruel and unusual punishment.

## B. ACCESS TO COURTS

57.    Plaintiff titles Ground Five of his Complaint "Malicious Persecution" and as supporting facts claims he has been denied work around the jail in retaliation for filing this lawsuit and for helping other inmates with lawsuits. Plaintiff also claims he has been denied access to the courts, citing his inability to get a response to motions he claims to have filed in Municipal Court and the unavailability of Municipal Cases pertaining to his

pending charges or inmate rights. Plaintiff has not made a prima facie case of malicious prosecution, and appears to be misusing the term.

58.     Plaintiff complains of discrimination, citing the fact that federal inmates have access to legal materials, but that similar materials are not available for municipal inmates. Plaintiff cannot show that a lack of municipal legal materials prejudiced him in his pending criminal cases or in bringing an action to challenge the conditions of his confinement, and therefore does not have standing to challenge the sufficiency of the legal materials provided for the reasons set forth fully below under Access to Courts.

59.     The fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. Bounds v. Smith, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977). While adequate law libraries assure meaningful access to the courts, and are required in the absence of suitable alternatives, law libraries are not required when suitable alternatives are provided. Id.

60.     A prisoner complaining of poor law libraries does not have standing to challenge such circumstances unless he or she can demonstrate that a direct right, namely, the right of access to the courts, has been impaired. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001). The United States Supreme Court decision in Bounds did not create an abstract, free-standing right to a law library or legal assistance, and an inmate cannot establish the relevant, actual injury simply by establishing that his or her prison's law library is subpar in some theoretical sense. Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996).

61.    Even in the absence of a library, an inmate must demonstrate that the absence in some way hindered his or her efforts to pursue a legal claim. Id. An inmate does not have standing, or the right, to sue simply because the inmate was not provided access to the courts, but that, instead, an inmate must go one step further and demonstrate that the denial of access to the courts hindered the inmate's efforts to pursue a legal claim. See e.g. McConico v. Martin, 716 So. 2d 222, 98 A.L.R.5th 753 (Ala. Civ. App. 1998) (The court, denying the inmate's claim that he was denied the right to meaningful legal research facilities, ruled that the defendant failed to demonstrate an "actual injury" resulting from the denial of his purported right of access to the courts).

62.    In Redd v. Conway, 160 Fed. Appx. 858 (11th Cir. 2005), the Eleventh Circuit held that a pretrial detainee, who was able to bring a pro se complaint alleging improper treatment in county detention center, was not denied access to courts, despite the claim that he was not allowed needed access to law library and legal supplies. The Court went on to explain that:

> An inmate alleging lack of access to the courts must show actual injury, i.e., that the lack of access has hindered his efforts to pursue a legal claim. Lewis v. Casey, 518 U.S. 343, 349-51, 116 S.Ct. 2174, 2179-80, 135 L.Ed.2d 606 (1996). Accordingly, an inmate must allege that the prison official impeded his pursuit of a non-frivolous, post-conviction claim or civil rights action, such as a denial or dismissal of a direct appeal, habeas petition, or civil rights case seeking to vindicate basic constitutional rights. Lewis, 518 U.S. at 348-54, 116 S.Ct. at 2178-82.

Redd v. Conway, 160 Fed.Appx. 858, 862, 2005 WL 3528932, 4 (11th Cir. 2005)

63.    When this action was filed, Plaintiff was a pretrial detainee on the Receiving Stolen Property and Harassment charges. Exhibits A, B and C. He was also serving time on prior sentences, upon which the times for appeal had all passed. Exhibits

B and C. Thus, the only access to the courts guaranteed by <u>Bounds</u> was related to Plaintiff's pending misdemeanor charges and in a lawsuit to challenge the conditions of his confinement.

64.    The record reflects that Jarrett was represented by a public defender in his pending criminal cases (Exhibit A) and that he received a favorable deal in which one charge was nol prossed and the remaining charge was disposed for time served on his other unpaid fines – in effect a free pass. Obviously, Jarrett was not impeded in filing this lawsuit to challenge the conditions of his confinement. Plaintiff cannot make the requisite showing of actual harm and therefore lacks standing to sue for denial of the limited constitutional right to have access to courts.

### C. QUALIFIED IMMUNITY

65.    Plaintiff titles Ground Three of his Complaint "Discrimination" and appears to be making three claims of discrimination: (1) that Helen Turner has treated him differently than other inmates by denying his application to work in the kitchen; (2) that federal inmates are treated differently as to the availability of legal materials (discussed above under Access to Courts); and (3) Marie Jenkins has "blackballed" him from working details because of this Complaint.

66.    As for his retaliation claim, none of the named defendants retaliated against Jarrett for anything. Exhibits R, S, T and U. Further, Jarrett had not yet filed this lawsuit when he claims the retaliation occurred. Inmates do not have a constitutional or statutory right to work outside their cells and Jail officials have discretionary authority to deny an inmate's request to do so.

67.    Plaintiff states that on October 2, 2007, Marie Jenkins told him that the

reason Plaintiff can not work in the kitchen is because he has "come back with that shit." Officer Jenkins did not say that to Plaintiff, and it is unclear what that statement would have referred to in any event. Plaintiff goes on to claim that he had been blackballed from working details because of this Complaint, but this Complaint was not filed until October 10, 2007, after he claims he was denied the opportunity to work outside his cell.

68.     Defendants Collins, Brantley, Jenkins and Turner are all employed in the Montgomery Municipal Jail as employees of the city of Montgomery.  The defense of qualified immunity is an affirmative defense that shields governmental officials performing discretionary functions from civil liability if their conduct violates no clearly established statutory or constitutional right of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982), Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692 (1999).

69.     There is nothing in the Complaint to suggest that any of these defendants were acting in anything but their discretionary authority.  The doctrine of qualified immunity, therefore, should operate to shield each of these defendants from liability in this action. In this case, Defendants Collins, Brantley, Jenkins and Turner are entitled to qualified immunity because each was acting within the scope of his or her discretionary authority and any conduct did not violate a clearly established constitutional right.

70.     To be entitled to qualified immunity, a defendant must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a)

pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).

71.     The discretionary authority criteria are satisfied here. At all times relevant, each individual defendant was performing routine job-related functions at the jail. Exhibits R, S, T and U. Defendants Turner and Jenkins each had discretionary authority to choose which inmates would work in the kitchen and on work details, respectively. Exhibits R, S, T and U. Plaintiff's allegations against Defendants Collins and Brantley seem focused on their day to day running of the Jail, which is within the discretionary authority of the Warden and Assistant Warden. Exhibits Q, R and S.

72.     Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. Crosby v. Monroe County, 394 F.3d at 1328, 1332 (11th Cir. 2004). The plaintiff then must demonstrate that a reasonable jury could find from record evidence that the defendant violated a clearly established constitutional right of which a reasonable government official would have been aware. Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001).

73.     Here, even viewing the evidence in the light most favorable to the plaintiff, these defendants did not violate any of Plaintiff's statutory or constitutional rights. Plaintiff is not entitled to work outside his cell (Exhibits R, S, T and U), and it is wholly within these defendants' discretionary authority to deny his requests to do so. Further, none of these defendants prevented Plaintiff from receiving medical care (Exhibits D through P).

74.     These defendants were at all times relevant acting within the scope of their official duties and pursuant to their discretionary authority. Plaintiff cannot prove that any of these defendants violated his statutory or constitutional rights. Therefore, Defendants Collins, Brantley, Jenkins and Turner are entitled to qualified immunity.

### D. STATE AGENT IMMUNITY

75.     Plaintiff titles Ground Two of his Complaint "Negligence" and as supporting facts claims his requests for medical treatment for his back were ignored. He also states that the shower is normally out of order and repeats his complaints about not receiving fresh towels and bed linens as often as he would like.

76.     Plaintiff seems to be aiming this charge of negligence at Warden Collins and Assistant Warden Brantley. Collins and Brantley are both sworn peace officers acting at all times within the scope of their job duties and within their discretionary authority, and are entitled to qualified immunity, discretionary function immunity and state-agent immunity, as more fully set out herein.

77.     Factually, Plaintiff cannot maintain the allegations he levies in Ground Two. The evidence reflects that Plaintiff was treated promptly and repeatedly for his back problems. Exhibits D through P. The shower in Cellblock 3-B has been in working order, and linens and towels are passed out regularly. Exhibit S.

78.     Notwithstanding, Alabama Code §6-5-338 (1975) grants law enforcement officers immunity from tort claims arising out of acts committed while the law enforcement officer engages in the performance of discretionary functions. The performance of the discretionary functions must be within the scope of the officer's law enforcement duties.

79.    In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), the Alabama Supreme Court stated the rule governing State-agent immunity:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's … (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons … Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000).

Defendants Collins, Brantley and Jenkins are sworn peace officers who were each clearly engaged in the performance of discretionary functions in the enforcement of Alabama criminal law at the time the alleged torts occurred. Their acts constituted exercise of judgment and involved choosing what was just and proper under the circumstances. See Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala. 2000).

80.    Cranman states an exception that a state agent shall not be immune from civil liability in his personal capacity: (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000).

81.    Plaintiff has not produced any evidence that would show, or even allow an inference that Defendants Collins, Brantley or Jenkins acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. In fact, each individual defendant in this case has testified that he or she has nothing

personal against Stanley Jarrett and that Jarrett is treated the same as any other inmate. Exhibits R, S, T and U.

82.     The statute is explicit that liability will not attach unless a police officer acts willfully or maliciously.  As there is no evidence of such intent or acts by Defendants Collins, Brantley and Jenkins in this case, each is entitled to discretionary immunity.

### E. RESPONDEAT SUPERIOR

83.     A supervisor sued in his individual capacity in a federal civil rights action is entitled to qualified immunity unless a reasonable supervisor would have known that his actions were unlawful in light of clearly established law and information that he possessed. Dolihite v. Maughon, 74 F. 3d 1027 (11th Cir. 1996), cert. denied, 519 U.S. 870 (1997).  Such liability must be predicated on either actual participation in the unconstitutional act by the supervisor or a causal connection between the supervisor's action and a plaintiff's injury.  Id.  In this case there was neither.

84.     Supervisory personnel cannot be held liable under § 1983 for the actions of subordinates under the theory of respondeat superior; they may only be held liable if they personally participated in the acts comprising alleged constitutional violations or instigated or adopted a policy of violating constitutional rights.  Ortega v. Christian, 85 F. 3d 1521, 1526 (11th Cir. 1996); Adams v. Poag, 61 F. 3d 1537, 1544 (11th Cir. 1996). Thus, to the extent applicable, Defendants Collins and Brantley are due to be dismissed from the §1983 portion of this suit.

### F. CLAIMS AGAINST THE CITY OF MONTGOMERY

#### 1. 42 U.S.C. §1983 Municipal Liability

85.     As a threshold issue, Plaintiff never states a claim against the City of

Montgomery. In order to recover there must be a causal connection between the policy or custom of the municipality and the constitutional right alleged to have been violated. Church v. City of Huntsville, 30 F. 3d 1332, 1342 (11th Cir. 1994). To establish causation, "a plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Board of County Comm'rs. of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).

86.     For civil rights liability pursuant to 42 U.S.C. §1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of Plaintiff's constitutional rights while acting pursuant to official governmental policy. Here, Plaintiff fails to state what that policy or custom caused his alleged deprivation of rights.

87.     There is nothing in this case to support a claim that any Defendant officers were wrongful or negligent. Nor has Plaintiff submitted any evidence that any final policymaker of the City acted with an unconstitutional motive.

88.     A municipality is liable only for its own wrongs and cannot be held liable in an action brought pursuant to 42 U.S.C.A. §1983 under a theory of respondeat superior. Monell v. Department of Social Services of New York City, 436 U.S. 658, 694 (1978). Thus, Plaintiff may not base his claims against the City on respondeat superior or vicarious liability; rather, he must show an official policy or custom of the City directly caused the alleged injury to him.

89.     In Monell, the Supreme Court held that absent unconstitutional or illegal policies or customs, municipalities and their officials may not be sued for the acts of their employees. Id. Moreover, a plaintiff must show that an official policy caused the alleged

constitutional deprivation. <u>Farred v. Hicks</u>, 915 F. 2d 1530 (11th Cir. 1990). It is only when executing a municipal policy inflicts constitutional injury that the municipality or its official policymakers are responsible under §1983. <u>Monell</u>, <u>supra</u> at 694.

90.    Here, Plaintiff cannot show that following the procedures contained in the Municipal Jail Standard Operating Procedures caused violations of his constitutional rights. Exhibit Q. Nor can he show an official policy or custom caused any violation of his constitutional rights. Such liability requires that the Plaintiff provide evidence that establishes "a widespread practice that, 'although not authorized by written law or express municipal policy is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" <u>St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988). In such circumstances, however, "considerably more proof than [a] single incident will be necessary" to establish liability. <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 834 (1985).

91.    In this case, Plaintiff cannot succeed on his claim that a policy, procedure, practice or custom would make the City of Montgomery liable under 42 U.S.C. §1983. Indeed, the employees in the Jail must follow the Standard Operating Procedures. Exhibits Q, R and S.

92.    In <u>Byrd v. Clark</u>, 783 F. 2d 1002 (11th Cir. 1986) the trial court granted summary judgment in favor of the municipality. That decision was affirmed on appeal. The Eleventh Circuit Court of Appeals concluded that in the absence of any evidence of a policy, practice or custom, either express or implied, which contributed to the alleged violation of plaintiff's constitutional rights when she was arrested, released and rearrested, the city was not liable to plaintiff under §1983. In the present case, the City did not engage in any activity nor did it implement any custom or policy that caused

Plaintiff to be deprived of a constitutional right. Therefore the City of Montgomery, as in Byrd, is not liable.

## 2. INTENTIONAL TORT CLAIMS

93.    Under Alabama law, an action against a municipality may only lie for the "neglect, carelessness, or unskillfulness" of its agents. Ala. Code §11-47-190 (1975). Here, there was no neglect, carelessness or unskillfulness of the individually named Defendants. Therefore by definition the City of Montgomery cannot be held liable.

## 3. DISCRETIONARY FUNCTION IMMUNITY

94.    Code of Alabama §6-5-338(b) (1975) provides immunity not only to peace officers but governmental units and agencies authorized to appoint peace officers. The statute is explicit that liability will not attach unless a police officer acts willfully or maliciously. In concluding that a municipality is immune from allegations of negligence based on that statute, the Alabama Supreme Court, in City of Birmingham v. Sutherland, 2002 WL 475176 (Ala. 2002), rejected the claim that allegations of negligence would defeat the immunity provided by subsection (b) of §6-5-338. Accordingly, the court held that the trial court erred in not finding that the city had discretionary function immunity (i.e. immunity from tort liability) arising out of a police officer's conduct in the performance of his discretionary function within the line and scope of his law-enforcement duties. The facts of Sutherland are very similar to the present case at bar, and the outcome should be the same.

## VI. CONCLUSION

95.    Neither the law nor the facts support Plaintiff's claims. All individual defendants named herein are entitled to qualified immunity because they were at all times

relevant acting within the scope of their job duties as municipal officials. The law enforcement officers are entitled to the additional immunities listed above.

96.    Plaintiff has not stated any claim against the City of Montgomery, and cannot show a municipal policy or custom caused any constitutional violations.

97.    Finally, the evidence shows that none of the defendants have violated Plaintiff's constitutional rights. His living conditions are reasonable, he has received prompt and thorough medical treatment, he was not entitled to work outside his cell, and the lack of access to legal materials did not cause him harm in his criminal cases or this civil case challenging the conditions of his incarceration, especially because he was represented by counsel in the former.

Respectfully submitted this 11th day of December 2007.

/s/ Allison H. Highley          .
Allison H. Highley (HIG024)
Attorney for Defendants

OF COUNSEL
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101
(334) 241-2050 Telephone

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2007, I mailed the foregoing via U.S. Mail, first-class postage prepaid, addressed as follows:

Stanley Tyrone Jarrett
Montgomery Municipal Jail
Post Office Box 159
Montgomery, Alabama 36101

/s/ Allison H. Highley          .
Of Counsel

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **STANLEY TYRONE JARRETT**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:07-CV-911-MHT-TFM** |
| | ) | |
| **CITY OF MONTGOMERY**, et al., | ) | |
| Defendants. | ) | |

## TABLE OF EXHIBITS

COME NOW Defendants and submit this Table of Exhibits referenced to in their Special Report, filed herewith.

Exhibit A.    Case Action Summaries

Exhibit B.    Court Disposition Sheet (9/13/07)

Exhibit C.    Court Disposition Sheet (11/16/07)

Exhibit D.    Nurses Notes

Exhibit E.    Notes by Dr. Mendez (9/25/07)

Exhibit F.    Physicians' Order

Exhibit G.    Medical Request Form (10/7/07)

Exhibit H.    Inmate Request Form (10/9/07)

Exhibit I.    Notes by Dr. Mendez (10/16/07)

Exhibit J.    Convalescent and Change in Work Classification Status (10/16/07)

Exhibit K.    Southern Radiology Services, LLC, Service Request Form

Exhibit L.    Southern Radiology Services, LLC, X-Ray Report (10/17/07)

Exhibit M.    Notes by Dr. Mendez (10/25/07)

Exhibit N.    Convalescent and Change in Work Classification Status (11/7/07)

Exhibit O.    Medical Request Form (11/17/07)

Exhibit P.    MRI Report (11/13/07)

Exhibit Q.    Montgomery Municipal Jail Standard Operating Procedures Manual

Exhibit R.    Affidavit of Willie Collins

Exhibit S.    Affidavit of Mary Brantley

Exhibit T.    Affidavit of Marie Jenkins

Exhibit U.    Affidavit of Helen M. Turner

Respectfully submitted this 11th day of December 2007.


/s/ Allison H. Highley
Allison H. Highley (HIG024)
Attorney for Defendants

**OF COUNSEL**
City of Montgomery
Legal Department
Post Office Box 1111
Montgomery, Alabama 36101
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2007, I mailed the foregoing via U.S. Mail,

first-class postage prepaid, addressed as follows:

Stanley Tyrone Jarrett
Montgomery Municipal Jail
Post Office Box 159
Montgomery, Alabama 36101


/s/ Allison H. Highley
Of Counsel

Exhibit A

| State of Alabama<br>City of Montgomery<br>Form MMC-1010    Rev. 10/03 | COURT RECORD<br>CASE ACTION SUMMARY | Case Number<br>2007CRA007180A<br>PAGE 1 OF 4 |
|---|---|---|

IN THE MUNICIPAL COURT OF _____ MONTGOMERY _____ , ALABAMA

(Name of Municipality)

MUNICIPALITY OF __ MONTGOMERY __ v. STANLEY TYRONE JARRETT

Defendant

## DEFENDANT IDENTIFICATION AND INFORMATION

| Social Security Number | Date of Birth<br>02/02/1966 | Home Address<br>109 COURTLAND DR | | |
|---|---|---|---|---|
| Race<br>B | Sex<br>M | City<br>MONTGOMERY | State<br>AL | Zip Code<br>36105 |
| Height | Weight | Home Telephone Number | | |
| Eye Color | Hair Color | Employer Name & Address | | |
| Driver License State | Driver License Number | City | State | Zip Code |
| Other / Distinguishing Features: | | Employer Telephone Number | | |

Offense / Charge:  **(15G(14))  HARASSMENT**

Complainant - Victim / Arresting Officer:    WILLIE ARMASTEAD

Bondsman / Surety: _____    Bond Amount:    0.00

| Date of Offense | Date Warrant Issued | Date Committed to Jail | Date Released on Bond | Arraignment Date | Trial Date |
|---|---|---|---|---|---|
| 07/23/2007 | | | | 09/13/2007 | |

PROSECUTOR NAME:      DEFENSE COUNSEL NAME:

ARRAIGNMENT: _____    ARRAIGNMENT: _____

TRIAL: _____    TRIAL: _____

PLEA OF DEFENDANT: ☐ GUILTY AS CHARGED ☑ NOT GUILTY ☐ GUILTY OF: _____

## ADJUDICATION

☐ GUILTY AS CHARGED    ☐ NOT GUILTY    ☐ NOL-PROSSED    ☐ DISMISSED

NOLPROS

☐ GUILTY OF: _____

NOV 16 2007

DATE    JUDGE, CITY OF MONTGOMERY

## ACTIONS, JUDGMENTS, CASE NOTES

SENTENCED TO _____ DAYS IN JAIL, SUSPEND _____ DAYS.

FINE: $ _____    COURT COST: $ _____    SUBPOENA / ALIAS<br>WARRANT FEES: $ _____

TOTAL FINE, COST & FEES: $ _____    PAYMENT<br>DUE DATE: _____

Page 4 of 2

| State of Alabama<br>Unified Judicial System<br>Form C-64(a)(front) Rev. 11/92 | **DEPOSITION** | Warrant Number<br>2007M03315<br>Case Number |
|---|---|---|

**IN THE   MUNICIPAL** _____ **COURT OF   MONTGOMERY,** _____ **ALABAMA**
      (Circuit, District or Municipal)              (Name of Municipality or County)

☐ STATE OF ALABAMA        ☒ MUNICIPALITY OF **MONTGOMERY** _____

v. Stanley Tyrone Jarrott _____, Defendant

---

### INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

Name of Accused (or Alias)                                        Telephone Number
STANELY  TYRONE  JARRETT

| Social Security Number | Driver's License Number | Date of Birth<br>02-20-66 | Age | Race<br>B | Sex<br>M |
|---|---|---|---|---|---|

| Height<br>6 1 | Weight<br>180 | Hair<br>Black | Eyes<br>Brown | Complexion  Brown |
|---|---|---|---|---|

Address of Accused                         City                State     Zip
109  COURLAND  DR                MONTGOMERY    ALA    36105

Name of Employer                                    Employer's Telephone Number

| Address of Employer | City | State | Zip |
|---|---|---|---|

---

### INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense: Harassment

Date and Time of Offense: 7-23-07   5. PM

Place of Occurrence: 3819 South Court St.  Cloverland As.

Person Attacked or Property Damaged:          Willie Armstead

How Attacked: Mr. Jarrett hit me several times trying to get away from (me) Willie

Did Accused Possess or Use a Weapon?   ☐ Yes   ☒ No   Type:

Damage Done or Injuries Received: yes (I) Willie recieved several stratchs on my right arm

Value of Property:

Details of Offense: I (Willie) was (Willie) was walking floor during security when (I) notice Mr. Jarrett in the back of the store with both a pack of hillshile fata farm sausage in his hand, Mr. Jarrett asket me (Willie) what isle the rice was on (I) Willie showin Mr. Jarrett and (I) Willie went up toward the front but turned and went down another isle (I) (Willie) met Mr. Jarrett coming up the isle with only a bag of rice in his hand, I (Willie) stopped Mr. Jarrett an asket him where was the meat he (Mr. Jarrett) had. Mr. Jarrett ran his hand down into his pants an gave me the meat, I (Willie) told Mr. Jarrett that he needed to go with me to the back room Mr. Jarrett kept walking toward the front of the store (I) Willie called for the (manager) Mrs. preechitt to lock the door (I) Willie told Mr. Jarrett that he was not going any where, that whent Mr. pushed me (Willie) into some shopping carts and started wrestling with me (Willie) and hottens me (Willie) trying to get out the of the front door.

Page 2 of 2    2007M03314

ABOUT THAT TIME A EMPLOYEE CAME TO TRY
AND HELP ME (WILLIE) GET MR. JARRETT UNDER
CONTROL, BUT MR. JARRETT WAS STILL HITTING
ME ON MY CHEST, MY ARM, AND ONCE ON MY
FACE KNOCKING MY GLASSES OFF, THAT WHEN
I USED MY TASER GUN ON MR. JACK
MR. JARRETT TO TRY AN GET HIM UNDER
CONTROL. MR. JARRETT WAS FIGHTING WITH
ME (WILLIE) UP UNTIL 30 SECONDS BEFORE
THE POLICE ARRIVED AND TOOK MR. JARRETT
I. (WILLIE) RECEIVED SEVERAL STRATCH'S ONE MY
ARM.

| State of Alabama<br>City of Montgomery<br>Form MMC-1010    Rev. 10/03 | **COURT RECORD**<br>**CASE ACTION SUMMARY** | Case Number<br>**2007CRA007180B**<br>PAGE 1 OF 4 |

## IN THE MUNICIPAL COURT OF     MONTGOMERY     , ALABAMA
*(Name of Municipality)*

**MUNICIPALITY OF**    MONTGOMERY    v. **STANLEY TYRONE JARRETT**

Defendant

## DEFENDANT IDENTIFICATION AND INFORMATION

| Social Security Number | Date of Birth<br>02/02/1966 | Home Address<br>109 COURTLAND DR | | |
| --- | --- | --- | --- | --- |
| Race<br>B | Sex<br>M | City<br>MONTGOMERY | State<br>AL | Zip Code<br>36105 |
| Height | Weight | Home Telephone Number | | |
| Eye Color | Hair Color | Employer Name & Address | | |
| Driver License State | Driver License Number | City | State | Zip Code |
| Other / Distinguishing Features: | | Employer Telephone Number | | |

Offense / Charge:    **(05O) RECEIVING STOLEN PROPERTY**

Complainant - Victim / Arresting Officer:    WILLIE ARMASTEAD

Bondsman / Surety: _____    Bond Amount:   0.00

| Date of Offense | Date Warrant Issued | Date Committed to Jail | Date Released on Bond | Arraignment Date | Trial Date |
| --- | --- | --- | --- | --- | --- |
| 07/23/2007 | | | | 09/12/2007 | |

**PROSECUTOR NAME:**      **DEFENSE COUNSEL NAME:**

ARRAIGNMENT: _____    ARRAIGNMENT: _____

TRIAL: _____    TRIAL: _____

PLEA OF DEFENDANT: ☑ GUILTY AS CHARGED   ☐ NOT GUILTY   ☐ GUILTY OF:

### ADJUDICATION

☑ GUILTY AS CHARGED    ☐ NOT GUILTY    ☐ NOL-PROSSED    ☐ DISMISSED

☐ GUILTY OF: _____

NOV 1 6 2007

DATE        JUDGE, CITY OF MONTGOMERY

### ACTIONS, JUDGMENTS, CASE NOTES

SENTENCED TO *Time Served (2 months)* DAYS IN JAIL, SUSPEND _____ DAYS.

FINE: $ _____   COURT COST: $ _____   SUBPOENA / ALIAS<br>WARRANT FEES: $ _____

**TOTAL FINE, COST & FEES:** $ _____   PAYMENT<br>DUE DATE: _____

Page 1 of 2

| | | Warrant Number |
|---|---|---|
| ___ System ___(a)(front) Rev. 11/92 | **DEPOSITION** | 2007M03312 |
| | | Case Number |

THE    **MUNICIPAL**    COURT OF    **MONTGOMERY,**    **ALABAMA**

(Circuit, District or Municipal)    (Name of Municipality or County)

☐ STATE OF ALABAMA    ☒ MUNICIPALITY OF __MONTGOMERY__

V. Stanely Tyrone Jarrett , Defendant

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

Name of Accused (or Alias) STANELY TYRONE JARRETT     Telephone Number

| Social Security Number | Driver's License Number | Date of Birth 02-20-66 | Age | Race B | Sex M |
|---|---|---|---|---|---|

| Height 6'1 | Weight 180 | Hair Black | Eyes Brown | Complexion Brown |
|---|---|---|---|---|

| Address of Accused 109 COURTLAND JR | City MONTGOMERY | State ALA | Zip 36105 |
|---|---|---|---|

Name of Employer     Employer's Telephone Number

| Address of Employer | City | State | Zip |
|---|---|---|---|

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense: Receiving Stolen Property 3rd Degree

Date and Time of Offense: 7-23-07  5 P.M.

Place of Occurrence: CLOVERLAND A.g. 3819 SOUTH COURT ST.

Person Attacked or Property Damaged: One (1) Pack of Hillside Farm Sausage

How Attacked: Stolen merchandise found on him

Did Accused Possess or Use a Weapon? ☐ Yes    ☒ No    Type:

Damage Done or Injuries Received:

Value of Property: 3.29

Details of Offense: X I (WILLIE) WAS DOING SECURITY AT CLOVERLAND A.g. WHEN I NOTICE MR. JARRETT WITH A PACK OF HILLSIDE FARM SAUSE IN HIS HAND, MR JARRETT ASKED ME (WILLIE) WHERE DID WE KEEP THE RICE I (WILLIE) WENT ON UP TOWARD THE FRONT, BUT TURNED AND WENT DOWN ANOTHER ISLE, I (WILLIE) MET MR. JARRETT COMING UP THE ISLE HEADING FOR THE REGISTER, I (WILLIE) STOP MR. JARRETT AND ASKED HIM (MR. JARRETT) WHERE WAS THE MEAT HE HAD, MR. JARRETT RAN HIS HAND DOWN IN HIS PANTS AND PULLED OUT THE MEAT AT THAT POINT, I CALLED FOR THE MANAGER TO CALL 911, I (WILLIE) TOLD MR. JARRETT THAT HE NEEDED TO STAY THERE UNTIL THE POLICE ARRIVE, MR. JARRETT PUSHED ME AND THATS WHEN MR. JARRETT HIT ME (WILLIE) AND MR. JARRETT STARTED WRESTLING WITH ME (WILLIE) AND ANOTHER EMPLOYEE THAT WORKED IN THE MEAT DEPT, MR. JARRETT WAS TRYING TO GET OUT THE FRONT DOOR, MR. JARRETT FIGHTING WITH ME (WILLIE) AND ANOTHER EMPLOYEE SO I (WILLIE) USED MY TASER GUN ON HIM

Page 2 of 2  2007M03312

TO TRY AND MAKE MR. JARRETT STOP, MR. JARRETT
STOP FIGHTING FIGHTING ABOUT 30 SECONDS BEFORE
THE POLICE ARRIVED. MR. JARRETT WAS ARRESTED

# Exhibit B

MONTGOMERY MUNCIPAL COURT
STATE OF ALABAMA

Date & Time:    9/13/2007 1:02:11 PM    BOOKING NUMBER:    2007-00007180
NAME:   JARRETT,STANLEY,TYRONE,
RACE:   Black    SEX:  Male    DOB:   02/20/1966    SSN:  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
ADDRESS:   109 COURTLAND DR, MONTGOMERY, Alabama, 36105

| | CHARGE DESCRIPTION | CASE # | COURT DISPOSITION OF CASE |
|---|---|---|---|
| 1 | COMM. DRIVING WHILE SUSP, R | 2007TRT016489 | $325.00 DUE BY 01/01/2008 |
| 2 | COMM. DRIVING WHILE SUSP, R | 2007TRT023819 | $225.00 DUE BY 01/01/2008 |
| 3 | COMM. IMPROPER TAG | 2007TRT023821 | $145.00 DUE BY 01/01/2008 |
| 4 | COMM. IMPROPER LIGHTS | 2007TRT023820 | $130.00 DUE BY 01/01/2008 |
| 5 | COMM. DRIVING WHILE SUSP, R | 2004TRT044906 | $427.00 OR 17 DAYS |
| 6 | COMM. STOPPING ON HIGHWAY | 2004TRT044905 | $256.00 OR 10 DAYS |
| 7 | COMM. DRIVING UNDER INFLUEN | 2004TRT044907 | $1075.00 OR 43 DAYS |
| 8 | HARASSMENT | 2007CRA007180A | TRIAL DATE OF 11/16/2007 AT 8:30 AM |
| 9 | RECEIVING STOLEN PROPERTY 3 | 2007CRA007180B | TRIAL DATE OF 11/16/2007 AT 8:30 AM |
| 10 | POSSESSION OF PARAPHERNALIA | 2003CRA008722C | $430.00 OR 17 DAYS |
| 11 | ONE HEADLIGHT | M9681160 | $150.00 OR 6 DAYS |
| 12 | NO INSURANCE | M9681161 | $282.00 OR 11 DAYS |
| 13 | DRIVING WHILE REVOKED | M6131702 | $349.00 OR 13 DAYS |
| 14 | NO INSURANCE | M6131908 | $256.00 OR 10 DAYS |
| 15 | FALSE STATEMENT | 2003CRA008722A | $565.00 OR 22 DAYS |
| 16 | | | |
| 17 | | | 149 DAYS OR $3,790 00 |
| 18 | RELEASE = 2-7-08 | | |
| 19 | | | COURT COPY    2007 SEP 13 P 1: 44 |
| 20 | | | MONTGOMERY MUNICIPAL COURT |
| 21 | | | CLERK OF COURT FILED |
| 22 | | | |

Exhibit C

MANDATORY TIME RELEASE DATE: _____    HW# 15/9
COMMUTED TIME RELEASE DATE: _____

HOLD FOR CITY CONVICT    MONTGOMERY MUNICIPAL COURT    HOLD FOR CITY CONVICT
STATE OF ALABAMA

Date & Time:   11/16/2007 1:39:09 AM    BOOKING NUMBER:   2007-00007180
NAME:   JARRETT,STANLEY,TYRONE,
RACE:   Black   SEX:   Male   DOB:   02/20/1966   SSN:   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
ADDRESS:   109 COURTLAND DR, MONTGOMERY, Alabama, 36105

| | CHARGE DESCRIPTION | CASE # | COURT DISPOSITION OF CASE |
|---|---|---|---|
| 1 | COMM. DRIVING WHILE SUSP, R | 2007TRT016489 | $325.00 due by 1-1-08 |
| 2 | COMM. DRIVING WHILE SUSP, R | 2007TRT023819 | $225.00 due by 1-1-08 |
| 3 | COMM. IMPROPER TAG | 2007TRT023821 | $145.00 due by 1-1-08 |
| 4 | COMM. IMPROPER LIGHTS | 2007TRT023820 | $130.00 due by 1-1-08 |
| 5 | COMM. DRIVING WHILE SUSP, R | 2004TRT044906 | Serving Time |
| 6 | COMM. STOPPING ON HIGHWAY | 2004TRT044905 | |
| 7 | COMM. DRIVING UNDER INFLUEN | 2004TRT044907 | |
| 8 | HARASSMENT | 2007CRA007180A 2007M03314 | NOLPROS Case close |
| 9 | RECEIVING STOLEN PROPERTY 3 | 2007CRA007180B 2007M03312 | Time Served case close |
| 10 | Poss of Paraphernalia | 2003CRA08722C | |
| 11 | One Headlight | M9681160 | Serving Time |
| 12 | No Insurance | M9681161 | |
| 13 | Driving While Revoked | M6131702 | |
| 14 | No Insurance | M6131908 | |
| 15 | False Statement | 2003CRA08722A | |
| 16 | | | |
| 17 | | | COURT COPY |
| 18 | | | 2007 NOV 16 P 4:39 |
| 19 | | | FILED |
| 20 | | | CLERK OF COURT MONTGOMERY MUNICIPAL COURT |

V. DOE SET 11 11 07

Exhibit D

# NURSES NOTES

| DATE | Stanley Jarrott D.O.B. 20 Feb 1966 | NOTES |
|------|------|------|
| 08 NOV 07 | 1320 Reschedule MRI L/S spine, 13 Nov 07 @ 0930 Jackson Hosp. Radiology Dept. ——— Davis LPN | |
| 13 NOV 07 | Transported to Jackson Hosp for MRI LS Spine per Officer Tison ——— Davis, LPN | |
| 11/20/07 | Seen by D. Kennedy for the event ——— (signature) | |

Stanley Jarrett, Bay
DOB: 20 Feb. 1966

| DATE | NOTES |
|---|---|
| 12 Dec 2004 | 0930 Rocephin 1 gm given IM @ ↑ gluteal as ordered, tolerated well — Daus, LPN |
| 14 Dec 2004 | 0900 Rocephin 1 gm given IM @ ↑ gluteal as Ordered, tolerated well — Daus, LPN |
| 16 Dec 2004 | Inmate Jarrett was not seen today. Dr. Wendes reviewed Medical record, will see 21 Dec 04. See M.D. Order — Daus, LPN |
| 12/20/04 | Seen by Dr. Kandey Orders for ↓ RC [signature] |
| 22 Dec 04 0810 | Transported to Dr. Bay office for evaluation. [initials] |
| 0930 | Return to facility from Consultation c̄ Dr. Gregory Bay. Diagnosis: draining fistula. See M.D. Report of Consultation and Medical Order — Daus, LPN |
| 28 Dec 2004 1046 | Appt. schedule c̄ Sister Hill Dental Clinic 2 Feb 05 @ 1400 — Daus, LPN |
| 9/[date]/07 | Seen by Dr. Kandey for Rx [signature] |
| 10/25/07 | Seen by Dr. Kandey for [illegible] [signature] |
| 26 Oct 07 | Schedule MRI 30 Oct 07 @ 0900, Jackson Hosp. Radiology Dept. — Daus, LPN |
| 11/7/07 | Seen by Dr. Kandey for [illegible] [signature] |

Stanley James Cull
1000 20 Feb. 1966.

| DATE | NOTES |
|---|---|

21 Nov. 2002  Seen by Dr. Mendy for c/o stomach ulcers and pain @ jaw. See M.D. order.  ⎯ Daix LPN

29 Nov 2002  Seen by Dr. Mendy for c/o jaw pain see M.D. order.  Daix LPN

12 Dec. 2002  Seen by Dr. Mendy for c/o TMJ pain. See M.D. order.  Daix LPN

12/15/02  c1000 - c/o ultracet was not "helping @ all". Subject requests to see us again, but has seen MD x2 for same complaint. No distress noted.  ⎯ memaye

12/18/__  Seen by Dr. Landa c/o ____ to see Dr. dentist see orders  ⎯ memaye

25 Nov. 2004  Seen by Dr. Mendy. see M.D. order.  ⎯ Daix LPN

11/29/04  This writer failed to LHS pharmacy Amcef is on back order.  ⎯ memaye

12-02-04  1800 - Amcef (1) gt given im rt gluteal (FM) as ordered tol well.  ⎯ memaye

03 Dec 04  1815 Amcef (1) gt given IM @ upper gluteal as ordered, tol. well  ⎯ Daix, LPN

12/10/04  Seen by MD c/o abscess to @ jaw. See orders.  ⎯ S. Motley LPN

12/11/04  1305 1gm Rocephin given IM @ buttock tol. well.  ⎯ S. Motley

Exhibit E

JARRETT STANKEY
DOB: 02/20/66

09/25/07: _____: Here today with multiple complaints. He says he has an ulcer and wants a bland diet. We will go ahead and give him a bland diet and restart his NEXIUM. Also says he has asthma and needs an inhaler. Also says that somebody fell on his back the other day. Lastly he does complain of a cold.

PE: His back has no palpable tenderness. No ecchymosis. Full ROM. He does have slight sinus congestion. Afebrile. HEART: Regular. LUNGS: Clear.

A: and P:
1. Give patient a bland diet and start NEXIUM 40 mg one p.o. daily x 90 days.
2. Asthma – we will give him an ALBUTEROL Inhaler 2-puffs q.i.d. x 30 days – keep on person.
3. Back pain - We will give him TYLENOL two t.i.d. x 10 days prn pain.
4. MEDENT DM one p.o. b.i.d. x 10 days.

_____
Marcial J. Mendez, M. D.
Montgomery City Jail

Exhibit F

Montgomery Municipal Jail

Physicians' Order

NAME: Jarrett Stanley                DOB: 3/20/66

SIG: Nexium 40 mg 1 po daily x 90 day
Albuterol inhaler 2 puffs qid x 90 day
[Theneg] 1 po tid x 90 day

DATE: 9/25/07                          Physicians Signature

SIG: Medrot Dsn 1 po bid x 10 day

DATE: 9/28/07                          Physicians Signature

SIG: Flexeril 10 mg 1 po tid x 10 day
Ultram 50mg 1 po tid x 10 day

DATE: 10/16/07                         Physicians Signature

SIG: Ultram 50mg 1 po tid x 10 day

DATE: 10/15/07                         Physicians Signature

## —————————Montgomery Municipal Jail—————————

### Physicians' Order

NAME: _Jarrett Stanley_         D.O.B. _____

SIG.

Darvocet's 100 + P.o. tid X10 days,
Flexeril 10 mg + P.o. tid X)5 days

DATE: _11/7/07_         Physician Signature:

SIG.

Motrin 800 mg ÷ P.o. tid X10 days
Flexeril 10 mg ÷ P.o. tid X10 days
Benadryl 50 mg ÷ P.o. HS X10 days PRN insomnia

DATE: _11/20/07_         Physician Signature:

SIG.




DATE: _____         Physician Signature:

SIG.




DATE: _____         Physician Signature:

*——————————Montgomery Municipal Jail——————————*

*Physicians' Order*

NAME: _Jarrett Stanley_          D.O.B. _2/20/66_

SIG. _Flexeril 10mg ÷ Po tid X10 days_
_Motrin 800mg ÷ Po tid X10 days_
_Benadryl 50mg ÷ Po q HS X10 days prn insomia_

DATE: _11/20/07_                              Physician Signature:

SIG.

DATE:                                         Physician Signature:
SIG.

DATE:                                         Physician Signature:
SIG.

DATE:                                         Physician Signature:

Exhibit G

MONTGOMERY MUNICIPAL JAIL
MEDICAL REQUEST

This form will be completed to see the physician or nurse. Also complete this form for over the counter or treatment items, i.e. Tylenol, band-aids, ointments, etc.

Print Name: _Stanley Jarrett_  Date: _10-7-07_
Date of Birth: _2-20-07_  Location: _3-B_

Medical Request: _I request Medical Treatment for my back, +_
_hernia pain._

_Request to see Doctor A.S.A.P._

_Request A+D Ointment for facial skin_

_Stanley Jarrett_
Inmate Signature

Officer Signature: _____ Time:_____

Medical Issues
_____ Home medication
_____ Outside medical appointments Date: _____ Time:_____

Contact___Physician/Clinic                          _____ Family/Friend
Name:_____                               _____
Address:_____                            _____
_____                                    _____
Telephone#_____                            _____

**DO NOT WRITE BELOW THIS LINE**

Date: _____           Date: _____
Time: _____           Time: _____
Allergies_____           Receiving Nurse: _____

Assessment:_____
_____
_____

Plan: _See M.D. 15 Oct 2007 Jaub_

Refer to: (Physician)    Mental Health    Emergency room    Return to Clinic PRN
**CIRCLE ONE**

Exhibit H

Montgomery Municipal Correction facility
## INMATE REQUEST FORM

Name: _Stanley Jarrett_    Time: _6:00 am_

Date: _10-9-07_    Booking#: _7180_

Cellblock: _3-B_

Please check one of the following:

___ Charges/Bond Information
___ Food Services
___ Hygiene items
___ Mail

___ Money Information
___ Property
___ Recreation
___ TV Change
___ Visitation
_✓_ Other

### Briefly state your request (Please Print Clearly)

Request pain medication for my back +
medication for my cold. My back continue
to be in pain.
Also request to see a back Doctor A.S.A.P.   Thanks

Request received by officer: _____ Date: _____ @ _____ hrs

### DO NOT WRITE BELOW THIS LINE FOR REPLY ONLY

Date: _____ Time: _____

Schedule to see m.D. for L/O back pain.
Just completed a precription for cold symptom

This form should be given to any correction officer.
Inmate request forms will be routed to the appropriate supervisor or Administrator.
Inmates will receive a copy when a written response is required.

Exhibit I

STANLEY JARRETT
DOB: 02/20/66

10/16/07: City:  Here today complaining of pain to his lower back. He said an inmate fell on his back after jumping out of the top bunk.

PE:  He has some tenderness to the lumbosacral area.  Full ROM of the spine.  DTRs are 1+.  Negative straight leg.  Muscle strength intact.  Normal ambulation.  No difficulty going from standing to sitting or from sitting to standing.

A: and P:
1. Tenderness to the T and LS spine with history of trauma – we will x-ray both. Start FLEXERIL 10 mg one p.o. t.i.d. x 10 days prn spasms, ULTRAM 50 mg two p.o. t.i.d. x 10 days for pain.
2. NOTE:  He has PUD and cannot tolerate NSAIDS.
3. Also requested a clipper shaver – we will go ahead and grant that since he cannot use shaving cream.


_____
Marcial J. Mendez, M. D.
Montgomery City Jail

# Exhibit J

MONTGOMERY CITY JAIL
MEDICAL SERVICES

## CONVALESCENT AND CHANGE IN WORK CLASSIFICATION STATUS

TO: ALL CONCERNED                    DATE: 10/16/07

INMATE NAME: _Stawley Jarrett_ CELL: _3B_

( ) BED REST FROM: _Clipper Profile_ ~~TO:~~ _due not able to_

( ) REASON: _Use the Shaving Cream_

( ) CONVALESCENT: List any restricted activity for medical reason _____

_____

( ) RESTRICTED DUTY: specify exact restriction _____

_____

( ) INSTRUCTIONS/SPECIAL NEEDS: _____

_____

_____

AUTHORIZED SIGNATURE

Original - medical record          Copy - Inmate

# Exhibit K

# SOUTHERN RADIOLOGY SERVICES, LLC

**PLEASE PRINT**

Please Indicate Patient Status:
___ Bill Facility (Medicare Part A Skilled)
___ Bill Insurance (3rd Party Non-Skilled)
___ Hospice
___ Employee

PATIENT: _Garrett Stanley_
Last / First / MI

DOB: _2 Jan 66_  SEX: M  F  ROOM #: _____ CODE

FACILITY: _Municipal Jail_

PHONE: 334/12-645  FAX: 334/12-286

SS#: _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_  CODE

MEDICARE #: _____ CODE

MEDICAID #: _____ CODE

INSURANCE: _____ CODE

INSURANCE #: _____  PRE CERTIFICATION # _____

**RESPONSIBLE PARTY INFORMATION**
(MUST BE COMPLETED FOR ALL PATIENTS)

NAME: _Inmate Dept_  PHONE #: ( ) _334/12-287_

ADDRESS: _C/o Jackson_

CITY: _Montgomery J_  STATE: _AL_  ZIP: _36111_

PATIENT SIGNATURE: _____

Patient's or Authorized Person's Signature. I authorized the release of any medical or other information necessary to process this claim. I request payment of government/insurance benefits be made to the provider performing services.

☐ Patient Unable to Sign

## EXAMS REQUESTED: Please Mark Each Clearly
### X-RAY EXAMS

| Code | Exam | | | Code | Exam | | | Code | Exam | | |
|------|------|--|--|------|------|--|--|------|------|--|--|
| 74000 | Abdomen, 1 View | | | 73520 | Hip, Min 2 Views w/Pelvis | L | R | 73590 | Tibia/Fibula, 2 Views | L | R |
| 73600 | Ankle, 2 Views (AP 7 LAT) | L | R | 73510 | Hip, Comp Min 2 Views | L | R | 73100 | Wrist, 2 Views | L | R |
| 73610 | Ankle, Comp Min 3 Views | L | R | 73600 | Humerus, Min 2 Views | L | R | 73110 | Wrist, Min 3 Views | L | R |
| 73650 | Calcaneus (Heel), 2 Views | L | R | 73560 | Knee, 2 Views | L | R | | OTHER | | |
| 71010 | Chest, 1 View (AP) | | | 73562 | Knee, 3 Views (inc OBLQ) | L | R | | OTHER EXAMS | L | R |
| | | | | 70160 | Nasal Bones, Comp Min 3 Views | | | | | | |
| 71111 | Chest With Ribs, 4 Views | | | 72170 | Pelvis, 1 Views | | | | | | |
| 73000 | Clavicle, Complete | L | R | 71100 | Ribs, 2 Views | L | R | 93000 | EKG   Pacemaker: Y  N | | |
| 73070 | ELbow, 2 Views | L | R | 72220 | Sacrum/Coccyx, Min 2 Views | | | 95819 | EEG | | |
| 73080 | Elbow, Comp 3 Views | L | R | 73030 | Shoulder, Min 2 Views | L | | | | | |
| 73550 | Femur, 2 Views | L | R | 70210 | Sinuses, Less Than 3 Views | | | | | | |
| 73620 | Foot, 2 Views | L | R | | | | | | | | |
| 73630 | Foot, Comp Min 3 Views | L | R | 70250 | Skull, Less Than 4 Views | | | | | | |
| 73090 | Forearm, 2 Views | L | R | 72040 | Spine, Cervical 2 Views | | | | | | |
| 73120 | Hand, 2 Views | L | R | 72100 | Spine, Lumbosacral 2 Views ✕ | | | | | | |
| 73130 | Hand, Min 3 Views | L | R | 72070 | Spine, Thoracic 2 Views ✕ | | | | | | |

## DIAGNOSIS/SYMPTOM(S): Please Mark ALL that apply

| Code | Symptom | Code | Symptom | Code | Symptom |
|------|---------|------|---------|------|---------|
| 787.3 | Abdomen Distention (Flatulence) | 496 | COPD, Chronic Obstructive Pulm. Dis. | 560.9 | Obstruction, Intestinal |
| 787.5 | Abnormal Bowel Sounds | 786.2 | Coughing | | Pain in _____ |
| 413.0 | Angina | | Dislocation of _____ | 485 | Pneumonia, Confirmed |
| | Arthritis of | 780.4 | Dizziness | 514 | Pneumonia, Probable |
| 429.2 | ASCVD, Arteriosclerotic cardiovas. Dis. | 787.2 | Dysphagia (Difficulty Swallowing | 795.5 | Positive Mantoux, PPD |
| 427.31 | Atrial Fibrillation | 782.3 | Edema (Swelling) | 518.4 | Pulmonary Edema, NOS |
| 507.0 | Aspiration | 492.0 | Emphysema | 515 | Pulmonary Fibrosis |
| 427.89 | Bradycardia | 780.6 | Febrile (Feverish) | 786.7 | Rales in Chest |
| | Bruise of | | Possible Fracture of _____ | 786.09 | Shortness of Breath |
| 466.0 | Bronchitis, NOS | 560.39 | Impaction | 780.2 | Syncope & Collapse |
| | Carcinoma of _____ | 518.3 | Infiltrate, Lung | 785.0 | Tachycardia |
| 429.3 | Cardiomegaly | 410.92 | Myocardial Infarction | 011.90 | Tuberculosis |
| 786.50 | Chest Pain, Unspecified | 787.01 | Nausea and Vomiting | 519.8 | URI (Chronic) |
| 514 | Congestion, Chest | | | | OTHER _____ |
| 428.0 | Congestive Heart Failure | | | | |

PHYSICIAN'S SIGNATURE: _____

Because of physical psychological and/or age limitations, this patient would find it difficult to receive this/these procedure(s) at a fixed site. I certify that this/these procedure(s) is/are medically necessary for the proper treatment of this patient.

RADIOLOGIST: _____

PRELIMINARY REPORT:

NURSE'S SIGNATURE: _____

ORDERING PHYSICIAN: _____  CODE

PHONE #: _____

FAX: _____

X-RAY #: _____  TECH: _____

DATE: _10-17-06_  #VIEWS: _2_

ARRIVE TIME: _0925_  Q0092 # _2_

DEPART TIME: _____  # PTS SEEN _2_

_____ AM

TIME: _____ PM

Exhibit L

# SOUTHERN RADIOLOGY SERVICES, LLC
## X-RAY REPORT

| DATE 10/17/2007 | LAST NAME JARRETT | FIRST NAME STANLEY | MI |
| D.O.B. | SEX | FACILITY | |

ORDERING PHYSICIAN
MENDEZ, MARCIAL

FACILITY
MONTGOMERY CITY JAIL
X-RAY NO.

## THORACIC SPINE, TWO VIEWS, 10/17/07

**HISTORY**: Pain.

**FINDINGS:** There is very minimal scoliosis in the upper thoracic spine convexed to the right. No paraspinous soft tissue masses are seen. Pedicles appear to be intact. Vertebral body heights are well maintained.

**IMPRESSION:** No acute process.

## LUMBAR SPINE, TWO VIEWS, 10/17/07

**FINDINGS:** There are 5 lumbar type vertebral bodies. Extensive facet degenerative changes are identified at L4-5 and L5-S1, worse on the right. Anterior alignment appears appropriate on the lateral view. No fractures or subluxations detected.

**IMPRESSION:** Extensive facet degenerative changes in the lower lumbar spine. It is difficult to exclude a unilateral spondylolysis on the right at L4-5. No acute fractures are detected.

**UNSIGNED REPORTS ARE DICTATED BUT NOT REVIEWED**

Randall Finley, M.D./pag

tt:    10/17/2007  4:09:48 PM
td:    10/17/2007  3:22:21 PM

10/23/07

Exhibit M

STANLEY JARRETT
DOB: 02/20/66

10/25/07: City:  Here today complaining of back pain.  I had called to see
him and go over his x-ray report.  Thoracic spine x-ray – Impression:  No
acute process.  Lumbar spine – extensive facet degenerative changes in the
lower spine.  It is difficult to exclude a unilateral spondylosis on the right at
L4/5.  No acute fractures are identified.

A: and P:
1. Since he continues to hurt we will go ahead and schedule him for a
   MRI of the LS-spine.
2. We will also refill his ULTRAM 50 mg two p.o. t.i.d. x 10 days
   prn pain.
3. He is already on FLEXERIL.


Marcial J. Mendez, M. D.
Montgomery City Jail

Exhibit N

MONTOMERY CITY J__
MEDICAL SERVICES

CONVALESCENT AND CHANGE IN WORK CLASSIFICATION STATUS

TO: ALL CONCERNED                                    DATE: 11/7/07

INMATE NAME: Stanley Jowett                 CELL: 3B

( ) BED REST FROM: Extra Mat           due TO: Lock

( ) REASON: injury

( ) CONVALESCENT: List any restricted activity for medical reason _____

_____

( ) RESTRICTED DUTY: specify exact restriction _____

_____

( ) INSTRUCTIONS SPECIAL NEEDS: _____

_____

AUTHORIZED SIGNATURE

Original - medical record           Copy - Inmate

# Exhibit O

MONTGOMERY MUNICIPAL JAIL
MEDICAL REQUEST

This form will be completed to see the physician or nurse. Also complete this form for
over the counter or treatment items, i.e. Tylenol, band-aids, ointments, etc.

Print Name: _Stanley Jarrett_          Date: _11-17-08_
Date of Birth: _2-30-66_               Location: _3-B_

Medical Request: _I like to see the doctor about_
_Results of my M.R.I_

_A.S.A.P._

_Stanley Jarrett_
Inmate Signature

Officer Signature: _____ Time:_____

Medical Issues
_____ Home medication
_____ Outside medical appointments Date: _____ Time:_____

Contact ___ Physician/Clinic                    _____ Family/Friend
Name:_____                            _____
Address:_____                         _____
_____                                 _____
Telephone#_____                          _____
_____  DO NOT WRITE BELOW THIS LINE  _____

Date: _____                Date: _____
Time: _____                Time: _____
Allergies_____               Receiving Nurse: _____

Assessment:_____
_____

Plan: _____
_____

Refer to:    Physician    Mental Health    Emergency room    Return to Clinic PRN
                         CIRCLE ONE

# Exhibit P

# JACKSON HOSPITAL & CLINIC, INC.
### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

Order Location:   OXR

**Name:** JARRETT, STANLEY

**Physician:** MENDEZ, MARCIAL

**Med Rec No:** 159554

**Order ID:** 297068

DOB: 02/20/1966    Age: 41Y

Patient Location: /

Xray #:

Account #: 0731400071

Addendum #: 0

---

Clinical Data: BACK PAIN

**Procedure:** MRI LUMBAR W/O CONTRAST

**Date of Exam:** 11/13/2007

**Date of Transcription:** 11/13/2007

**CLINICAL HISTORY:** Back pain.

**PROTOCOL:** Images are obtained on a 1.5 Tesla magnet. Sagittal spin-echo T1 and fast spin-echo T2 weighted images were obtained. Axial T1 and fast spin-echo T2 weighted images were also obtained contiguously from L3 through S1. All images were obtained at 4mm intervals.

**FINDINGS:** Slight exaggeration of the usual Lordotic curve.  Mild anterolisthesis of L5 is noted.  A secondary degenerative change at the L5/S1 level with narrowing and desiccation of the disc.  There is also a mild broad annular bulge of disc present at L5/S1.  Facet hypertrophy is also present at this level.  These changes result in mild narrowing of the canal and encroachment on both neural foramen at L5/S1.  Less prominent slight disc bulge and secondary degenerative change also seen at L4/5.  There is also foraminal narrowing bilaterally at this level.  Facet hypotrophy also slightly encroaches on the neural foramina on each side at L3/4.   No dominant areas of spinal stenosis are seen.  I see no intradural abnormalities.  There is an atypical hemangioma noted in the L3 vertebral body.

**CONCLUSION:**

SLIGHT ANTEROLISTHESIS OF L5 WITH EXAGGERATED LORDOTIC CURVE.  THERE IS MILD DISC BULGE AND SECONDARY DEGENERATIVE CHANGES AT L4/5 AND L5/S1 THAT RESULTS IN SOME FORAMINAL NARROWING.  THERE IS ALSO MILD FORAMINAL NARROWING AT L3/4 DUE TO FACET HYPERTROPHY.

**JACKSON HOSPITAL.**

Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non-profit Organization

Page 1 of 2

**X-RAY REPORT**



**Name: JARRETT, STANLEY**

**Physician: MENDEZ, MARCIAL**

Med Rec No: 159554

Order ID: 297068

Order Location:    OXR

DOB: 02/20/1966    Age: 41Y

Patient Location:  /

Xray #:

Account #: 0731400071

Addendum #: 0

---

Dictated by: SCOTT, GARY WAYNE

Verified by: SCOTT, GARY WAYNE

Transcriptionist: BIXLER, TONYA



**JACKSON HOSPITAL**

Jackson Hospital & Clinic, Inc.
1725 Pine Street
Montgomery, AL 36106-1117
A Non-profit Organization

**X-RAY REPORT**

# Exhibit Q

MONTGOMERY MUNICIPAL JAIL

Every Municipal Jail employee is to read and be familiar with the Montgomery Police Departments Manual of Rules and Regulations as it states in Article II Section 2.058.

The following is a standard operating procedures manual that the employees of the Municipal Jail will follow.

The Montgomery Municipal Jail is a non-smoking facility.  No employee, inmate or visitor will be allowed to bring any such contraband into this facility. If a Municipal Jail employee violate the non-smoking policy while working in the jail, he/she will be discipline in accordance with the Montgomery Police Department Manual of Rules and Regulation.


Every person entering this facility is subject to be searched at any time.

Revised    8/98

SECTION I

MAJOR DUTIES AND RESPONSIBILITIES OF JAIL EMPLOYEES

THE WARDEN AND ASSISTANT WARDEN

MAJOR DUTIES AND RESPONSIBILITIES

The responsibility for all administrative and operational functions of the jail is delegated to the Warden.

He/she will be responsible for making assignments of jail employees where they will be of the greatest value to the department.

In cooperation with the MPD Training Division he/she will be responsible for preparing, supervising, coordinating, and evaluating training programs for all newly assigned employees.

It is his/her responsibility to ensure compliance with all laws and regulations, city, state, and federal, which govern the custody and treatment of prisoners.

He/she will coordinate jail management activities with the local fire marshal in maintaining an effective fire prevention and safety program.

He/she will be responsible for enlisting the resources of state and local health departments for assistance in maintaining high standards of sanitation and medical and health services.

The Warden has a definite responsibility to maintain public property economically and efficiently. He/she is directly responsible for maintaining the jail and its equipment in the proper state of repair. It is his/her responsibility to establish and follow maintenance schedules and to make maximum use of inmate labor. He/she will be responsible for enlisting the resources of local supporting agencies for those activities requiring mechanical skills not otherwise available. It is his/her responsibility, in consultation with the Administrative Division's Assistant Division Commander to discuss the current needs and to make recommendations for keeping the jail and its equipment in good repair.

He/she is responsible for developing and maintaining a good public relations program designed to create public opinion favorable to the whole program of jail operations.

It will be his/her responsibility to monitor all drugs prescribed for jail use.

It shall be his/her responsibility to expedite the judicial disposition of the mentally ill committed to jail. To this end, in consultation with the Municipal Court, the Probate's Office,

and the physician, he/she will initiate and coordinate administrative action necessary to facilitate legal processing.

SHIFT SUPERVISOR/RELIEF SUPERVISOR
MAJOR DUTIES AND RESPONSIBILITIES

He/she will be responsible for preparing daily work schedules.

He/she is responsible for the operational control of the jail during his/her tour of duty.

He/she will exercise operational control over all jail employees assigned to his/her shift and will be responsible for directing, coordinating, and supervising their activities.

He/she will receive, obey, and pass on all lawful orders and instructions from the superior chain of command.

He/she will be responsible for inspecting, directing, implementing, and supervising procedures necessary to ensure adequate jail security.

He/she will be responsible for maintaining high standards of sanitation, housekeeping, and safety. To this end, it will be his/her responsibility to plan, organize, and assign housekeeping details.

It will be his/her responsibility to inspect, direct, and supervise procedures necessary to ensure adequate control, discipline, and supervision of prisoners.

It will be his/her responsibility to ensure that adequate medical and health services are made available to all sick and injured prisoners.

He/she will exercise supervision of the jail kitchen and will assign inmate food service personnel. He/she will inspect all such personnel each time they report for duty.

He/she will perform all administrative functions pursuant to operational requirements in accordance with procedures established herein.

He/she will take every precaution to ensure fair and impartial treatment of prisoners without regard to race, color, or creed with humane treatment for all.

He/she will be responsible for providing constructive employment for all prisoners undergoing sentence and for the assignment of prisoners to outside work details.

There will be a supervisor or relief supervisor on duty at all times on each shift.

4

He/she will also ensure that a translator be provided for any non-English speaking inmate during medical screening upon intake.  The AT&T number is 1-800-528-5888.

He/she will implement instructions and suggestions for the correction of deficiencies of fire prevention and safety measures.

He/she will report to the Assistant Warden or Warden all occurrences, incidents, problems, irregularities, etc., of an unusual nature, and any prisoners who are sick or injured.

The shift supervisor shall check the inspection log to ensure the log is being properly maintained and is correct.  The check will also be made to ensure that the logs are not being completed until such inspections are actually performed.  These checks will be periodically made once every two hours; however, they are not limited to this number.

If necessary, the shift supervisor or relief supervisor may assign a Municipal Jail Corrections Officer to office duties, including booking, so that he/she can oversee the operation throughout the jail during his/her tour of duty.

The shift supervisor or relief supervisor is responsible for dispensing inmate medication in the absence of a Municipal Jail Nurse and the logging of such.

The shift supervisor or relief supervisor will ensure that all inmates signed out of the jail are checked in the computer for any holds or special conditions and that the inmate is wearing the correct color clothing.

## THE MUNICIPAL JAIL CORRECTIONS OFFICER
## MAJOR DUTIES AND RESPONSIBILITIES

He/she will receive, obey, and carry out all lawful orders and instructions from the Supervisor, the Warden, Assistant Warden, the Administrative Division Commander, Assistant Commander, the Chief of Police, or Assistant Chief of Police.

He/she will carefully search all prisoners entering the jail regardless of whether they have or have not been searched.

He/she will be responsible for fingerprinting, photographing (mugshots), and confining all prisoners committed to jail.

He/she will take every precaution to ensure fair and impartial treatment without preference to any prisoner or class of prisoners, and without regard to race, color, or creed.

It is his/her responsibility to ensure that prisoners are not subjected to control or domination by other prisoners or prisoner organizations.

It will be his/her responsibility to safeguard the rights of prisoners to medical care necessary to conserve their health. He/she will report to the supervisor the name of any prisoner desiring or requiring medical attention and provide an inmate request card for the prisoner to request such treatment.

He/she will ensure that every prisoner is given every reasonable opportunity to confer with his attorney or other persons he needs to contact pursuant to the procedures prescribed herein and ensure the inmates are provided the opportunity to place a telephone call upon entering from the street or the Municipal Court.

He/she will be responsible for supervising all inmate labor concerning housekeeping activities and all housekeeping details.

He/she will make frequent, but irregular, rounds of the jail during his/her tour of duty.  The frequency of these inspections will not be less than, or limited to one inspection per hour. He/she will give particular attention to cells where dangerous or escape-minded prisoners are confined, including those cells where the insane, mentally disturbed, the sick, injured or other prisoners known to have suicidal tendencies are confined.  These inspections will be made every 15 minutes with the aid of a flashlight. If necessary, visible observation should be made of these inmates during these rounds.

He/she will supervise the feeding of prisoners and will ensure that all eating utensils are returned to the kitchen after each meal.

Any MJCO that assigns or re-assigns an inmate to a cell is to ensure that the cell assignment is entered in the booking computer and that the shift supervisor or relief supervisor is advised concerning the move.

He/she will keep all prisoners not actively engaged in housekeeping work details or maintenance activities locked in their respective cells. He/she will not allow prisoners to loiter in any part of the jail.

He/she will report to the shift supervisor or relief supervisor all incidents, irregularities, and problems of an unusual nature.

Female correctional officers will serve in the same capacity in the handling of female prisoners that they serve in the handling of male prisoners.

Male correctional officers will only search female prisoners in an emergency situation involving the immediate security of the facility. If it is necessary for a male correctional officer to conduct such a search of a female inmate, it should be witnessed by another Municipal Jail employee. Male correctional officers are not to conduct unclothed searches of female inmates. Female correctional officers are not to conduct unclothed searches of male inmates.

The MJCO will ensure that all inmates signed out of the jail are checked in the computer for any holds or special conditions, and that the inmate is wearing the correct color clothing.

MEMORANDUM

TO      :  Warden E. McCurdy

FROM    :  Captain D. A. Ducker

DATE    :  May 21, 1998

SUBJECT:  Municipal Jail Corrections Officer Trainees

The following are guidelines to be used when a new Municipal Jail
Corrections Officer Trainee is assigned to the Municipal Jail.
The Trainee will:

1.  Complete the first available Municipal Jail Corrections
    Officer school.

2.  Be assigned to only one (1) training officer of the same
    shift.

3.  Stay with that training officer at all times while on duty,
    and not be given jobs or tasks to do on their own.

4.  Be assigned to a different shift every two (2) months until
    the Trainee has served on all three (3) shifts.

5.  Complete any written or verbal tests that the Warden may
    devise.

6.  Be given training reports on the first and fifteenth of the
    month, which will be turned into this office the next working
    day by the training officer and supervisor.

It should be noted that the training period should not last more
than six (6) months, unless brought to the attention of this
office by the Warden.

(CONDUCT)

When any public official takes the oath of office he automatically waives certain privileges of the private citizen. In private life, as well as public life, his conduct must be exemplary at all times. People who know him or see him in uniform know him as a member of the Montgomery Police Department. His personal reputation becomes public in nature from which he cannot escape.

Every employee while on duty will at all times present a neat appearance. The uniform will be clean and neatly pressed, hair neatly trimmed, clean shaven, and shoes polished

Each and every employee will adopt a professional attitude toward his particular job. They will be impartial and courteous at all times, be tactful and well mannered under all circumstances whether on duty or off duty. Preserve your dignity at all times.

Employees will not, while in uniform, frequent, patronize, or loiter in or around any place of questionable reputation.

Upholding the law requires that public officials first obey the law. Therefore, no employee shall violate any law of the United States, State of Alabama or any County, City or Municipality, whether on duty or off duty.

Intoxicating beverages of any description will not be consumed on the premises of the Jail, except for medicinal purposes prescribed by the jail's physician. Employees reporting for duty under the influence of alcoholic beverages will, under all circumstances, be considered unfit for such duty and will be reported to the jail supervisor.

Gambling of any description on the premises of the jail is strictly prohibited. Games of amusement are prohibited for all employees on duty. No employee, whether on or off duty, will frequent or loiter about, or participate in any activity in any unlicensed gambling room, parlor, or establishment.

No employee shall make or cause to be made any false official reports, or knowingly enter or cause to be entered in any records or reports, any inaccurate, false, or improper information. All entries will be made with black non-erasable ink or ball-point pens.

The acceptance of any gratuity, loan, reward, gift, or bribe, directly or indirectly, from any prisoner or other person liable to arrest or complaint, or from any friend or friends of such persons, is strictly prohibited.

The use of violent, profane, or provocative language is prohibited. Such language is neither necessary nor required.

9

look natural and compliment the individual. Hair ornaments such as ribbons, combs, barrettes, or bobby pins will not be worn while in uniform. Hair pieces will not be worn while in uniform.

Male hair - hair will be neat, clean, trimmed and presented in a groomed appearance. Hair will not touch or be tucked behind the ears, or extended below the top of the collar except the closely cut hair on the back of the neck which may be either tapered or blocked. Hair in front will be groomed so it does not touch the eyebrows.

Cosmetics - cosmetics will be conservative and in good taste. Colored nail polish will not be worn in uniform. Fingernails should not be longer than 1/4 inch out in length.

Uniforms - uniforms, as provided by the department, will be kept clean, neat, and in good condition. Wear the correct size, not one that is too tight or too small.

Underclothing - will be worn at all time while in uniform. No specific type or color of underwear is prescribed, except that an undershirt will be worn and if exposed it will have to be white. Female officers will wear a bra that supports their breasts substantially and does not give the appearance of braless.

Shoes - will be black, smooth toe, and low heels. Boots are optional and will meet the same standards as shoes. Socks will be dark blue or black and will be worn with the departmental uniform at all times. They will be pulled up to their full extent.

There will be no exception to these rules.

11

NURSE
MAJOR DUTIES AND RESPONSIBILITIES

PURPOSE:

The purpose of this Post Order is to establish a uniform procedure for assigning responsibility for specific tasks which are to be performed by the personnel within the Municipal Jail.

RESPONSIBILITY:

It is the responsibility of the nurse to ensure that the provisions of this order are followed. In the absence of the nurse, the shift supervisor will ensure compliance. The Departmental Manual, the Prisoner's Rules and Regulations, and current policy memorandums will be used to supplement this order.

ATTITUDE:

The attitude of the nurse will be courteous and professional at all times. Such an attitude leave little room for a display of anger, emotional outbursts, profane language, etc.

1.   SPECIFIC RESPONSIBILITY:

A. INITIAL INTERVIEWS TO ISOLATE MEDICAL PROBLEMS

(1)   Normally the booking officer will conduct a short interview to determine medical problems during the booking process. At this point, the prisoner will be encouraged to telephone a family member to bring any medications which is being taken to the jail. If necessary, the officer will assist in the call. Names of family members, telephone numbers, family physician, nature of medical problem, and if he/she is a veteran will be ascertained. Regular procedure will be utilized to initiate the medical record, set up medication routines, and referral to the nurse. At any time during this process, if the prisoner is found to be lying or attempting to obtain illegal drugs through subterfuge, the interview will be terminated.

(2)   The nurse will conduct a follow-up interview with all prisoners referred by the booking officer. All information will be verified, additional information obtained, and the inmate placed on the doctor's list whenever appropri-

ate.

    (3)   All incoming federal inmates will be processed in the same fashion as outlined in paragraphs (1) and (2) above.

    (4)   Whenever a prisoner is determined to have a serious life threatening medical condition, the Warden or Assistant Warden will be contacted before any attempt is made to secure a release.

B.   MEDICATIONS:

    (1)   All medications which come in with the prisoner will be listed in red on the face of the property envelope. The medication will be charted on the medical record, and when it is used, the empty bottle will be placed into the property envelope. Before any of these medications are renewed by this department, the city's physician must approve the renewal.

    (2)   At no time may jail medication be administered to a prisoner because, "He was taking it the last time he was here", or because he said, "He is taking the medication."  The prisoner must bring the medications with him/her, be scheduled to see the city's physician, or in cases of a life threatening illness, the prisoner's physician will be contacted for the medication which must be approved by the city's physician before ordered or administered.

    (3)   Except federals, city purchased medications will not be given to the prisoner upon departure.  However, all personal medications which were brought in by him/her will be returned to him/her.

C.   MEDICAL RECORDS:

    (1)   Whenever a medical record is indicated, the files will be checked and the original record will be pulled.  A new opening number will be given with the first charting of medications.

    (2)   Without exception, all medical records will be initiated with the "Medical History Form." Upon completing, the prisoner will be interviewed about all major medical problems which have been marked on the form.  Any additional

13

comments needed may be added to the "Progress Notes" by the interviewing officer.

(3) A specific question will be asked about allergic reactions to medications, and if indicated, it will be marked in red on the "Medical History Form," and on the outside of the medical folder.

D. PHYSICIAN APPOINTMENT:

(1) Except during the initial interview at booking, all medical requests, including a request to see the city's physician, will be initiated by the prisoner submitting the prisoner request card.

(2) The prisoner request cards will be forwarded to the nurse to arrive by 0800 hours. The nurse will interview each prisoner who submitted a card and determine course of action.

(3) If a dental appointment is requested, the nurse will determine during the interview the location of the bad tooth and will mark the dental chart accordingly. The nurse will determine if there are any allergic reactions or heart problems and will mark the dental chart in red, if indicated. If heart problems do exist, it must be determined to what extent, then the dentist must be notified in advance in order that medication may be ordered, if indicated. In the case of an abscess, prior notice must also be given.

(4) The nurse will review each active chart daily to ensure accuracy of the information posted. If inaccuracies are found, it will be brought to the attention of the shift supervisor or relief supervisor concerned.

(5) The nurse will review the medical record of each prisoner scheduled to see the doctor or dentist just prior to the visit to ensure the information is correct and current and that the prisoner is still in the jail.

(6) In most cases, any doctor appointments made by the prisoner prior to incarceration will not be honored.

14

E.    MENTALS:

    (1)    The mental prisoner is a unique problem to the jail and must be treated as such.

    (2)    On the first duty day after incarceration of the mental prisoner, the nurse will interview the prisoner's family or next of kin to determine if a Probate Court Petition has been signed.  If not, the nurse will encourage the family to do so.  During this interview, determine mental history, medications, if any, and ask that the medications be brought to the jail.

    (3)    Advise the Municipal Court of the prisoner's condition and ask for a mental evaluation by Mental Health.

    (4)    Ensure completeness and accuracy of medical records and maintain a running log of the prisoner's behavior.  This information will be used in Probate Court proceeding for commitment.

    (5)    In cases where the family will not sign a Petition, and a Petition is clearly indicated, then the nurse will proceed to Probate Court, initiate the Petition and testify at the commitment hearing.

F.    OTHER:

    (1)    Although the nurse is responsible to the shift supervisor or relief supervisor, the shift supervisor or relief supervisor may, at any time, ask for assistance working with female inmates, or in relieving jail personnel for break.  If the nurse is not busy, assistance will be given.

    (2)    The nurse may not read books, watch television, listen to the radio, sleep, or perform other personal tasks while performing duty at the jail.

    (3)    Whenever the medical room is in use, the door will remain unlocked

    (4)    A medical journal log will be maintained by each nurse.  However, it need not be approved by the shift supervisor or relief supervisor.

    (5)    The nurse will be responsible for rendering first aid, for dispersing all medicines,

drugs, and other medications, and for
maintaining all medical records.

(6)   It is the nurse's duty to collect inmate fees
for nurse or doctor visits.  These fees are to
be transferred to the Municipal Jail commis-
sary operator on a regular basis, and
produce the proper receipts and/or paperwork.

(7)   Whenever the nurse requires a day off, leave,
etc., coordination will be through the shift
supervisor and/or Warden's office.

## MESS STEWARD

Skill in the efficient and large scale preparation of palatable food and meals.

Knowledge of the proper use, care and maintenance of equipment, appliances and material used in large volume food preparation.

Ability to plan meals for the economic purchase and maximum utilization of food. Ability to train, direct and motivate a number of unskilled kitchen helpers as needed for the orderly, efficient and sanitary preparation of meals and the clean up and maintenance of kitchen facilities and equipment.

Ability to compute or to determine the food and food items needed in the preparation of meals by using an estimated number of inmates to be served.

Ability to determine the amount of food stock to maintain in order to prepare a week of meals based upon the weekly menus and to plan use of leftovers, in the absence of the Food Service Supervisor.

Ability to communicate in writing to the extent necessary in order to prepare documentation and maintain records. Ability to read to the extent necessary to comprehend recipes, menus, invoices, etc., or to determine which food items and condiments to utilize in meal preparation.

Knowledge of department and state health department food service regulations regarding cleanliness, duties and responsibilities as well as guidlines regarding the acceptable quality of food items delivered, etc.

Knowledge of methods for planning and incorporating special dietary needs resulting from medical, religious or ethnic backgrounds into the daily menu.

17

SECTION II

ADMINISTRATIVE PROCEDURES

## ADMINISTRATIVE PROCEDURES

### (GENERAL)

Time is of the essence in receiving and processing prisoners. The arresting officers must not be detained any longer than is absolutely necessary. Booking shall receive top priority over all other processing. To this end, jail employees will not permit themselves to become engaged in lengthy conversations with the arresting officers or the prisoner. Keep distractions and confusion to a minimum. Keep all prisoners off the floor except the one being processed and the approved work detail inmates.

(DISCIPLINARY ACTIONS FOR INMATES)

MEMORANDUM

TO:          Major Martha R. Huett
             Warden Edward McCurdy

FROM:        Chief John H. Wilson

Date:        July 10, 1997

Subject:     PROCEDURE FOR PUNITIVE INCARCERATION IN
             MUNICIPAL JAIL

The following guidelines will be used from this date forward when
it becomes necessary to utilize the City's drunk tank or isola-
tion cells for punitive and/or isolated purposes.

This memo is intended to provide clear cut guidelines to be used
in the event it does become necessary to incarcerate prisoners in
the Montgomery Municipal Jail in the cell that has been known as
the "drunk tank". First and foremost, this office recognizes
that there may be those rare times when it becomes necessary to
isolate inmates in the drunk tank. Before getting into specific
procedures that must be followed, and circumstances that must be
met, the number one priority should always be that basic human
rights are preserved at all times, even when we are dealing with
a violent, intoxicated, mentally impaired individual, or under
any other circumstances that might render an inmate uncontrolla-
ble. Basic human needs must be provided including, but not
limited to, food, water, proper ventilation, proper medical care
and sanitary resources.

It will, therefore, be this department's policy that from hence-
forth no inmate will be incarcerated in the City's drunk tank for
punitive reasons unless the following exceptions are met and the
following procedures are followed.

Inmates will only be isolated in the drunk tank when every other
possible option has been exhausted. At the time of this memo,
Montgomery Municipal Jail has what is referred to as Cells 2A-B-C
and D. These cells should be utilized first, if no space is
available in one of these cells, then any vacant cell away from
the general population, including those in the new Federal hold-
ing facility, should be the first options. Also, in the future
it is the City's intent, and funds have been allocated, to con-
struct at least two cells to be used on a permanent basis as
isolation units. Once these cells are constructed, they should
be added to the list of first options. In the event, AND ONLY IN
THE EVENT, that all of these cells are occupied and cannot be
utilized, may the drunk tank be used as an isolation cell and
only until one of these aforementioned cells becomes available.
If it becomes necessary that the drunk tank be used as an isola-

tion unit, it will only be done until the problem is rectified. In other words, if an inmate has violated Jail policy and becomes unruly and then indicates at any point he/she is ready and placed back into the general population. Should the uncontrollable behavior continue for an extended period of time, then the inmate will be verbally questioned at least once every eight hours in an attempt to ascertain whether said inmate can be safely placed back into the general population. If no progress is made, and no other cells have become available during a two day period, a more indepth assessment should take place to see if perhaps Mental Health or some other agency could better address the uncontrollable behavior and place the inmate in a more suitable environment.

In other words, it is imperative to see that everything humanly possible is done to prevent inmates from being held for punitive reasons over extended periods of time in the drunk tank. During an inmate's incarceration in the drunk tank for behavior problems, they should not be placed in the same cell with other persons who are there for its intended purpose. This means intoxicated individuals, being held during a sobering up period, which could present both a physical and health risk to all inmates involved.

In closing, let me remind you, when it becomes necessary, and there is absolutely no recourse but to place inmates in the drunk tank for behavior problems, it will be the responsibility of Jail personnel to see that basic human needs are provided and that the inmate's physical and mental well-being be taken into consideration at all times. This cannot be done without a sufficient supply of food, water, and sanitary necessities.

This memo will be complied with at all times.

REPORT OF INMATE RULE VIOLATION(s)

NAME: _____    DATE: _____

JAIL NUMBER: _____

ALLEGED VIOLATION(s)   MAJOR VIOLATION                    #_____

_____    #_____

_____    #_____

_____    _____

DETAILS OF VIOLATION(s):

_____

_____

_____

_____

_____

_____

_____

_____

_____

                                    REPORTING OFFICER

WITNESS

_____    _____

_____

DISTRIBUTION: Original to Jail Records
              Copy to inmate. The inmate will initial the original
              upon receiving the copy. Initials: _____

OFFENDER CERTIFICATE

I certify that I am quilty of the rule violations as outlined above and
I do apologize with the understanding that future violations will be
considered as more serious in nature. I request to be returned to jail
population with my sincere promise of good behavior.

_____

22

DATE: _____

TO INMATE: _____ JAIL NUMBER: _____

You are hereby notified that the Hearing Committee has reviewed your case and the following decision has been rendered:

_____ You have been found not guilty of the alleged rules infraction and no disciplinary action will be taken against you.

_____ You have been found to be guilty of rules infractions as charged, and the following disciplinary action shall be taken against you:

_____

_____

_____

_____

The decision of the Hearing Committee was based on the following evidence:

_____

_____

_____

_____

COMMITTEE MEMBERS

A copy of this notice was served on the above mentioned inmate on

_____

_____ 19_____

_____ At_____hours

_____ By: _____

_____

_____

NOTICE:  You are hereby advised that if you do not agree with the decision of the Committee, you have the right of appeal to the Jail Administrator for a review.  Your request must be in writing and must outline your reasons for requesting the review.

(SEARCH OF PRISONERS)

Every new prisoner must be given a thorough search to make certain that he/she has no weapons on this person. This is the first and most important step in processing the prisoner. It will be done even though it has already been accomplished by the arresting officer. It's on video camera.

All cash and personal property will be removed from the prisoner's possession and given to the desk correctional officer for control and placement in the Property Envelope. Expensive valuables such as jewelry or large amounts of cash are to be impounded in the Supply and Evidence room or at the rear desk. Inmates are allowed to keep up to $35.00 cash on them.

(INMATE SEARCHES)

All inmates housed in the Montgomery City Jail are subject to search at any time. All inmate searches will be conducted by a correctional officer, police personnel, or medical personnel at the discretion of the shift supervisor.

A.  Frisk Search

1.  Frisk searches may be conducted by MJCO's at any time that the officer believes the inmate may have contraband.

2.  Frisk searches will be conducted on all inmates entering the jail.

3.  Only female MJCO's will frisk female inmates. Male MJCO's may only search female inmates under emergency circumstances and not by themselves.

4.  If an MJCO of the same sex is not available, a police officer of the same sex will be obtained.

5.  This procedure will be in effect unless exigent circumstances prevail.

B.  Strip Search

1.  Strip searches may be conducted on any inmate at any time by MJCO of the same sex with a witness.

2.  All felonies and/or drug related inmates will be strip searched prior to being placed in the inmate housing area.

3.  Strip searches will be conducted by MJCO's of the same sex as the inmate.

4.    Strip searches will be conducted in private with two officers of the same sex.

5.    If a MJCO of the same sex as the inmate is not available, a police officer of the same sex will be requested to do the search.

6.    Searching officers should not touch the inmate during strip searches.

7.    This procedure will be in effect unless exigent circumstances prevail.

C.    Body Cavity Searches

1.    Body cavity searches are considered anal and vaginal.

2.    Body cavity searches will be preformed only by medical personnel.

3.    Body cavity searches will be conducted under medical conditions.

4.    If, in the opinion of the medical personnel, a safe body cavity examination cannot be conducted in the jail under the conditions present and considering the inmate's condition, the inmate will be transported to the emergency room and the search performed by emergency room personnel.

5.    Immediately following all body cavity searches, a complete report will be forwarded to the Warden's office.

6.    All body cavity searches will be performed in private.


(JUVENILES)

Under no circumstances will a juvenile (a person under 18 years of age) be placed in the Municipal Jail unless so ordered by the court.  The Juvenile Division will process all offenses committed by juveniles under 18 years of age.  This does not apply to traffic cases.  If for any reason a juvenile is housed in the Municipal Jail, he/she will be housed separate from adult inmates.

(BOOKING)

BOOKING PROCEDURE

1.  Sign on system
2.  Type 1, work with booking
3.  Pres F6, add booking


25

4.  Type prisoner's name: Last, part of first to get into Global Name Search
5.  Press enter, this will take you to Global Name Search Screen
6.  Find prisoner's name that you are entering.  You may have to scroll up or down to find name.  Once you find the name, verify information on screen such as DOB, press F11 and this will show you individual's address, phone number.  Pressing F11 again will show SSN/DVL number.
7.  If individual's name is not found during Global Name Search, following steps will be accomplished.  If found, skip to step 8.
    a.  Press F6, this takes you to the jacket screen. Utilizing information from the arrest report, and the inmate property envelope, complete the jacket information to include: name, address, race, sex, DOB, height, weight, hair color, eye color and SSN.
    b.  Once all information has been entered, press F22, additional information.
    c.  Tab down to "Additional characteristics"
    d.  Type 2, change
    e.  Press enter twice
    f.  Enter additional information accordingly such as scars, tattoos, etc.
    g.  Press enter four times; this take you back to the orginal booking screen.
8.  If name is there, tab down and place a 1 beside that name and press enter.
9.  Enter shift NBR, field exit
10. Enter prisoner type, field exit
11. Field exit
12. Type of incarceration, field exit
13. Type custody class, field exit
14. ID number of officer booking in subject, field exit
15. Field exit
16. ID number of officer fingerprinting (if done), field exit
17. ID number of officer searching subject, field exit
18. ID number of officer strip searching subject, field exit
19. Any other vital information that is shown, enter accordingly.
20. If federal inmate, ensure you enter in the housed for ORI with ALUSM0200.
21. Once all information has been entered, press enter.
22. Enter who brought subject in, enter ID number (F4) name (U.S. Marshal Smith) or agency (F4) press enter
23. Assign charges against subject - commits/charges
    a.  Ensure group/ori is AL0030100
    b.  Prompt (F4)
    c.  Press F9 twice
    d.  Type (COMM) "Description, Driving While _____, enter.
    e.  Tab down to desired charge

26

  f. Place a "1" next to desired charge, press enter twice.
  g. If hold for another agency, tab to hold for ORI and enter appropriate ORI. (F4) Also refer to special conditions, PG.
  h. Tab down to offense tracking number, enter UTC number from capias paperwork.
  i. Enter (J) ensure bond types are correct such as cash bonds, etc.
  j. Tab down and put court date when inmate is due in court.
  k. If more charges repeat steps b thru j.  If no more charges press F12.

24. Enter your ID number, field exit
25. Complete medical questionare (41 questions). 1 thru 10, scroll down, 11 thru 20, scroll down, 21 thru 30, scroll down, 31 thru 40, scroll down, 41, enter
26. Assign subject to a cell, bed.  Enter appropriate (Type F4) & (F4) cell location.  Type 1 next to desired selection, press enter.
27. Next screen will show who else occupies same cell, press enter.
28. Enter required supervision, if any.
29. Press field exit
30. Press enter
31. Next type a G next to inmate just booked in
32. Press enter
33. Type 1 next to booking/court sheet
34. Press enter
35. Place a 1 next to required paperwork requesting
36. Press enter 3 times.  This takes you back to original booking screen.


## ASSIGNING CHARGES


At times, you may have to put additional charges on inmates to do this, the following steps will be followed.

1. Sign onto system
2. Type 2, work with housed inmates
3. Press F9, resequence by name
4. Move cursor to the reset line, type inmate's name that you are searching for.
5. Tab down to inmates name
6. Type "2, change" , nest to inmate name
7. Press enter
8. Press F8, this will take you to the work with charges/holds window
9. Press F6
10. To add a charge, ensure the following:
  a. Local, ensure GROUP/ORI block shows "AL0030100"
  b. State, ensure GROUP/ORI block shows "S"
11. Press F4 to prompt up charges

12. Press F9 twice
13. To locate charge:
    a. If local type "Comm. and a few letters of the charge, such as "Comm. DRI, will take you to the Comm. Driving charges.
    b. If state type a few letters of the charge, such as SP, and it will take you to the speeding charge.
14. Tab down to desired charge
15. Type 1 next to charge
16. Press enter
17. On this screen:
    a. If entering charge from capias paperwork
       1. Tab down to OFNS track
       2. Enter UTC number from capias paperwork
       3. Field exit
    b. If entering a re-committ charge
       1. Tab down to plea
       2. Enter RC
       3. Field exit
18. Press enter, ensure bond is correct
19. Press enter
20. If more charges to add, follow steps 9-19, if there are no more charges, press F12
21. Press enter three times
22. This bring you back to work with housed inmates screen.
23. If more, follow steps 4 thru 20, if not sign off system

COURT DISPOSITIONS

1. Sign onto system
2. Type 2 work with housed inmates
3. Press enter
4. Press F9, resquence by name
5. Move cursor to reset line, type inmate's name that you want to update court dispositions
6. Tab down to name
7. Type 2 to left of name
8. Press enter
9. Press F8, Charges/Holds
10. Using court disposition paperwork, tab down to charge you wish to update
11. Type 10, sentence
12. Press enter
13. Tab down to court date and enter date
14. Field exit
15. Field exit
16. Enter disposition, either G or S, field exit
17. Enter disposition date, if disposition is S, enter the set-off date in this area

18. If disposition is Guilty, enter court sentence and then sentence date

19. Press enter
20. If there more charges to update, follow steps 10-19.

28

21. Once all dispositions have been posted, next you need to enter any jail time received.
22. Total days court has assigned inmate
23. Place a 16 next to top charge
24. Press enter
25. Press F6
26. Press field exit
27. Press field exit
28. Enter days received
29. Field exit
30. Enter court date
31. Field exit
32. Press enter, the scheduled release is shown
33. Press enter 6 times
34. If no other inmates need updating, sign off system. If more, repeat steps 5 thru 33.

### CHANGING INMATE HOUSING

The following steps will be accomplished when changiang the inmate's housing location:

1. Log onto system
2. Type 2, work with housed inmates
3. Press F9, resquence by name
4. Move cursor to the reset line, and type inmates name that you want to move
5. Tab down to inmates name
6. Type 18, housing, next to inmates name
7. Press enter
8. Press F15, transfer
9. Find the new location you are moving the inmate to. Whether moving them to another cell or another location. (Example: Marshal's custody, hospital) you need to ensure the correct information is entered.  To find, scroll down to find the location.
10. Place a 1 next to the new location
11. Press enter/ This takes you to the screen that shows any other inmates who are housed in the same cell.
12. Press enter
13. Mark if any additional supervision is required.  Field exit if none, no entry required
14. Press enter
15. You are now back to original screen "Work with housed inmates."

16. If there are other imates to relocate, repeat steps 4 thru 15.  If no other sign off system.

### MUGSHOTS ✓

1. Sign onto the system with your ID number and individual password.

2. Enter option 1 (Work with bookings).

3. Tab down to the inmate that you are working with.

4. Place a "10" next to the inmate's name. This will bring up the inmate's jacket. Notice in the upper right corner the word "change." If this word does not appear, then back out and try again. If there is a photo in the record, you must still take another photo. This ensures that the most recent picture of the inmate is in the system.

5. Tab down to the last line entry under "Other ID type's." You can either prompt it or type in "MJCO", field exit, then type in your ID number.

6. Ensure that the timer is on, click on the camera icon. Next, have the subject stand in the appropriate location, adjust the height accordingly to ensure you get the entire head in the picture, then click on the camera icon with the flash attachment.

7. If you do not like the picture and wish to re-do the picture, click on the top camera icon. This will take you back to live action. If satisfied with the photo, click on the green check.

8. Center the photo inside the red box, then click on the green check.

9. Pose the subject for a profile photo. Again, ensure that the entire head can be seen.

10. Once the subject is in position, click on the icon showing the camera with a flash attachment.

11. Again, if the picture is not suitable, click on the top icon of the camera. This will take you back to live action. If you are satisfied, click on the green check.

12. Center the photo inside the red box, then click on the green check. Once completed, return the one extra photo to the supervisor's office.

13. Next, a box will appear that states "Annotation." In this box you enter today's date and the booking number as such 98000000, then click on the green check.

14. You should see the picture in the upper right hand corner of the screen and under that you should see the date and booking number.

15. Once that is done, press enter (Ctrl) until you are back to the work with booking screen, and then type in 90 to log off.

STEPS FOR SENDING INFORMATION TO THE TENPRINTER FOR FINGER-
PRINT CARDS

1.    From the "Work with Booking Screen" place a 6 next to
      the inmate's name, then press enter (Ctrl).  This will
      bring up a "Work with reports window."

2.    Tab down to "Print fingerprint cards to DBI."  Place a
      1 there and press enter (Ctrl).

3.    You are now at the "Work with DBI charges."  Press F20
      (Shift F8) to print the fingerprint cards with all the
      charges.  If all charges are not to be printed, then
      select the ones that should appear on the cards.

4.    Now just exit all the way out of the system and proceed
      to the Tenprinter.

INSTRUCTIONS IF THE PHOTO PC NEEDS TO BE RE-BOOTED.

1.    Turn computer off, allow to sit for about 2 minutes.
      Power up computer.

2.    Windows will starts automatically.

3.    After windows starts, select connect.

4.    Enter password (Photo), then click OK.

5.    Next, select close.

6.    Go to New World System "Mugshots" and double click on
      "2000 Mugshot" icon.

7.    This will bring up the AS400 screen to the left and the
      photo image screen to the right.  If not, repeat steps
      1-7.

                    (FINGERPRINTING COMPUTER)

1.    At the DBI Tenprinter, tab down to your name and press
      enter, then enter your password.

2.    Select "Misdemeanor Arrest" and press enter,

3.    Next, you will enter the booking number as follows:
      Type 980 and then the last five digits of the booking
      number.

4.    Press page down.

5.    Now check all the information and ensure everything that
      is needed on the card is completed.  Page down until you
      get to the fingerprint session, and fingerprint as
      normal.

31

(CLOTHING)

<u>MEMORANDUM</u>

TO:        All Municipal Jail Personnel

FROM:      Warden's Office

DATE:      June 12, 1998

SUBJECT:   INMATE'S JUMPERS/WRISTBANDS

Effective today, all inmates classified as prisoners will continue to wear blue jumpers.

All inmates classified as convicts will wear black & white stripes.

All inmates with holds on them will continue to wear orange & white stripes.

All federal inmates will continue to wear solid orange.

THERE WILL NO LONGER BE A NEED TO PLACE WRISTBANDS ON IN-MATES.  THE ONLY INDENTIFICATION NEEDED WILL BE A LARGE PHOTO THAT WILL BE PLACED IN THE INMATE'S PROPERTY ENVELOPE, THAT SHOULD BE CHECKED BEFORE RELEASING.

(PROPER HANDLING OF CASH AND PROPERTY)

All cash and personal property will be removed from the prisoner's possession upon commitment. These items will be inventoried in the presence of witnesses, in view of the office video camera, and listed on the property envelope.

The booking officer will exercise diligent care in listing inventory on the property envelope - the listing must be accurate. If there is not any cash, the word "None" will be entered in the appropriate column. A locker key is to be issued to the searching officer for the inmate so that the inmate's clothing/footwear can be secured inside an inmate locker. The locker key is to be placed in a key envelope and stapled inside the inmate's property envelope.

The booking officer and the prisoner will authenticate the property envelope as acknowledgement that all personal effects are accounted for. If the prisoner is not competent by reason of insanity or intoxication to verify the personal effects inventory and authenticate the property envelope, the booking officer will secure the signature of a witness for this purpose. Any valuable property, such as jewelry or a large amount of cash, is to be impounded in the Supply & Evidence room or at the rear desk after hours.

Additional information relative to the proper handling of cash and property is contained elsewhere in this document.

Small jewelry or valuable items are to be placed in a small envelope and secured in the property envelope or Supply & Evidence room.

(EXAMINATION OF PRISONERS)

During the booking procedure, the booking officer and searching officer will make a close examination of the prisoner to detect signs of illness or injury requiring immediate medical attention.

The prisoner will be questioned as to whether he is a diabetic or epileptic. Any symptoms of contagious disease or signs of drug addiction will be carefully noted.

In case of serious illness or injury, the supervisor or relief supervisor will book the prisoner; however, he will not confine or accept responsibility for him pending proper disposition by medical authorities. This procedure is necessary to avoid being left with an injured or dying prisoner. A decision in such cases will be made in the presence of the arresting officers. In cases of this nature, the supervisor shall exercise the utmost tact and diplomacy. He/she and other jail employees will not permit themselves to become

33

engaged in any argument with the arresting officers. Any disagreement will be referred immediately to the Warden or Assistant Warden for a decision.

All prisoners charged with illegal possession of drugs or those suspected of being drug addicts will be "strip searched." All personal clothing worn by the prisoner will be exchanged for jail clothing.

Individual medical records will be prepared for each prisoner requiring medical attention.

A medical screening form is to be completed during the booking of each inmate into the facility.

### (TELEPHONE CALLS)

As soon as circumstances permit, prisoners will be given every reasonable opportunity to confer with their attorneys and other persons they need to contact. The correctional officer will ensure that every prisoner has the opportunity and necessary assistance to complete a telephone call. This does not mean that any prisoner shall use the telephone indiscriminately, but shall be limited to one call for a reasonable length of time. Intoxicated persons will be asked: "Would you like for us to notify anyone for you?" Should the prisoner reply in the affirmative, the correctional officer will ensure compliance with the request.

The cell telephone will be used for all long distance calls made by prisoners. Long distance calls on any other telephone is prohibited.

The use of telephone calls by prisoners to transact business or for telephone-type visits is strictly prohibited.

When a prisoner, having been sentenced, is returned from court, he/she will again be given an opportunity to use the telephone.

After the initial call made by city and federal prisoners, all other telephone calls made by these prisoners will, under all circumstances, be subject to approval by the jail supervisor, and recorded on the telephone register. All telephone calls will be signed for by the prisoner and initialed by the officer.

Telephone calls made by prisoners that have been sentenced will be subject to approval by the Warden or Assistant Warden.

### (PRISONER ROSTER)

There are five types of rosters that can be printed. The below steps will be followed to print each roster:

1. Sign onto the system

2. To print "Federal" Roster

   a. Type 17
   b. Press enter

3. To print "Convict" Roster

   a. Type 18
   b. Press enter

4. To print "Prisoner" Roster

   a. Type 19
   b. Press enter

5. To print "Court List by Court Date" Roster

   a. Type 20
   b. Press enter

6. To Print "Court List by One Day" Roster

   a. Type 21
   b. Enter
   c. At this screen, tab over to the value field.  Enter
      the court date you are wanting, such as 19970630 for
      30 Jun 97.
   d. Press enter

7. When you are finished, press F3 to sign off the system.

                        (DETAINERS)

   Any detainer (hold) placed on a prisoner by any person
or agency must be supported by the authority for such detain-
er.  A request by an individual or agency does not in itself
necessarily constitute a legal detainer.

   A detainer placed by a bonding company and a bondsman
process will be accompanied by a certified copy of the Appear-
ance Bond or Appeal Bond.

   Detainers placed by other law enforcement agencies must
be accompanied by a certified copy of the writ, remand,
N.C.I.C. teletype, or warrant.  This does not preclude plac-
ing a detainer on an individual pending receipt of legal
authority therefor.

   Entries relative to detainers made in the jail booking
computer will always include the agency.  For example, "Hold
for Montgomery County."

Nothing in this directive shall preclude detainers placed on individuals by the Montgomery Police Department. In the absence of a writ or remand, the officer placing the detainer is the authority therefor.  For example, "Hold for MPD-Lieutenant Jones."

Written detainers (writs or remands) on file in the jail will be turned over to the receiving authority at the time of the prisoner's transfer.

(SPECIAL CONDITIONS)

Follow steps below when entering special conditions, such as holds, work details, and set-offs, into the computer.

1. Sign onto system
2. Type 2 - work with housed inmates
3. Press enter
4. Press F9 - resequence by name
5. Move cursor to reset line. Type inmate name you are putting a special condition on.
6. Tab down to name
7. Place 16 - to left of name, classify
8. Press enter
9. Type 6
10. Press F6 - to add condition
11. Type S
12. Enter correct code for special condition (F4)
13. Place cursor on reason line and enter appropriate information
14. Field exit
15. Officer's ID
16. Field exit
17. Press enter three times.  This returns you to the first screen, "Work with housed inmates."

(BAIL BONDSMEN)

No jail employee shall suggest or recommend the name of any bondsman or attorney to any prisoner; nor shall they permit any prisoner to violate this regulation.

It shall be the responsibility of all employees to ensure that prisoners are not fleeced or exploited by unscrupulous persons.  Those persons suspected or known to be engaged in such activities will be reported to the Warden.

There is to be no loitering or solicitation by bonding company employees within the Public Affairs Building or upon the ground of the Public Affairs Building.

Employees of a bonding company must receive a request from the incarcerated person or another person in his/her behalf before talking to a prisoner about making a bond at the Montgomery City Jail.

If a bonding company contacts the jail and requests the charges that a subject is booked on, or is going to be booked on, then jail personnel are to give this information.

When a bond is received, the booking officer will write the date and time along with his/her initials on the bond. In the event two (2) or more bonds, from different bonding companies, are received on the same subject, then the bond or bonds that are received first will be the bond that is honored to release the incarcerated person. The other bonding company is to be advised that this subject's bond was made prior to the making of the second bond.

All bonding company employees are to check with the Records & Communications desk officer prior to going to the jail.

Bonding company employees will be allowed to remain outside the jail (in the hall) while waiting for the release of an incarcerated person. When a bond has been made and a subject is released from the jail, then jail personnel are to advise the bonding company employee (if he is waiting outside of the jail) the name of the subject being released. Also, if a bonding company makes a bond and makes a request of the booking officer that he be notified when this subject is to be released, then the booking officer is to attach a note to the bond. Jail personnel are then to contact the bonding company and advise them the subject being bonded out is being released.

(PRISONERS AWAITING TRIAL)

The following court schedule shall be adhered to in preparing a court roster for prisoners awaiting trial:

Monday through Friday - City Court, All misdemeanors (Including traffic cases)

The third shift supervisor shall be responsible for the preparation of Municipal Court rosters in conformity with court schedules. He/she will carefully screen all prisoners awaiting trial to ensure timely disposition of their cases. Circumstances permitting, all prisoners awaiting trial will be scheduled for the nearest court date unless otherwise directed. Trial shall not be set over from one court date to another without proper authority.

The name, commitment number, and charges reflected in the court roster must correspond with entries in the jail booking computer.

(JAIL DISPOSITION)

The court will return the original copy of the "Court Transcript" to the jail. This transcript will reflect the

court's disposition of each charge. The transcript will be filed pending proper disposition at the end of each month.

After trial, each prisoner will again be given the opportunity and assistance to complete a telephone call to anyone of his/her choice. If booked into the jail through court, the inmate will be dressed in jail clothing.

### (MILITARY PERSONNEL)

Military personnel committed for misdemeanors may be released to local military authorities on their own recognizance to their first sergeant or local air police.

Military personnel committed for violations other than misdemeanors will be processed in accordance with procedures prescribed herein. A bond will be required.

Local military authorities will be notified of military personnel committed to jail.

Military personnel, not under jurisdiction of local military authorities, suspected of absence without leave or desertion will be referred to the U.S.A. AWOL Section, Ft. Rucker, Alabama.

### (RELEASE OF PRISONERS)

The authority for the release of prisoners is vested in the Municipal Court, the Chief of Police, the Warden and Assistant Warden for ROR. This authority is not delegated to jail employees.

All legal requirements pursuant to the release of prisoners must be fulfilled prior to the actual release of the prisoner. Any jail employee who willfully and knowingly releases any prisoner without proper authority automatically assumes responsibility for the release.

All releases are preconditioned; that is, the requirement for the release is (1) a bona fide cash or surety bond, (2) payment of fine, or (3) a court release. This does not apply to Federal prisoners.

Appearance Bonds: Appearance bonds will be prepared by the Municipal Court Clerk. The supervisor must ascertain (1) that the information on the bond corresponds with the entry in the jail booking computer, (2) that the amount of the bond adequately covers the particular charge, (3) that the bond is authenticated by the bondsman and the officer approving the bond, and (4) that the bond is authenticated by the prisoner prior to his release. Separate Appearance Bonds will be prepared for each offense with which the individual is charged.

Appeal Bonds:  Appeal Bonds will be accepted from the Municipal Court only.  Appeal Bonds originating from other sources must be approved by the Municipal Court Clerk. Procedures prescribed in the preceding paragraph will be followed in processing Appeal Bonds.  Separate Appeal Bonds will be prepared for each offense with which the individual is charged.

Cash Bond:  Cash Bonds may be made by the Warrant Clerk in accordance with bonding schedules for the particular charge.  Separate bonds will be prepared for each respective charge.

Information pertaining to the amount of the bond and date of trial will be entered in the jail booking computer.

The following steps will be accomplished when releasing inmates.  Inmates can be released from either "Work with booking" screen or "Work with housed inmates" screen.

1.  Sign onto the system
2.  There are two ways you can release an inmate:

    a.  If you are going to release from "Work with housed inmates" screen,

        1.  Type 2
        2.  Press F9, "Resequence by name"
        3.  Move cursor to the reset line, and enter inmates name you wish to release.
        4.  Tab down to the inmate's name
        5.  Type 20, "Release" next to the inmate being released
        6.  Press enter

    b.  If you are going to release from "Work with bookings" screen,

        1.  Type 1
        2.  Move cursor to the reset line
        3.  Type 97, field exit
        4.  Enter the booking number of the inmate you wish to release, field exit.

        5.  Tab down to the inmate's name.
        6.  Type 20 "Release" next to inmate being released.
        7.  Press enter

3.  Tab down to release by block and enter the officer's ID number who is releasing the inmate.
4.  Field exit
5.  Field exit
6.  In this block, enter the reason for release.  Key F4 will take you to the field with all the proper codes.

7.  Field exit
8.  In this block, if going to another agency, such as county or US Marshal, ensure that information is entered.
9.  Field exit
10. Enter information in this block such as who the inmate is being released to such as the name of the bonding company, etc.  If being released to the county, enter the Deputy's name that is transporting the inmate.
11. Press enter - at this point, you may get a warning message.  The following actions will be taken for each warning message:

    a.  If the warning message states that charges may exist without disposition(s):

       1)  Press enter

       2)  Type 2 next to the charge

       3)  Press enter

       4)  Tab down to "Bond Post Type."  Enter the appropriate information in this area.

       5)  Field exit

       6)  In this block, enter the court date when the inmate is due to appear in court.

       7)  Field exit

       8)  Field exit

       9)  In this block, enter who is posting this bond.

      10) At this point, it will take you to the global name search screen.  Find the name and select it, then press enter.  If name is not there, then create the jacket accordingly.

      11) Press enter three times.

    b.  If warning message states "Due to active holds on the inmate, password and override reason are mandatory," you will need to ensure that the hold is removed from the inmate.  To do that, the following will be accomplished:

       1)  Press enter

       2)  Type 2 next to the charge

3)  Press enter

4)  Tab down to hold for ORI

5)  Field exit

6)  Press enter two times

7)  Check the remainder of the charges to ensure all have the holds removed.

8)  Once completed, hit enter to take you all the way out to the original screen.

NOTE:  THE ONLY TIME THAT THE PASSWORD SHOULD BE USED IS IF YOU ARE RELEASING DUE TO EARLY OUTS SUCH AS MEDICAL ROR, ETC.

Court Releases:

Even though a prisoner has completed his sentence, the booking officer must have a court release prior to releasing the prisoner.  If, on the expiration date of the sentence, the release has not been received, the booking officer will contact the Municipal Court Clerk.  In the event that the clerk's office is closed, he will contact the Warden or Assistant Warden.

The authority of prisoners released at the time of trial will usually be reflected on the court transcript.  The authority for the release of prisoners before and after trial will usually be issued by the Municipal Court Clerk.  The authority for the release will be reflected in the jail booking computer.

Releases by the Chief of Police:

Authority for releases of this type will usually come directly from the Chief of Police via telephone.  If the supervisor is not familiar with or does not recognize the voice authorizing the release, he will make a return telephone call to the Chief to verify the authorization prior to releasing the prisoner.

Remember, you are the Chief's representative.  Should an examination of the jail records disclose circumstances or information which you have reason to believe were not available to the Chief in rendering his decision, it shall be your responsibility to advise him of your findings.  It is your duty always to question the circumstances surrounding all releases - but not the authority for the release.

(ESCAPE)

1. Note the date and time notified or observed, obtain a positive identification, physical description, last known address, date booked, charge or charges, and date out. NOTE:  If a Federal Inmate is involved, immediately notify the Marshals and follow steps 1-4, and 8.

2. Notify the desk supervisor concerning the above information and request that a lookout be placed over the police radio.

3. Notify the Assistant Warden, or Warden, who will then notify the Assistant Division Commander.  If necessary, notify the Marshal's Office, if concerning a Federal Inmate.

4. Place the above information on the pass-on and daily Municipal Jail activity.

5. Contact the Montgomery Police Department, Detective Division, Crimes Against Persons supervisor so that an escape warrant can be processed.  (Be sure that the Detective Division Investigator will place this information on the Departmental Serious Incident Report).

6. On the next regular official working day, notify the Municipal court by telephone concerning the above information.

7. When the court forwards a transcript, the entry in the jail booking computer pertaining to prisoners who escape should be closed.  The booking computer will reflect the date and hour of escape.

8. All personal effects belonging to the escapee will be turned in to the Assistant Warden or Warden for proper disposition.  If, and when, the escapee is returned to custody he/she automatically reverts to his/her previous status-that of a convict,  and should be kept in his/her cell until such time that his/her misdemeanor sentence is completed, at which time he/she will be transferred to the Montgomery County Detention Facility for felony escape.  (Upon re-booking into the Municipal Jail, the escape hold is to be indicated in the booking computer).

(SENTENCE CONVERSIONS)

Sentence conversions, days to fines, or fines to days, will be made by the court.  If pay-out information is requested, it will be obtained from the court.  If an outside caller

requests information concerning sentence conversions, the caller will be transferred to the court.

The twenty-four (24) hour clock system is used in computing the release dates; that is, one day (24 hours) begins and ends at midnight. The date of the sentence or recommitment, regardless of the hour, is credited as one (1) day.

A prisoner who is sentenced or recommitted and who pays out on the same day, that is before midnight, must pay the full amount of the fine. He cannot be credited with the day on which he was sentenced.

### (DEATHS)

All suspected deaths should be handled as any other major medical problem, in that paramedics should be called immediately. If death is ascertained by paramedics, then the following procedure will be followed.

All deaths, whether by suicide or from natural causes, will be reported immediately to Assistant Warden, Warden, Assistant Commander and Commander of the Administrative Division.

The supervisor, when making his report to the chain of command, will advise of a suspected death in the jail.

The remains of the deceased will not be removed pending a release by the Coroner. No member of this Department has the authority to authorize such a release.

Jail employees on duty at the time any death is discovered will not be relieved from duty prior to arrival of the detective and completion of the investigation or until released.

The entry in the jail booking computer pertaining to the deceased will be indicated in the manner prescribed for other releases.

A commitment will be prepared in the manner prescribed for the release of prisoners on their own recognizance except that the word "Deceased" will be written across the top of the commitment.

Personal effects belonging to the deceased will be inventoried by the supervisor and released under a complete property receipt to the Detective Division officers handling the case.

It will be the responsibility of the Detective personnel to notify the next of kin of such death.

SECTION III

SUPERVISION AND CONTROL

## SUPERVISION AND CONTROL

### (GENERAL)

The jailer's basic responsibility is intelligent supervision and constant control of his/her prisoners. Supervision is more than observing the prisoners in their quarters. It includes all the procedures necessary for keeping the prisoner in safe custody and maintaining proper discipline and control. Supervision must be continuous; it must be thorough. Any laxity of authority or supervision is certain to be used as leverage for ensnarling employees and for vicious domination over other prisoners. Good jail practice requires that jail personnel do what they are paid to do; namely, supervise and control their prisoners.

### (SUPERVISION BY PRISONERS)

Prisoners will not supervise or control or assume any authority over other prisoners. The jailer, who intentionally or otherwise permits prisoners to assume any degree of the authority which is rightfully his/hers, has to that degree lost control of this jail.

Prisoners will not be given job assignments involving responsibility for such duties as distribution of supplies, supervision of feeding, assignment of housekeeping tasks, etc. This is another form of prisoner control which will invariably result in discrimination against the weaker prisoner and extra privileges for a favored few.

### (TREATMENT)

All prisoners are entitled to safe custody, to humane treatment and decent living conditions. Brutality and abuse is neither required nor will it be tolerated for security or disciplinary reasons.

Treatment of prisoners must always be fair and impartial, without preference for any prisoner or class of prisoner.

There will be no discrimination in the treatment of prisoners with regard to race, color, creed, or religion.

Provocative or abusive language by jail employees is prohibited.

All prisoners are entitled to freedom from control or domination by other prisoners or prisoner organizations.

Any inmate committed to jail is entitled to medical care necessary to conserve his/her health, just as he/she is entitled to food and shelter. He/she is also entitled to the

services of a competent doctor and dentist and to prompt admission to a hospital when necessary.

Every city and federal inmate will have the opportunity to exercise twice a week in conjunction with the exercise video tapes.

### (CONTROL OF PRISONERS IN HOUSING UNITS)

The type of housing used for the confinement of prisoners must be commensurated with the requirement for safe custody of the individual, the charge involved, and the security risk.

Prisoners will be housed separately according to category; that is, those (convicts) serving their sentence, those with holds for other agencies that have been through Municipal Court, those awaiting trial on misdemeanor charges, and those who are of the unusual or problem type.

Prisoners who are suspected or known to be dangerous or serious custody risks and those charged with serious crimes will be confined individually in maximum security cells. Under no circumstances will two such individuals be confined in the same cell. All personal clothing will be exchanged for jail clothing and all personal property will be removed from the prisoner's possession. A "Shakedown" of cells in which prisoners of this type are confined will be conducted by each respective shift at the time each shift is changed.

Serious custody risks, those charged with serious crimes, and weaklings who might be imposed upon by other prisoners will not be assigned to dormitory housing.

For purposes of control, two or more prisoners charged with the same offense (co-defendant) will be confined separately if warranted by the circumstances. They will be confined separately if directed by the arresting authority.

### (FEMALE PRISONERS)

The law requires that female prisoners be fully segregated from male prisoners and full supervision by female personnel. Otherwise, procedures for their custody and control are the same as those applicable to male prisoners.

The handling and supervision of female prisoners will be accomplished by a female officer under the direction of the supervisor.

After booking, fingerprinting, and mugshots, female prisoners will be quickly removed from all contact with male personnel and confined in the female section of the jail.

Any female prisoner removed from the female section, for any purpose, will be accompanied by a female officer.

Communication by sight, by conversation, or written message between male and female prisoners is strictly prohibited.

Under no circumstances, except as noted below, will male employees enter the female section of the jail unaccompanied by a female officer, and no male inmates will ever be permitted access to the female quarters.

The female officer will report in writing immediately any irregularity or discrepancy contrary to the procedures prescribed herein.

The female officer will retain the keys to the female section in her possession at all times.

Male employees will not take over or assume otherwise the responsibilities of the female officer assigned to the female prisoners.  Handling and supervision of a female prisoner is a job for a female - not a male employee.

(JUVENILE PRISONERS)

The law requires the juveniles be confined fully apart from adult prisoners; therefore, juveniles will not be booked into the jail with the following exceptions:

1.  If a juvenile is certified to stand trail as an adult, then regular booking procedures will be followed. However, the juvenile will be housed apart from adult prisoners.

2.  If a juvenile, age 16 or 17, is brought in for DUI, that juvenile will be booked in the booking computer (The jacket should indicate that the inmate is a juvenile). The juvenile's parents or guardians will immediately be contacted.  The parents or legal guardians will be advised of the juvenile's condition, and they will be required to sign a Waiver of Responsibility Form, and the juvenile will then be released into the custody of the parents or legal guardians (A brother, sister, uncle, aunt, or close adult friend does not qualify as parents or legal guardian).

   In cases where the parents or legal guardian cannot be contacted, the juvenile <u>must</u> be held until his blood alcohol level falls below 0.08%.  Once his blood alcohol level falls below 0.08%, the juvenile may be released to a responsible adult.  If no

47

responsible adult is available, and the juvenile's conduct and demeanor indicate responsibility, then the supervisor should notify the Juvenile Division.

3.  If a juvenile, passing as an adult, is booked for any reason, as soon as that person is identified as a juvenile, and if that juvenile is charged with an offense other than outlined in Paragraph 2, then the Juvenile Division will immediately be contacted and the juvenile will be removed. The booking computer will be updated accordingly.

    If a juvenile is booked on the booking computer, that juvenile will be held within sight and hearing of the booking officer, either in the visiting cage, elevator cage, or Cell Block 2. If adults are held in Block 2, they will be locked down in their individual cells until release of the juvenile.

### (THE HOMOSEXUAL)

Suspected or known homosexuals and HIV prisoners will be segregated immediately and kept under supervision. Under no circumstances will they be confined with other prisoners.

### (THE SUICIDE RISK)

Usually the inmate contemplating suicide will exhibit certain clues in his behavior. These may include sleeplessness, loss of appetite, withdrawal from contacts with others, a depressed and hopeless attitude, or even threats of suicide. All jail employees must be alert to these symptoms.

When any jail employee has reason to believe that a prisoner is a suicide risk, he will immediately notify the supervisor, who will then arrange for close surveillance (every 1/4 hour) and supervision.

Security cells will be used for the confinement of prisoners displaying suicidal tendencies. All personal items that could possibly be used in any such attempt will be removed from the possession of the prisoner. Thoroughly search the cell prior to confinement of the prisoner. <u>Keep him/her under surveillance</u>.

### (THE MENTALLY ILL)

Security cells will be used for the confinement of mentally ill inmates. Remove every item from the inmate and cell that might possibly be used for self-destruction. Provide close supervision and surveillance, if necessary.

Security cells will be used for confinement of mentally ill inmates requiring restraint. Management of violent mentally ill inmates will be referred to the jail's physician, who can prescribe sedation as needed to control the patient and prevent injury to himself or others.

No inmate suspected or known to be mentally ill will be placed in dormitories or confined with other prisoners.

The name of each such inmate, along with the case history if known, will be brought to the attention of the Jail Warden for necessary action. Make an entry in the diary and call Mental Health to start commitment procedures.

### (COMMITMENT OF MENTAL INMATES)

When a mental person is processed in the Municipal Jail, it is brought to a nurses attention. The nurse contacts the Bailiff of the court and if possible, will try to get them before the judge and release them back to their family. If the family puts them in for committing an overt act, the person's family is advised to go to Probate Court and sign a Petition for commitment, and to bring that person's medication. Then contact is made with the court and they are asked that someone from Mental Health come to the jail and do an evaluation. If the Petition is taken by Probate Court, a date for a probate hearing is scheduled for the mental person to be seen by Probate Judge. The petitioner is also present to give details of why this person should be placed in a hospital for treatment. If no family member can be found, then it is the responsibility of the medical staff of the Municipal Jail to seek possible medical help for such a person. There are certain procedures to be followed to get help for these persons. We cannot just put them in the hospital and have them committed. These are the procedures for commitment:

1. A person must show signs of needing mental treatment in the jail such as committing an overt act, seeing imaginary things or persons, playing, eating, or drinking any form of their body waste. It is at this time that the nurse starts the procedure of getting this person help, if the person's family has not already done so.

2. The court has to ask for someone from Mental Health to come and do an evaluation on the subject. If the person from Mental Health recommends commitment, than a Petition is submitted to Probate Court.

3. Jail official (nurse) goes to Probate Court to complete a Petition for commitment, at which time, a date and time of hearing is set.

4. A hearing is conducted on the date and time by a Judge of Probate of the Probate Court. If sufficient evidence sup-

ports that the said person needs help, then he is
committed to the State  Department of Mental Health by
the Probate Judge.

5.  The person is brought back to the jail to be held until a
bed becomes available in the designated Mental Health
Facility.


### (THE ALCOHOLIC)

All inmates committed for public drunkenness will first
be placed in the drunk tank until they have sobered suffi-
ciently (0.08%) to be transferred to a dormitory.  Shoes,
ties, belts, and other items that might be used for self-muti-
lation will be removed from the prisoner's possession prior
to confinement in the drunk tank.  These measures are neces-
sary for his/her own self-protection.  By-passing the drunk
tank and confining the prisoner in a dormitory with other
prisoners is an open invitation to trouble.  Do not let
sympathy over-shadow your better judgement.  Inmates will be
segregated prior to confinement in the drunk tank.

During the sobering-up period, close supervision must be
maintained to guard against the ever-present danger of deliri-
um tremens, an acute medical condition which may prove fatal
if untreated.  In its most acute form, there may be severe
tremors, hallucinations, disorientation, and convulsions.
When these symptoms are present, the patient is in extreme
danger, and death may follow unless prompt medical treatment
is given.  Call for the nurse, paramedics and ambulance.

There are many conditions which may produce symptoms
resembling those of intoxication.  Remember, the odor of
alcohol on the breath is not always a reliable guide.  It is
very difficult to distinguish between confusion produced by
alcohol and that caused by injury or illness.

Before placing any prisoner who appears to be intoxicat-
ed in the drunk tank, examine him very carefully for symptoms
of illness or injury.  Do not take chances simply because the
prisoner was booked for public drunkenness.  You could end up
with a dead prisoner, and without a valid explanation.  The
Intoximeter assigned to the Municipal Jail is to be utilized
to determine the B A C (Blood Alcohol Content) of the inmate
which should be 0.08% or less.


### (THE NARCOTIC ADDICT)

Narcotic addicts constitute one of our most difficult
custodial problems and must be considered dangerous to him-
self/herself and to others.  The effects of withdrawal are

painful and difficult to endure, and the addict will resort to extreme measures, including feigned illness, self-mutilation, destruction of jail equipment, assault of jail employees, and even suicide to get "just one more shot."

Narcotic addicts will be confined apart from other prisoners so that their behavior during withdrawal can be controlled with the least disturbance to the jail. For the first 24 hours known addicts will be confined to a security cell. If his/her condition shows improvement, he/she may then be moved to a regular cell.

All prisoners committed to jail on narcotic charges will, prior to confinement, be strip searched; that is, all personal clothing will be exchanged for jail clothing including foot gear. Every item, except a mattress without a mattress cover, will be removed from the cell.

The management of prisoners who are addicted to narcotics must, of necessity, be referred to the jail's physician, who must decide in each case whether narcotics can, with safety, be withdrawn abruptly, or whether such drugs must be administered in diminishing doses to effect gradual withdrawal. This is a decision for the doctor, not the jail employee. Ask the doctor for advice and follow his/her instructions. All narcotic addicts will be brought to the attention of the jail supervisor.

An individual medical record will be prepared for each such commitment.

### (THE EPILEPTIC AND THE DIABETIC)

Epileptics will be housed with other prisoners for purposes of assistance during epileptic seizures. Other prisoners can give warning and render temporary first aid until jail employees arrive. Instruct the epileptic to inform his cell mates what to do at the first indication of a seizure. An epileptic not confined with other prisoners must be kept under constant supervision. The majority of epileptics committed to jail are found among the chronic alcoholics and require constant surveillance during the sobering-up period.

Since the sedative-type drugs normally prescribed for the control of epilepsy are sought after by narcotic addicts and other prisoners, careful safe-guards for administering the medication must be taken. All such drugs in the prisoner's possession will be removed at the time of commitment and will be administered as needed. Do not trust another prisoner with this medication; the epileptic may never get it. They should sleep on the bottom bunk.

If it is possible, the diabetic like the epileptic will be confined with other prisoners.

51

Under no circumstances will the prisoner be permitted to retain in his/her possession his supply of insulin or the hypodermic needle and syringe used to administer it.

Again, the majority of diabetics committed to jail are found among chronic alcoholics and require constant surveillance during the sobering-up period. The diabetic lacking insulin may go into a diabetic coma and death may result unless prompt treatment is provided. All jail employees must be familiar with and alert to these symptoms.

Most diabetics committed to jail will have valid identification to attest their status; that is, the arm band and insulin prescription. In the absence of the insulin prescription, the supervisor or nurse will, if possible, ascertain the proper dosage of insulin from the prisoner's own doctor. If this is impossible, the jail's physician will be consulted.

Under no circumstances will a known diabetic booked for public drunkenness be confined in the drunk tank without close surveillance. A diabetic coma may result from a lack of insulin during the sobering-up period.

(PHOTOGRAPHING AND PUBLICITY)

Jail employees have no authority to give out publicity concerning prisoners other than to confirm their presence in jail. They shall not give out personal histories or photographs of the prisoners or permit reporters to interview them. They shall not permit the photographing of any prisoner by reporters, news photographers, or other persons not connected with the Montgomery Police Department.

(VISITS)

Visits to prisoners, other than attorneys and clergymen, ordinarily will be permitted during scheduled visiting hours. Visits at other times may be permitted at the discretion of the Supervisor or Assistant Warden in special circumstances such as illness in the family, arrival of persons who have traveled long distances, etc.

Visiting hours are scheduled on Saturdays and Sundays, 0730 hrs. - 1030 hrs. and 1300 hrs. - 1600 hrs., refer to the bulletin board for the time scheduled.

The supervisor has the right to deny a visit to any prisoner, when, in his/her opinion, such a visit would not be in the best interest of society or might endanger security in the jail.

Visits to federal prisoners awaiting trial will be restricted to identified members of the family, attorneys, and persons with whom the prisoner needs to confer to prepare the defense of his case. Subsequent to trial, such visits

will be restricted to identified members of the prisoner's family and his attorney only.

Any other visits to federal prisoners must be approved by the U.S. Marshal's Office and the Assistant Warden or Warden is to be notified.

Visits to federal inmates by former federal inmates is strictly prohibited without the approval of the United States Marshal.

A visitor's register showing names and addresses of visitors, name of inmate visited, and date and hour visited will be maintained for all visits to all prisoners. After proper identification, each visitor will be required to sign this register before visiting the prisoner.

The number and duration of visits is left to the discretion of the supervisor. Normally such visits will be fifteen minute duration and will be limited to no more than one (1) visit per inmate during the morning and afternoon scheduled nor more than one visit per visitor per day.

### (ATTORNEYS AND CLERGYMEN)

Every inmate has a legal right to communicate with counsel of his own choosing and a bondsman, if bond has been set. Except where safe custody of the inmate is involved, an inmate awaiting trial will be permitted to communicate with his/her accredited attorney or bondsman.

Visits from the inmate's attorney will be permitted at reasonable hours and as frequently as necessary to prepare his case. Ordinarily, visits by attorneys should be unsupervised unless, for example, the inmate is suspected of being mentally ill or is an unusual custody risk, or if the attorney requests that someone be present.

An inmate, upon his/her request, will be permitted visits from a clergyman of his/her choice. Such visit should be unsupervised and private.

Attorney will be permitted to call to the jail to make an appointment to use the attorney room to confer with his/her client. If both attorney rooms are occupied, the law library can be use for an alternative.

If an attorney choose to use the law library, before the attorney enter into the jail, a waiver of claim and release from liability agreement must be signed by the attorney, and the shift supervisor must also sign. Also, when an attorney enter into the jail, he/she will be subject to being searched.

MONTGOMERY POLICE DEPARTMENT
MONTGOMERY, ALABAMA

WAIVER OF CLAIM AND RELEASE FROM LIABILITY AGREEMENT

I, the undersigned, do hereby request permission to enter into the Montgomery City Jail, a potentially dangerous area, for the purpose of using the inmate's law library to confer with my client, and as a condition thereto, I do hereby, jointly and severally, for myself, my heirs, executor and administrators agree to indemnify and hold harmless the City of Montgomery, its officers, personnel, agents, and employees, acting officially or otherwise, against all suits, actions, claims, cost of demands, evolving from injury or death, whether arising for sole or concurrent negligence or otherwise in connection with said activity.

Name _____ DOB _____

Telephone Number _____ DL# or ID# _____

In case of injury notify _____ Phone _____

Signature _____ Witness _____

Date _____ Time _____

Supervisor's name _____

**THIS WAIVER TO BE APPROVED BY SHIFT SUPERVISORS, ASSISTANT WARDEN OR WARDEN ONLY**

ANY PERSON PRIOR TO ENTERING THE JAIL FOR THE PURPOSE OF USING THE LAW LIBRARY, SHALL COMPLETE THIS WAIVER AND HAVE IT APPROVED.

(MAIL)

Inmates will be permitted to correspond with their families, friends, their attorneys, and in the case of inmates awaiting trial, with persons whom they need to contact in preparing for trial.

In addition to mail privileges prescribed above, federal inmates will be permitted to write to the Attorney General, the United States Marshal, the Director of the Bureau of Prisons, the Pardon Attorney, and the United States District Judge without having their mail censored by jail officials.

If inspection of incoming mail discloses evidence of contraband, attempts to escape, information concerning criminal activities, or any material in violation of postal laws mail will be withheld and reported promptly to the Warden.

(CONTROL OF CASH AND OTHER PERSONAL PROPERTY)

A record of all withdrawals of cash and other valuable articles will be maintained on the property envelope indicating the amount and date of such withdrawals. All such withdrawals must be initialed by the recipient.

The amount of cash withdrawals per prisoner will not exceed $35.00 on any day and no more than $35.00 per week. This allowance is not cumulative; that is, the most that any prisoner can withdraw at any time, on any day is $35.00, unless such withdrawal is to be turned over to the prisoner's immediate family.

Cash or other valuable articles will not be transferred from one prisoner to another.

Cash and other valuable articles will not be withdrawn from the property envelope and turned over to another prisoner for delivery to the owner. No prisoner will be allowed to handle cash or other valuable articles belonging to another prisoner. At booking, if the prisoner has more than $35.00 in cash, check, money order, etc., the excess will be impounded in to Supply and Evidence or the rear desk.

Cash brought to the jail by visitors or money orders received through the mail will be noted on the property envelope indicating the amount and date, along with the signature of the officer making the entry. Money orders received will be cashed by the vending machine employee. A chit will be completed and signed by the inmate indicating that he/she received the cash.

Property envelopes belonging to prisoners who escape or die will be removed from the file and turned in to the Warden or Assistant Warden.

Upon release, the booking officer and the prisoner will again be required to check his money and personal property and sign the receipt for their return. The date and hour of release will be indicated on the property envelope. Should there be any disagreement on the part of the prisoner relative to these personal effects, a written report setting forth the circumstances will be prepared for the Warden or Assistant Warden.

(CONTROL OF PACKAGES)

Packages from outside sources will not be permitted to be brought in or sent to prisoners. This is one of the best sources of contraband.

(CONTROL OF NEWSPAPERS AND OTHER PUBLICATIONS)

Newspaper and other publications from outside sources will not be permitted to be brought in or sent to the prisoners. This applies particularly to work detail returning to the jail.

Under no circumstances will such publications be permitted to accumulate in prisoner quarters. This is a fire hazard and a tool for escape.

The possession of these items is restricted to no more than one publication per prisoner at any one time.

Under no circumstances will obscene or sexually explicit material be permitted within the jail.

(CONTROL OF CLOTHING)

Personal clothing in the possession of inmates will be restricted to minimum essential items; that is, two (2) suits of underwear, one (1) shirt, one (1) pair of trousers, two (2) pairs of socks, and one (1) pair of shoes. All excess clothing and baggage will be secured and placed in the inmate's assigned locker. Excessive amounts of clothing is to be impounded in Supply & Evidence or the rear desk.

Clothing brought to the jail by visitors will be accepted on an item for item exchange basis; that is one (1) dirty item in exchange for a similar clean item.

Convicts will not, under any circumstances, have access to clothing suitable for street wear.

SECTION IV

SECURITY

## SECURITY

### (GENERAL)

Prisoners are among the shrewdest judges of character, and they will make few mistakes in sizing up jail employees. If jail employees are really alert, their prisoners will be the first to know it; and, strangely enough, they have only respect for efficiency. By the same token, jail employees who are lax, indifferent, or haphazard in their methods, not only lose the respect and control of their prisoners, but they are a hazard to the security of the jail and the safety of other employees as well as themselves.

### (RESPONSIBILITY)

The supervisor will have total responsibility for security of the jail and will report any breach or compromise of security measures to the Warden or Assistant Warden.  To this end, he/she will be responsible for inspecting, directing, and supervising all activities.

### (SECURITY CLEARANCE)

Each person entering the jail will be positively identified prior to entry.  Under no circumstances will the supervisor permit any person, regardless of status, to enter the jail without confirming his identity.  Be suspicious always of unknown persons.  Identification must be valid and not based upon conjecture.  For example, a driver's license and credit cards presented by a stranger claiming to be an attorney, doctor, or clergyman is not valid for purposes of entering the jail.  The supervisor will exercise the utmost tact and diplomacy in confirming identifications.

Under no circumstances will the supervisor permit any unauthorized person to enter the jail.

The jail is "OFF LIMITS" to all personnel other than members of the Montgomery Police Department and other law enforcement officials on official business and those personnel engaged in their professional pursuits; that is, attorneys, clergymen, doctors, and those maintenance and service personnel and visitors authorized by the Montgomery Police Department.

Unless personally known to the supervisor, the identification of detectives will be confirmed prior to entry into the jail.  The fact that a person in civilian dress arrives at the jail with what appears to be a prisoner is not a valid identification.  Be suspicious of all unknown persons regardless of who or what they claim to be.

(INSPECTIONS)

Correctional officers will make frequent, but irregular, rounds of the jail during their tour of duty. They will give particular attention to cells where dangerous or escape-minded prisoners are confined, and where the insane or mentally disturbed, the sick, or other prisoners known to have suicidal tendencies are confined. The frequency of these inspections will not be less than, or limited to one (1) inspection per hour. This does not preclude, restrict, or limit in any way additional inspections deemed necessary or directed by the supervisor. The supervisor will have responsibility for compliance with requirements established herein. Not less than 15 minutes inspection are the minimal for inmates of this type.

(CONTROL OF FIREARMS)

<u>All</u> law enforcement officers will be required to check their firearms prior to entering the jail. The booking officer will be alert to police officers and other entering the jail via the elevator to ensure that firearms are deposited in the gun cabinet. Police officers and other law enforcement officials entering the jail through the second floor entrance will deposit all firearms in the lobby cabinet prior to entering the jail. No one, law enforcement officials or otherwise, will be permitted to enter the jail with firearms of any description. The booking officer, in addition to observing these officials, must ask the specific question, "DO YOU POSSESS ANY FIREARMS?" Any law enforcement official unknown to jail employees or not properly identified will be searched prior to entry.

The possession of firearms by jail employees during their tour of duty is strictly prohibited.

(KEYS)

Key control is a major element of security and is the direct responsibility of the supervisor. At any hour of the day or night he/she must account for each key or ring of keys.

Master keys which actually permit entry to and exit from will be kept in the office under the direct supervision of the supervisor or booking officer.

Under no circumstances will prisoners ever be permitted to handle keys nor have access to security features of the jail. Locking and unlocking doors is the responsibility of jail employees.

The loss of any jail key will be reported to the jail supervisor immediately. The supervisor will initiate precautionary measures to restore those security features which may have been compromised by such loss.

Any type of key in the possession of prisoners is prohibited. All keys will be removed from possession of the prisoners at the time of booking.

(CONTRABAND CONTROL)

The supervisor of each respective shift will be responsible for conducting a "Shakedown" of all prisoner quarters when deemed necessary. In making quarters "Shakedown" it must be remembered that prisoners do have some rights. You can do a thorough job and still respect the rights of the prisoner by being careful not to damage or destroy his legitimate personal property. The cell is his/her home, and careless handling of his/her property results in deep resentment and bitterness toward jail officials. In short, searching should be done in such a manner that ensures it is thorough and at the same time articles and bedding can be left as neat and orderly as possible.

All prisoners assigned to outside work details will be searched upon returning to the jail. Those prisoners who introduce contraband into the jail will be removed from any outside work assignment.

The following are guidelines for the outside floorboys. The outside floorboy will:

1.  Answer to the Administrative Assistant to the Chief while outside.

2.  Keep the Chief's vehicle washed.

3.  Empty the trash can by the rear door.

4.  Keep butt cans empty.

5.  Keep picnic tables, parking lots, sallyport, and all concrete areas clean.

6.  Keep grass cut and bushes trimmed around headquarters and parking lots.

7.  Not come into building for any reason, unless asked by a Police Department employee to do a certain task. Note that the employee must stay with the floorboy until finished and return him to the outside.

8.  Use the sallyport elevator to go back and forth from the jail when using the restroom.

9.  Not use the phones around headquarters while out of the jail.

10.  Not use the benches or picnic tables or have conversations with employees or civilian who might be outside.

11. Be searched thoroughly each and every time he enters the
    jail via the sallyport elevator.

Inmates Assigned to kitchen work detail will be restricted to
the kitchen area and will be searched prior to being returned
to their quarters.  The very nature of their employment
constitutes a dangerous source of contraband; that is,
knives, forks, and other potentially dangerous articles.
These personnel must not be trusted by any jail employee.
Trusting these individuals is foolhardy and inexcusable.

   All vendors making deliveries to the jail will be sub-
ject to be inspected for contraband.

### (FEDERAL INMATES)

   All federal inmates must be considered as dangerous
security risks.  All corridor doors to the federal cell-block
will be locked at all times unless directed otherwise.

   The federal cell-block is "Off Limits" to all inmates
whose presence is not required in servicing the cell-block.

   No inmate will be allowed to enter the federal cell-
block without the presence of the correctional officer.

   Federal inmates will always be locked in their cells
before opening the main door to the day rooms in the federal
cell-block.

   The correctional officer will personally count all
eating utensils passed into the cell-block at meal time and
all utensils recovered from the cell-block after meal time.

   Do not remove any federal inmates from his/her cell
during the night for reasons other than medical emergency.

   All male federal inmates will be allowed to exercise for
(1) one hour in the exercise room.

### (TRUSTEES)

   Remember the old saying, "You can't trust a trustee."
That axiom is just as true today as it was 100 years ago.
They constitute the greatest source of contraband.  The job
of jail officials is to prevent them from getting back into
the jail with the contraband in their possession.  Every
prisoner returning to the jail will be searched.

   Prisoners with detainers (Holds) or "Keep In's" will not
be assigned to the status of "Trustee."

61

(LOITERING)

Prisoners not actively engaged in housekeeping, work details, and maintenance activities will be locked in their respective quarters.  They will not be permitted to loiter or visit in any part of the jail.  All prisoners engaged in housekeeping activities will be restricted to the area of assignment.

All authorized personnel entering the jail will depart upon completion of their mission.  Loitering in any part of the jail is prohibited.

Bondsmen will not be allowed into the lobby area without clearance from the rear desk personnel.

(DOORS)

All doors to cell-blocks and dormitories will be locked at all times except when removing or confining prisoners. These doors will not be left open at any time, even though the cell-block or dormitory is empty.

Individual cell doors within each respective cell-block will be locked at all times during the hours of darkness. During the day, these doors may be left open during periods of exercise and at meal time.

The South corridor and the West corridor doors around the No. 3 cell-block will be locked at all times except for cleaning or at meal time.

The North corridor door and the West corridor door around the No. 5 cell-block will be locked at all times except for cleaning or at meal time.

(CONTROL OF RIOTS AND OTHER DISTURBANCES)

Emergency plans for the control of riots and other major disturbances will be issued as a separate annex to this directive.  Therefore, this directive concerns itself with prevention of disturbances rather than disturbances themselves.

The best defense against disturbances is, of course, prevention through good procedures and intelligent control of prisoners.  Any disturbances must be met with firm and decisive action on the part of jail officials.  Through hesitation or indecision at the crucial moment, a very minor infraction may develop into a major disturbance.

At the center of every infraction or disturbance is a ringleader.  They usually are not difficult to identify but dangerous if not removed from the scene and confined apart

from other prisoners.  These individuals will be removed immediately to the isolation cell.

Correctional officers will not enter any prisoner's quarters or attempt to isolate ringleaders of disturbances or others guilty of disciplinary infractions without sufficient help from the police department.  Other prisoners will not be used for this purpose.

Correctional officers will not tolerate any disrespect, abuse, or other disciplinary infractions from prisoners. Permitting such infractions to go unnoticed is certain to be a reflection of weakness on the part of the correctional officer.  On the spot, corrective action will be taken in every instance.

Localize any and all disturbances if possible.  Immediate steps will be taken to prevent access to other areas of the jail to prevent disorder from spreading.  This is all the more reason why it is necessary to keep all doors to cell-blocks and dormitories locked.

SECTION V

MEDICAL AND HEALTH SERVICES

## MEDICAL AND HEALTH SERVICES

### (PRISONER RIGHTS)

Any prisoner committed to any jail has a right to medical and dental care necessary to conserve his health. He/she is entitled to sanitary surroundings with facilities for maintaining personal cleanliness; he/she is entitled to freedom from enforced contact with communicable disease; he/she is entitled to prompt admission to a hospital when necessary.

### (PROCEDURES FOR SICK CALL)

The jail's physician is available 24 hours per day and may be contacted for professional advice or service at any time. The physician's name and telephone number are posted on the bulletin board.

Jail employees will not attempt to diagnose a prisoner's illness or decide whether it is real or imaginary. The only safe rule is to let the doctor decide.

All prisoners will be given ample opportunity to make known their need for medical attention. The correctional officer on the floor will submit the name of each prisoner desiring medical attention to the supervisor or nurse along with the nature of illness.

The supervisor or nurse will call the jail's physician and inform him/her of those prisoners desiring or in need of medical attention along with the nature of their illnesses. Prisoners scheduled to see the doctor will be withheld from work details until after they have been released by the doctor. This information will be maintained in the medical file.

Sick calls at night will be restricted to **emergency** cases only. The decision as to whether the case is or is not an emergency rests with the supervisor or nurse. Nothing in this paragraph shall be construed to restrict the initiative and judgement of the supervisor or nurse, or to deny the prisoner medical treatment. When in doubt, call the doc-tor/paramedics.

All jail employees will be constantly alert for signs of illness in prisoners, particularly for contagious or communicable diseases.

65

(INFIRMARY)

Responsibility for the operation of the infirmary is delegated to the nurse on duty.  In the absence of the nurse, the supervisor on the floor will assume this responsibility.

The door to the infirmary will be locked at all times except when the infirmary is being used.

Prisoners will not be permitted in the infirmary for any purpose unless the nurse or supervisor is present.  This includes all prisoners regardless of status; that is, patients, clean-up details, etc.

All medicines, except simple aspirin and antacids, will be kept in the infirmary.  Possession of these supplies by jail employees for purposes of convenience is prohibited.

Empty prescription containers, medical devices used for administration of medicines, and all other similar items will be destroyed to avoid misuses.

Unused prescriptions for prisoners who have been released or transferred will be referred to the jail's physician for proper disposition.  If it is determined that the prescription is of no further use, it will be destroyed to avoid misuse.

(CONTROL OF MEDICINES)

Except for simple remedies such as aspirin and antacids, only those medicines and drugs prescribed by the jail's physician will be administered.

All medicines and drugs, excluding common aspirin, will be dispensed by the nurse, jail's physician or by jail employees in accordance with the advice and instructions of the jail's physician.

All medicines and drugs will be given to prisoners one (1) dose at a time and the employees will see that the medicine is taken in his/her presence.  Furnish the prisoner with a cup and have him/her fill it with water before giving him the medication.

Under no circumstances will a supply of medication be left with the prisoner to take at his/her discretion, including simple aspirin.

Hypodermic needles or other medical devices used for the administration of medicines will not be left in the hands of prisoners.

66

Medicines or drugs in possession for prisoners will be removed from his/her possession upon booking and will be dispensed only with the approval of the jail's physician.

The prescribing or administering of habit forming narcotic drugs to satisfy the craving of addiction is not considered bona fide medical treatment, and the use of narcotic drugs for that purpose is prohibited. When, however, an individual addict is aged or exceedingly debilitated because of disease or long standing addiction, drugs may be administered by the jail's physician as an emergency measure to save life or to prevent undue suffering.

Tranquilizer, and preparations containing alcohol, without approval of the jail's physician, is prohibited.

When the jail's physician prescribes medication for a prisoner, the supervisor will see that his/her instructions are carefully followed. If, for example, the physician directs that a specified medication be administered every hour, the supervisor will see that the medication is made available to the prisoner at the proper time and that a notation is made in the medical record that the medication was administered as directed.

### (MEDICAL SUPPLIES)

The amount and kind of medicinal supplies kept in stock and the manner in which they are administered will be determined by the jail's physician.

The purchase of drugs and other medicines, including prescription refills, will be made by the nurse or jail's physician.

If it becomes necessary to replenish individual prescriptions, the supervisor will notify the jail's physician giving him the name of the patient and prescription number. If the doctor indicates that the prescription is not to be continued, the prisoner will be notified. The prescription container will then be destroyed to avoid misuse.

### (MEDICAL RECORDS)

Individual Medical Record

(a)  The importance of an accurate individual medical record cannot be over emphasized. Adequate medical records will be of inestimable value to jail officials in the event that a released prisoner claims to have been injured during confinement or alleges that the jail failed to provide adequate medical treatment.

67

(b) An individual medical record will be prepared for each prisoner requiring treatment. Particular care will be taken to list all cuts, bruises, injuries, and abnormalities present at the time of admission. This record will reflect as much of his past medical history as is possible to obtain, any illness or injury occurring during confinement, and the treatment provided at the time of admission.

(c) When the jail's physician prescribes medication for a prisoner, the nurse or supervisor will see that his/her instructions are accurately recorded.

The administration of all medicines, except for simple remedies, will be accurately recorded in the Individual Medical Record. This form is self-explanatory.

The individual Medical Record will be inspected by the nurse or supervisor of each respective shift to determine whether or not the instructions are being carefully followed. Any evidence of laxity will be reported to the Warden or Assistant Warden.

The Inventory Register, except for simple remedies, reflects the amount of each prescription purchased, the amount dispensed, and the amounts on hand, so that tampering with the supply can be detected at once. This register provides a running balance of each medicine by type.

All stocks of medicines or drugs, except for simple remedies, purchased or dispensed to patients will be accounted for in the inventory register. Like items will be entered on the same sheet regardless of prescription number. For example, all phenobarbital prescriptions will be recorded on the same sheet.

(CONTROL OF COMMUNICABLE DISEASE)

Whenever any case of contagious or communicable disease is discovered, or suspected, the affected prisoner will be immediately segregated and not permitted to mingle with others in the jail pending proper disposition of his case by medical authorities.

Prisoners afflicted with infectious illnesses which do not require hospital care, such as venereal disease, will be immediately segregated and not permitted to mingle with others in the jail until they have been rendered non-infectious by treatment.

The jail staff will observe local health laws and report such cases to the County Health Officer for treatment or proper disposition.

68

Laundry of clothing, blankets, and mattress covers will be done separately. Laundry for these prisoners will not, under any circumstances, be mixed with the laundry of the other prisoners.

### (DNA TESTING INSTRUCTIONS)

PLEASE NOTE:  USE GLOVES AT ALL TIMES DURING YOUR SESSION

The Montgomery Municipal Jail has participated in the swabbing of saliva. Below are step by step instructions on who is to perform swabbing and how it is to be performed. A log will be kept on all samples taken and will be kept in the nurse's office of the Municipal Jail. Along with the samples will also be the kits. They all are to be delivered to the local Department of Forensic Science. The instructions are as follows:

First, each subject that is swabbed must be CONVICTED of one of the below listed charges. Please note, some of these charges are FELONY CHARGES. Felony charges are not convicted in Municipal Court, therefore, you will not swab any subject that has a HOLD on them, unless they are convicted of one of the below listed Misdemeanor offenses.

| Alabama Code | Violation | Type |
|---|---|---|
| 13A-6-4 | Criminal Negligent Homicide | FELONY |
| 13A-6-22 | * Assault 3rd Degree | MISDEMEANOR |
| 13A-6-23 | * Menacing | MISDEMEANOR |
| 13A-6-24 | * Reckless Endangerment | MISDEMEANOR |
| 13A-6-25 | Criminal Coercion | MISDEMEANOR |
| 13A-6-41 | Unlawful Imprisonment, 1st | MISDEMEANOR |
| 13A-6-42 | * Unlawful Imprisonment, 2nd | MISDEMEANOR |
| 13A-6-65 | * Sexual Misconduct | MISDEMEANOR |
| 13A-6-67 | * Sexual Abuse, 2nd | MISDEMEANOR |
| 13A-6-68 | * Indecent Exposure | MISDEMEANOR |
| 13A-4-1 | CRIMINAL SOLICITATION (For any of the above) | |
| 13A-4-2 | ATTEMPT (For any of the above) | |
| 13A-4-3 | CRIMINAL CONSPIRACY (For any of the above) | |

* OFFENSES WE PERFORM DNA TESTING ON

STEP BY STEP INSTRUCTIONS FROM THE COURTROOM TO THE JAIL:

1.    The subject is brought out of the courtroom with a
      sentence with one of the above listed offenses.  The
      shift supervisor or jail nurse on duty will take this
      subject to the nurses station.

2.    There will be a three way sectional pamphlet named DNA
      DATABASE COLLECTION INFORMATION FORM.  Open this
      pamphlet and begin filling out the information listed.

3.    Included on this is a section for a WITNESS.  The
      witness will print their name and then sign and date
      it.  Also, directly under the witnesses signature, their
      are two spaces for fingerprints.  One for the left thumb
      and one for the right thumb.

4.    There is a black strip inserted in the pamphlet also.
      It pulls apart from the top, then press one thumb at a
      time on this strip and then placed on the pamphlet.  No
      rolling necessary just press down and lift up.

LAST STEPS

DNA DATABASE SWAB COLLECTION KIT INSTRUCTIONS

1.    Remove the swab from the sterile package being careful
      not to touch the foam tip.  Place the foam tip in the
      subject's mouth and vigorously swab the insides of both
      cheeks.  Move the swab between the gumlines and the fold
      of the cheek and under the tongue, soaking up as much
      saliva as possible.

2.    Remove the swab from the subject's mouth and transfer
      the sample to the FTA Collection Card by pressing the
      foam tip in the two circles immediately above the print-
      ing on the card.  Press firmly to transfer as much
      saliva as possible from the foam tip to the circles.
      Continue pressing until both circles are saturated with
      saliva.

3.    Discard the collection swab in a waste receptacle.
      Enclose the FTA Collection Card in the envelopes
      provided.  Remove gloves and discard in a waste
      receptacle.

4.    Fill out the return address on the front of the kit
      shipping envelopes.

Insert the completed kit in the KIT SHIPPING ENVELOPES.  Pull
off the RED backing from the envelopes flap and press to seal.

The Warden or the Assistant Warden will hand deliver the
sealed kit to The Alabama Department of Forensic Science.  A

copy of the log will be delivered to the Administrative
Division office each month.

SECTION VI

SANITATION, HOUSEKEEPING, AND SAFETY

## SANITATION, HOUSEKEEPING, AND SAFETY

### (GENERAL)

Carelessness, indifference, and ignorance on the part of inmates and lack of supervision on the part of jail employees are the primary causes of poor sanitation , poor housekeeping, and unsafe living conditions. The majority of inmates committed to jails have little regard for themselves or their environment. Some are clean by nature, but most are slovenly, habitually unclean, and accustomed to unclean conditions and unsanitary personal habits before coming to jail. Obviously, the degree of sanitation, good housekeeping, and safety depends largely upon continuous and aggressive supervision on the part of all jail employees.

### (PERSONAL HYGIENE)

The best inducement to high standards of personal hygiene is plenty of soap and hot water. It encourages the prisoner to bathe and shave frequently without having to be encouraged by the correctional officer. The correctional officer on the floor determines whether or not adjustments are needed to lower or raise the temperature of the hot water.

Prisoners will be required to take at least two (2) baths a week. One (1) bath per day is recommended. With plenty of soap and hot water this will not create any problems. Prisoners will be required to be reasonably close shaven at all times. Long beards will not be tolerated. Razors are available in the office. The key to these razors will be kept in the office. Under no circumstances will the key and razors be given to inmates. The razors will be returned to the office.

The convict's hair will be trimmed to a reasonable length. Hair clippers are available in the office. There is usually someone among the prisoners with limited experience as a barber who can be used for this purpose. Long or bushy hair will not be tolerated.

Clothing will be exchanged at least once per week and more often if necessary.

An inmate who is particular careless and unclean may present a real problem unless firm and positive corrective action is taken. He/she may even have to be kept separate. Therefore, from the beginning, the slovenly inmate must be made to realize that unsanitary habits will not be tolerated. To this end, it may be necessary to force him/her to shave, to bathe, and to change his/her clothes.

(CONTROL OF VERMIN)

Control of all types of vermin is simplified by perfect cleanliness in all parts of the jail, including personal hygiene.

Whenever the presence of body vermin is found to exist in any cell block or dormitory, immediate steps will be taken to eradicate the problem. The following procedure will be followed:

1. Question inmates in other parts of the jail to determine whether or not the problem is localized or general throughout the jail.

2. Remove all blankets and mattress covers and take directly to the washing machine in the laundry.

3. Thoroughly clean the infested area, including beds, with hot, soapy water.

4. Issue clean clothing to all prisoners housed in the area and remove infested clothing directly to the washing machine in the laundry.

5. Disinfect all mattresses.

6. A special preparation for the eradication of body vermin is available in the nurses station. Require each prisoner housed in the infested area to apply this preparation to all affected parts of the body. Repeat this treatment according to the prescription.

(HOUSEKEEPING AND INSPECTION)

All floors will be swept and mopped with minimal hot, soapy water at least once a day and more often if necessary. Floor will be clean at all times.

Trash containers will be emptied as often as necessary. Trash will not, under any circumstances, be permitted to accumulate in any part of the jail. These containers will be thoroughly cleaned with hot, soapy water at least once daily and more often if necessary.

All bars and other exposed surfaces will be wiped daily with a clean cloth and washed with minimal hot, soapy water at least once a week.

Windows will be washed as often as necessary to keep them clean. Screens will be kept clean at all times.

Walls will be washed monthly and more often, if necessary. Keep all walls free of dirt spots, particularly in those areas where inmates are inclined to lean against or touch the wall with their hands.

All wood paneled doors and surfaces will be cleaned weekly with a cleaner prescribed for this purpose. Do not allow prisoners to use soap and water on these surfaces.

Mops, scrub brushes, and mop buckets will be thoroughly washed and rinsed after each use.

(PRISONERS' QUARTERS)

Commodes, lavatories, and shower stalls will be cleaned daily and as often as necessary to keep them clean throughout the day with hot, soapy water and scouring powder.

The tops of all beds will be cleaned daily, preferably in the morning, prior to departure for work details. All refuse and other waste will be removed and the top of the bed wiped with a clean dust cloth.

All beds will be washed weekly with hot, soapy water. this will be accomplished by removing all mattresses to the mess table so that beds can be thoroughly cleaned.

Each mattress will be protected by a mattress cover issued for this purpose. The mattress will be protected at all times with a cover, except during clean up.

Mattresses are issued on the basis of one mattress per individual or bed. The mattresses will be positioned horizontally on the bed - not folded. More than one mattress per bed is prohibited unless approved by the doctor or nurse.

Blankets will be folded and placed at the head of the bed when not in use. This applies to all beds in use which are not physically occupied during the day.

Accumulations of newspapers, magazines, and other similar items are prohibited. An accumulation of such items constitutes a fire hazard and is a threat to security as well as the safety of the inmates.

The correctional officer will give particular attention to the ventilation in prisoner quarters. Adjustment of windows will assist in alleviating most problems, particularly in the winter. Good ventilation is essential to the health and welfare of the inmates as well as helping to control bacterial build-up. Do not attempt to regulate thermostats. Any required adjustments will be reported to the shift supervisor.

Prisoners' quarters will be clean and orderly throughout the day. The standards of housekeeping and sanitation will remain constant; that is, it will not be good in the morning and poor in the afternoon. To this end, it behooves the correctional officer to make thorough inspections prior to departure of work details in the morning and again in the afternoon.

SECTION VII

FOOD SERVICE

FOOD SERVICE

(PERSONNEL)

Kitchen inmate labor will be escorted by the correctional officer to and from the kitchen. They will be restricted to the kitchen at all times unless their services are required elsewhere or until they are released from duty. At no time will they be permitted to loiter in other parts of the jail. The enforcement of this rule requires firm and positive action on the part of correctional officers.

All kitchen inmate labor will be searched prior to being returned to their quarters.

All kitchen inmate labor will be given a physical examination and certified free of communicable disease before being assigned to any duty in the kitchen. The Warden will solicit the services of local, county, and state health departments in administering the food service program.

Both civilian and inmate personnel assigned to the food service will be dressed in white clothing, freshly laundered each day.

White caps or hair nets will be worn at all times while on duty.

Kitchen inmate labor will bathe daily.

Kitchen inmate labor will present a well groomed appearance at all times. Hair will be trimmed reasonably short and they will be clean shaven at all times. Long hair and beards are prohibited.

Fingernails will be trimmed as short as possible. Long fingernails are a dangerous source of contamination.

Kitchen inmate labor will, upon reporting for duty, be inspected by the shift supervisor or kitchen staff to ensure that they meet the prescribed requirement.

All food service personnel will wash their hands upon returning from the bathroom. The cook on duty will rigidly enforce this regulation. Habitual violators will be reported to the supervisor.

Personnel with severe colds, lacerations, sores, etc., will not be permitted to perform any type of duty in the kitchen.

(KITCHEN SANITATION)

Floors will be scrubbed with hot, soapy water, rinsed with hot water, and dry mopped after each meal.

Bathroom facilities (Commode and lavatory) will be scrubbed daily with hot, soapy water and scouring powder.

All doors, tables, and metal surfaces will be washed daily.

Garbage and other waste will be stored in containers and will be removed from the jail after each meal. These containers will be thoroughly cleaned each time they are emptied.

Walls, floor, racks, and duckboards in the refrigerator will be scrubbed, when necessary, for cleanliness, with hot soapy water.

Walls will be washed weekly. Keep walls free of dirty spots, particularly in those areas where personnel are inclined to lean against or touch the wall.

(UTENSILS)

Eating utensils (cups, trays, spoons), cooking utensils (pots and pans), and all kitchen equipment used in the preparation and serving of food will be washed in hot, soapy water, rinsed, and scalded after every use.

After washing and scalded utensils, they will be air dried. Do not wipe with a cloth.

All eating utensils will be counted, returned to the kitchen, and recounted after use and not held in prisoner quarters.

(FEEDING PRISONERS)

The method of dispensing food often determines whether a meal is good or bad. Good food, well served, is a very important factor in maintaining discipline and a reasonable degree of contentment among prisoners. Insufficient, or unpalatable food is a constant source of resentment and discontent. A good feeding program calls for three meals a day, spaced at regular intervals, adequate in quantity, well prepared, and attractively served. This requires careful planning, intelligent supervision, and competent jail officials in all phases of food handling, preparation, and serving.

Security will be the primary consideration in establishing procedures for the food service program.

Supervision of food service is the responsibility of the shift supervisor and mess steward of each respective shift during his/her tour of duty. He/she will inspect, supervise, and report all deficiencies, along with his/her recommendations, to the food service supervisor or Warden.

Dispensing or service of food to prisoners is a responsibility of the correctional officers under the direction of the shift supervisor. Planning, supervising, and controlling the service of food is their responsibility.

Food should be served promptly after it is prepared. The correctional officer will ensure that hot foods are hot and cold foods cold, and neatly arranged in the compartment-type trays. Do not permit the cook to prepare large numbers of trays at one time or well in advance of the feeding schedule.

Food will be apportioned without favoritism. Prior to feeding time, a count will be made of each respective cell block and dormitory. The correctional officer will ensure that the number of food trays does not exceed this count. This count will also be used for removing trays after the meal. The correctional officer will be especially watchful to ensure that there is no discrimination as to quantity of food placed on individual food trays.

The correctional officer will personally hand each prisoner his/her tray, making sure that it has the proper amount of food with a cup and a spoon on each tray.

The feeding time allotted for each meal is twenty minutes. After the meal the correctional officer will make each prisoner that received a tray hand it back to him/her making sure that there is a cup and a spoon on the tray.

If an item is missing when the correctional officer receives the utensils back from the inmate, he/she will immediately recover the item, conducting a shakedown, if necessary, and request additional assistance, if needed.

Kitchen inmate labor is not allowed to hand inmates their food trays.

Kitchen inmate labor will not be permitted to visit or converse with other inmates except in the line of duty. After all food trays have been dispensed, kitchen personnel will be returned to the kitchen. They will not be permitted to loiter in corridors or other parts of the jail waiting to recover eating utensils. After the meal has been finished, these personnel will be escorted to the prisoner quarters to recover all eating utensils.

Jail personnel only are allowed to eat in the jail. Exceptions will be certain visitors approved by the Warden, Administrative Division Commander or the Chief of Police.

In the federal facility, the inmates are to receive and return their food trays/utensils and drinks through the food passes on the day room doors.  During emergency situations, they may receive and return their food trays/utensils and drinks at their assigned cells, provided all inmates in that pod are locked down.

SECTION VIII

LOGISTICS

LOGISTICS

(MAINTENANCE)

All maintenance of a technical nature will be referred to the jail shift supervisor. This, however, does not preclude preventive maintenance.

Jail employees will not attempt to service or repair heating and ventilating equipment including thermostats, elevator equipment, electronic devices, or other equipment of a similar nature, except in emergencies.

Except in emergencies, work orders for repair and maintenance will be prepared by the Warden or Assistant Warden and submitted to the Administrative Division Commander. The work order will include a description of the repair or maintenance along with justification therefor.

Agencies available for emergency service are posted on the bulletin board.

(SUPPLY)

For purposes of control and economy, the basic allowance prescribed below will be adhered to by all concerned:

| QUANTITY | UNIT | ITEM | BASIC OF ISSUE |
|---|---|---|---|
| | | (BEDDING) | |
| 1 | each | Mattress | per individual |
| 1 | each | Mattress cover | per individual |
| 1 | each | Blankets | per individual |
| 1 | each | Towel | per individual |
| | | (CELL SUPPLIES) | |
| 1 | roll | Toilet tissue | per commode |
| 1 | bar | Soap | per lavatory |
| | | (CLOTHING) | |

CONVICTS

**BLACK & WHITE STRIPES**

| 1 | each | Shirt | per inmate |
|---|---|---|---|
| 1 | each | Trouser | per inmate |
| **1 | each | Jacket | per inmate |

PRISONERS

**BLUE JUMPER**

| 1 | each | Jumper | per inmate |
|---|---|---|---|

83

FEDERALS

### ORANGE JUMPER

| 1 | each | Jumper | per inmate |

INMATE WITH HOLDS FOR OTHER AGENCIES

### ORANGE & WHITE STRIPES

| 1 | each | Shirt | per inmate |
| 1 | each | Trousers | per inmate |

** As required for outside work details.

### (UTILITIES)

All lights in prisoner quarters will be turned off at 10:30 p.m. each night or as soon as practical thereafter, except in emergencies.

All lights not necessary for jail operations will be turned off. Do not leave lights burning in storage rooms, nurse station, laundry, etc., when they are not needed. It takes only a moment to turn the light "On" or "Off."

Use discretion in replacing light bulbs. For example, using a 150 watt bulb as a replacement unit for a 75 watt bulb is a waste of electricity.

SECTION IX

EMERGENCY PLANS

|  | PAGE |
|---|---|
| Mail | 55 |
| Control of Cash and Other Personal Property | 55 - 56 |
| Control of Packages | 56 |
| Control of Newspapers and Other Publications | 56 |
| Control of Clothing | 56 |

IV  SECURITY

| General | 58 |
|---|---|
| Responsibility | 58 |
| Security Clearance | 58 |
| Inspection | 59 |
| Control of Firearms | 59 |
| Keys | 59 - 60 |
| Contraband Control | 60 - 61 |
| a.  Floorboy guidelines | |
| Federal Inmates | 61 |
| Trustees | 61 |
| Loitering | 62 |
| Doors | 62 |
| Control of Riots and Other Disturbances | 62 - 63 |

V  MEDICAL AND HEALTH SERVICES

| Prisoner Rights | 65 |
|---|---|
| Procedures for Sick Call | 65 |
| Infirmary | 66 |
| Control of Medicines | 66 - 67 |
| Medical Supplies | 67 |
| Medical Records | 67 - 68 |

|  |  | PAGE |
|---|---|---|
|  | Control of Communicable Disease | 68 - 69 |
|  | DNA Testing Instructions | 69 - 71 |
| VI | SANITATION, HOUSEKEEPING, AND SAFETY | |
|  | General | 73 |
|  | Personal Hygiene | 73 |
|  | Control of Vermin | 74 |
|  | Housekeeping and Inspection | 74 - 75 |
|  | Prisoners' Quarters | 75 - 76 |
| VII | FOOD SERVICE | |
|  | Personnel | 78 |
|  | Kitchen Sanitation | 79 |
|  | Utensils | 79 |
|  | Feeding Prisoners | 79 - 81 |
| VIII | LOGISTICS | |
|  | Maintenance | 83 |
|  | Supply | 83 - 84 |
|  | Utilities | 84 |
| IX | EMERGENCY PLAN (RESTRICTED) | 85 - 106 |

Exhibit R

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STANLEY TYRONE JARRETT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:07-CV-911-MHT-TFM** |
| | ) | |
| CITY OF MONTGOMERY, et al., | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF WILLIE COLLINS

**STATE OF ALABAMA**          )

**COUNTY OF MONTGOMERY**   )

Before me, a Notary Public in and for said State and County, personally appeared Willie Collins and, after first being duly sworn by me, did depose and state as follows:

1.      My name is Willie Collins and I am over nineteen years of age.  I have first-hand knowledge of the facts contained herein and am competent to testify thereto.

2.      I am the Warden of the Montgomery Municipal Jail, and as Warden I oversee all aspects of Municipal Jail operations.

3.      The Montgomery Municipal Jail houses thousands of municipal inmates each year, and we do not have adequate resources to give each inmate his own copy of our inmate handbook, however, a copy is provided in the cell blocks. We do, make copies available for any inmate that request an additional copy. I do not know what Mr. Jarrett is referring to when he claims "Jailers are holding Kangaroo Court, on inforcing [sic] the rules," however the jail does adhere to the due process clause which includes disciplinary hearings.

4.     The sheets and blankets are changed weekly, and inmates are given fresh towels at least three times per week, as required by our jail policy and procedures. Further, there are showers in Mr. Jarrett's cellblock, and nothing prevents him from showering at any time inmates are allowed to be out of their beds.

5.     There is no indication that diseases are spreading among the inmates any more than in any environment where a group of people live in close proximity to one another. By no means is there any sort of epidemic. Many of the inmates are sick when they come in. Inmates are evaluated and triaged by Jail nurses. Many are referred to local hospitals. Others are treated by our nurses or seen and treated by our doctor, who works at the Jail at least 2 days each week and is on call at all times. Any inmate who wants to see a doctor submits a written request. The Jail nurses triage the requests and prioritize them by severity. Then the doctor sees inmates in the order prioritized.

6.     Jarrett claims that his requests to see a doctor were ignored, but this is simply not true. His medical records reflect that he was seen on a number of occasions by the Jail doctor who treated him for his alleged injury.

7.     It is true that we do not maintain a legal library for municipal inmates.

8.     There are a limited number of jobs for inmates to work – in the kitchen and on various details, such as cleaning the jail hallway floors or cutting grass. These jobs are unpaid, but provide the inmate an opportunity to get out of the cell for a time. No inmate is entitled to work in these jobs and I, along with my staff, have discretionary authority to decide which inmates may work these jobs. We screen all candidates for these jobs for safety reasons, and do not allow, for instance, an inmate with domestic violence or weapons charges work on outside details. Mr. Jarrett's pending harassment

2

charge and medical history would have made him a risk and may have precluded him from being assigned to a detail. His requests to work were not denied because he was assisting other inmates with their legal pleadings, as he claims.

9.      Finally, it is true that the Montgomery Municipal Jail is overcrowded. Regular capacity is 272 inmates, and we have been housing approximately 370 at any given time for several months now, due to recent the crack down on crime. There are only 272 beds in the Jail, so it is true that a number of inmates must sleep on mattresses set on the floor, but every inmate has a mattress with sheets and blankets. This is the best we can do with the resources and space that we have for the number of inmates we house.

10.      I am familiar with inmate Stanley Jarrett, who has been in and out of the Montgomery Municipal Jail for decades, but I treat him exactly the same as every other inmate. I have no malice against Mr. Jarrett and have not done anything to violate his constitutional rights. Further, to the best of my knowledge, no one who works for me has violated Mr. Jarrett's constitutional rights.

**Further Affiant saith not.**

_____
Willie Collins, Warden
Montgomery Municipal Jail

SWORN to and SUBSCRIBED before me this the 27th day of November, 2007.

_____
Notary Public
My commission expires: _10/16/09_

3

# Exhibit S

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STANLEY TYRONE JARRETT, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:07-CV-911-MHT-TFM** |
| | ) | |
| CITY OF MONTGOMERY, et al., | ) | |
|     Defendants. | ) | |

### AFFIDAVIT OF MARY BRANTLEY

STATE OF ALABAMA       )

COUNTY OF MONTGOMERY   )

Before me, a Notary Public in and for said State and County, personally appeared Mary Brantley and, after first being duly sworn by me, did depose and state as follows:

1.     My name is Mary Brantley. I am over nineteen years of age. I have been employed with the City of Montgomery since 1978. I am the Assistant Warden of the Montgomery Municipal Jail. It is in that capacity that I make this Affidavit.

2.     We require inmates to take at least two showers per week, and encourage them to shower daily. We require inmates to stay reasonably close shaven at all times. Clothing is exchanged for clean clothing at least once per week, and more often if necessary.

3.     Inmate living quarters are cleaned regularly. Toilets and shower stalls are cleaned daily with hot, soapy water and scouring powder. The top of every mattress is cleared off daily and wiped with a clean dust cloth. All beds are washed weekly with hot soapy water, by removing the mattresses aside. Every inmate is issued a mattress, and additional mattresses may be authorized for medical reasons. We issue fresh towels to

inmates at least three times per week and we change out the blankets and sheets at least once a week.

4.    The common areas in the jail are also cleaned regularly, usually by inmate details. All floors are swept and mopped with hot, soapy water at least once daily, and more often if necessary. Trash containers are emptied as often as necessary, and are cleaned with hot, soapy water at least once daily and more often if necessary. All bars are wiped down and cleaned with hot, soapy water at least once a week. Walls are washed monthly, and wooden surfaces like doors are cleaned weekly. Mops, scrub brushes, and mop buckets are thoroughly washed and rinsed after each use.

5.    Cellblock 3-B has its own shower area that is available to inmates any time they are permitted to be out of their beds. The shower in 3-B has not been out of order, as Jarrett claims. We do not pass out towels daily, but inmates keep their towels until they are issued fresh ones so they always have a towel. Hygiene packets with soap and tissue are issued every other night.

6.    As Assistant Warden, I would be informed by our medical staff if disease was spreading among inmates to an unusual extent. I have not been so informed, nor have I personally observed an unusual level of sickness among the inmate population.

7.    We do not issue inmates their own copy of our Standard Operating Procedure Manual, because it is over 100 pages long and we cannot afford the cost of making copies for every inmate. All Jail employees, including the Warden, are required to follow the Standard Operating Procedure Manual.

8.    I have reviewed Stanley Jarrett's file, and the only time I was made aware of an incident where another inmate jumped off the top bunk onto Jarrett's back, was

2

when he reported it to the doctor. Jarrett was seen by Dr. Mendez and treated for back pain on September 25, 2007, which was only 12 days after he was placed in the Jail. We do not ignore inmate requests for medical care. Jail nurses triage all requests for medical care and prioritize them by seriousness of the reported medical issues.

9.    We are over capacity and some of our inmates are sleeping on mattresses on the floor. It is true that many of our municipal inmates are incarcerated for not paying their traffic fines, but we must comply with the orders of Municipal Court and the laws that govern municipal inmates. The Jail does not decide who is incarcerated and who can be released.

10.    In addition to municipal inmates, we house a number of federal inmates. We are required to provide legal reference materials to the federal inmates, but we do not maintain legal reference materials for the municipal inmates, none of whom are charged with felonies.

11.    We have more volunteers than positions, so not every volunteer gets to work outside his or her cell. Inmates are not entitled to work outside their cells. Our kitchen supervisor is the final decision maker regarding which inmates will work for her in the kitchen, subject to our Standard Operating Procedures. Our Standard Operating Procedures prohibit any sick inmate from working in the kitchen.

12.    Finally, it is true that the Jail is overcrowded. Some inmates must sleep on mattresses set on the floor, but every inmate has his or her own mattress with sheets and blankets. This is the best we can do with the resources and space that we have.

13.    I am familiar with inmate Stanley Jarrett, who has been incarcerated in our Jail many times before. I have no malice against Jarrett personally, and have not done

anything to violate his constitutional rights. Further, to the best of my knowledge, no one

who works for me has violated Jarrett's constitutional rights. I do not treat Stanley Jarrett

differently than I treat any other inmate.

**Further Affiant saith not.**

Mary Brantley, Assistant Warden
Montgomery Municipal Jail

SWORN to and SUBSCRIBED before me this the _10th_ day of December, 2007.

Notary Public
My commission expires: _March 17, 2009_

4

Exhibit T

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

STANLEY TYRONE JARRETT,      )
      Plaintiff,                  )
                             )

v.                            )      Case No. **2:07-CV-911-MHT-TFM**
                             )

CITY OF MONTGOMERY, et al.,     )
      Defendants.              )

### AFFIDAVIT OF MARIE JENKINS

STATE OF ALABAMA         )

COUNTY OF MONTGOMERY   )

     Before me, a Notary Public in and for said State and County, personally appeared Marie Jenkins and, after first being duly sworn by me, did depose and state as follows:

     1.     My name is Marie Jenkins. I am over nineteen years of age. I am currently employed with the City of Montgomery as a Municipal Jail Corrections Officer. I have been employed as a Municipal Jail Corrections Officer for the City of Montgomery for approximately 18 years.

     2.     Inmates may volunteer to work in the kitchen or on various details, such as cleaning the jail hallway floors or cutting grass. As a Corrections Officer, one of my duties is to put together work details, by picking which inmates will work on which projects.

     3.     Stanley Jarrett applied to work in the kitchen, but was not given a job. Jarrett claims that I told him the reason he was not given the kitchen job is because he had "come back with that shit." I did not say that and I do not know what it means.

4.    Stanley Jarrett has not been "blackballed" from working details. I consider a number of factors when putting together a crew for a detail, to include personality, medical issues, safety and whether the crew is likely to come in contact with the public. It is in my discretion to choose the people I think will work well together and do a good job on the task at hand.

5.    I am familiar with inmate Stanley Jarrett, and I treat him the same as I treat every other inmate. I have no malice against Jarrett and have not done anything to violate his constitutional rights.

**Further Affiant saith not.**

Officer Marie Jenkins
Montgomery Municipal Jail

SWORN to and SUBSCRIBED before me this the _10th_ day of December, 2007.

Notary Public
My commission expires: March 17, 2009

2

Exhibit U

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **STANLEY TYRONE JARRETT,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:07-CV-911-MHT-TFM** |
| | ) | |
| **CITY OF MONTGOMERY**, et al., | ) | |
| Defendants. | ) | |

### AFFIDAVIT OF HELEN M. TURNER

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **COUNTY OF MONTGOMERY** | ) |

Before me, a Notary Public in and for said State and County, personally appeared Helen M. Turner and, after first being duly sworn by me, did depose and state as follows:

1.    My name is Helen M. Turner and I am over nineteen years of age.  I have first-hand knowledge of the facts contained herein and am competent to testify thereto.

2.    I am the Kitchen Supervisor for the Montgomery Municipal Jail, where I have worked for 21 years. As Kitchen Supervisor, I oversee all aspects of the Municipal Jail kitchen, including which inmates work for me there.

3.    I did receive a note from Stanley Jarrett, saying that he wanted to work in the kitchen, but Mr. Jarrett is listed on the medical list as someone who needs a bland diet.

4.    I do not allow people on the sick list to work in the kitchen because their medical problems could cause them to be a danger to themselves or others. For instance, a sick person could pass along infections through the food or be taking medications that

make it dangerous for them to work in the kitchen, or they might have access to, and eat, food they are not supposed to have.

5.     Even aside from the sick list, there are only a limited number of positions for inmates to work in the kitchen, so not everyone who applies can be given a kitchen job. I am the only person with authority to decide who works in my kitchen, and I do my best to be fair when I exercise my discretionary authority in matching inmates with jobs. The medical staff cannot authorize an inmate to work in the kitchen.

6.     I do not know Mr. Jarrett. In fact, my only information about him came from his note asking for a job in the kitchen and from the sick list, which showed that he needed a special bland diet. I have nothing against Mr. Jarrett, and did not deny his request to work for me out of malice or to retaliate against him for any reason. I have not violated Mr. Jarrett's constitutional rights.

**Further Affiant saith not.**

Helen M. Turner, Kitchen Supervisor
Montgomery Municipal Jail

SWORN to and SUBSCRIBED before me this the 27th day of November, 2007.

Notary Public
My commission expires: 10/16/09

2